## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE
805 15th Street N.W.
Washington, D.C. 20005,

*Plaintiff*,                                             Case No.

vs.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20405,

and

U.S. DEPARTMENT OF HOMELAND SECURITY
245 Murray Lane, S.W.
Washington, D.C. 20528,

and

U.S. SOCIAL SECURITY ADMINISTRATION
6401 Security Boulevard
Baltimore, MD 21235,

*Defendants*.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Common Cause, hereby sues Defendants, Presidential Advisory

Commission on Election Integrity ("PACEI" or the "Commission"), the U.S. Department

of Homeland Security ("DHS"), and the U.S. Social Security Administration ("SSA"),

and alleges as follows.

### Introduction

1.      This is an action under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(7), and the

Administrative Procedure Act (APA), 5 U.S.C. § 706, to halt the unlawful collection,

maintenance, use, and dissemination of the sensitive and personal voting data of millions of Americans by the Commission.

2.      In the wake of the Watergate scandal and revelations that the White House had compiled information on individuals with opposing political viewpoints, Congress passed the Privacy Act to regulate the collection, maintenance, use, and dissemination of sensitive personal information by federal agencies.  Among other safeguards, the Act proscribes the collection of information that "describ[es] how any individual exercises rights guaranteed by the First Amendment."  5 U.S.C. § 552a(e)(7).

3.      After campaigning on unsubstantiated claims of voter fraud and rigged elections, President Donald J. Trump asserted that he "won the popular vote if you deduct the millions of people who voted illegally."  Within days of his inauguration, President Trump called for "a major investigation into VOTER FRAUD."

4.      The Commission was created with the aim of examining this purported voter fraud and has opened a broad and unprecedented investigation into Americans' voting habits and political affiliations.  The Commission's first project is to assemble a national voter file and compare this information to data sets maintained by other federal agencies (including the Department of Homeland Security and the Social Security Administration) in order to discover the names of individuals that it believes are ineligible to vote.  To carry out this review, it initially gave all 50 states and the District of Columbia a deadline of July 14, 2017 to comply with a sweeping request for their residents' voting and other personal data, including information regarding the quintessentially First Amendment-protected activities of voting history and party affiliation.

5.      The Commission initially sought to have states upload the voting data to a Department of Defense website, from which the data would then be transferred to White House computers.  But after the Court in a separate lawsuit filed against the Commission inquired of the Government if the Department of Defense should be joined as a defendant, the Commission abruptly shifted course to "repurpos[e]" a computer system within the White House's Information Technology "enterprise" to collect, maintain, and use the data.  *See Elect. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-1320 (CKK) (D.D.C.) (EPIC lawsuit).  And when asked by the Court to describe the involvement of other federal agencies in this enterprise, the Government stated that the "mechanics" of it were "something that may not be appropriate to say in a public setting."  *See id.*

6.      The Privacy Act's protections—designed to curb this very type of encroachment on citizens' First Amendment activities by an earlier White House—cannot be so circumvented.  The Commission's collection, maintenance, and use of this data in cooperation with DHS and SSA, among other federal agencies either within or outside the White House,[1] violates both the Privacy Act and the APA.  Plaintiff therefore seeks to enjoin Defendants from collecting, maintaining, using, or disseminating this data and to destroy or return any such data that has already been collected and is being maintained in violation of the law.

---

[1] Plaintiff intends to seek discovery from the federal defendants and third-parties, if necessary, to determine whether additional agencies should be added as defendants based on their activities with regard to the electronic databases described herein.  *Bailey v. U.S. Marshal Serv.*, 584 F. Supp. 2d 128, 134 (D.D.C. 2008) ("[I]t is generally proper to allow discovery to determine the identity of unknown defendants.").

## Parties

7.      Plaintiff, Common Cause, is a nonprofit corporation organized and existing under the laws of the District of Columbia.  Common Cause is one of the nation's leading democracy reform organizations and has over 900,000 members nationwide. Common Cause also has a strong presence in 30 states, with either staff or volunteer boards.  Since its founding in 1970, Common Cause has been dedicated to the promotion and protection of the democratic process, such as the right of all citizens, including its eligible members, to be registered for and vote in fair, open, and honest elections.  Common Cause brings this action on behalf of itself and its members.

8.      Common Cause conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered to vote and have their ballots counted as cast.  Common Cause also advocates for policies, practices, and legislation – such as automatic and same-day registration – that facilitate voting for eligible voters and ensure against disenfranchisement.  Common Cause opposes efforts that burden registration and/or voting, including restrictive voter identification laws, partisan gerrymandering, and any other effort that could potentially chill citizens' rights to register or stay registered.  Common Cause advocates the safeguarding of personal information, in keeping with the dictates of both state and federal law.

9.      Common Cause and its members have been and will be injured by the Defendants' activities, including the efforts to obtain personal and private information regarding voter affiliation, vote history, and other related details.  Common Cause has already expended staff time and resources to engage in non-litigation related outreach and communications efforts to oppose the impermissible collection of voter information as

sought by the Commission, diverting resources from its core activities.  These expenditures are aimed at counteracting the harm that the Commission's impermissible attempt to collect voter information will cause to Common Cause's mission of encouraging and facilitating voter participation and engagement.

10.    The Commission's attempt to collect voter information will also harm Common Cause's and its members' efforts to encourage voter registration and participation.  For voters and prospective voters facing political polarization, the threat that the federal government will monitor their electoral participation and even their party affiliations is deeply troubling and has deterred and will continue to deter the exercise of their First Amendment-protected rights to express their views through the ballot box.  Further, the Commission's effort to collect voter information may cause registrants and voters, including Common Cause members, to cancel their registration status (as has already occurred in Florida and Colorado) or forgo registering and voting altogether.  Such actions would directly undo the work to which Common Cause has devoted itself over the past few decades and would limit voter engagement and participation in our democracy.

11.    Defendant PACEI is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1) and 5 U.S.C. § 551(1) that is headquartered in Washington, D.C.

12.    Defendant U.S. Department of Homeland Security is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1) and 5 U.S.C. § 551(1) that is headquartered in Washington, D.C.

13.     Defendant U.S. Social Security Administration is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1) and 5 U.S.C. § 551(1) that is headquartered in Baltimore, MD.

### Jurisdiction and Venue

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Privacy Act, 5 U.S.C. § 552a(e)(7), and the APA, 5 U.S.C. §§ 701-706.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

### Factual Allegations

*Candidate Donald J. Trump's Repeated, Unsubstantiated Claims of Voter Fraud*

16.     Prior to his election, then-presidential candidate Donald J. Trump repeatedly made unsubstantiated assertions of voter fraud.

17.     On October 10, 2016, Candidate Trump tweeted that, "Of course there is large scale voter fraud happening on and before election day." @realDonaldTrump, Twitter (Oct. 10, 2016, 8:33 AM), *available at* https://twitter.com/realdonaldtrump/ status/787995025527410688?lang=en.

18.     On October 17, 2016, candidate Trump told supporters at a campaign rally in Wisconsin that "voter fraud is very, very common," including voting by "people that have died 10 years ago" and "illegal immigrants."  C-SPAN, *Donald Trump Campaign Event in Green Bay, Wisconsin* (Oct. 17, 2016), *available at* https://www.c-span.org/ video/?417019-1/donald-trump-campaigns-green-bay-wisconsin.

19.     On November 8, 2016, Donald J. Trump was elected as the forty-fifth president of the United States.

20.     On November 27, 2016, president-elect Trump tweeted that, "In addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally."  @realDonaldTrump, Twitter (Nov. 27, 2016, 3:30 PM), *available at* https://twitter.com/realdonaldtrump/status/ 802972944532209664.

21.     Three days later, Kansas Secretary of State Kris W. Kobach echoed the president-elect's assertion, telling reporters that, "I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton."  Hunter Woodall, *Kris Kobach Agrees With Donald Trump That 'Millions' Voted Illegally But Offers No Evidence*, Kansas City Star (Nov. 30, 2016), *available at* http://www.kansascity.com/news/politics-government/ article117957143.html.

22.     Asked in a televised interview on December 2, 2016 about president-elect Trump's claim that "millions of people voted illegally," Trump senior adviser Kellyanne Conway said that she has "been receiving information about the irregularities and about the illegal votes, particularly from sources, officials like Kris Kobach."  Emily Shapiro, *Kellyanne Conway Dodges Question on Trump's Claim That 'Millions' Voted Illegally*, ABC News (Dec. 2, 2016), *available at* http://abcnews.go.com/Politics/ kellyanne-conway-dodges-question-trumps-claim-millions-voted/story?id=43924056.

*Creation of the Presidential Advisory Commission on Election Integrity*

23.     On January 20, 2017, Donald J. Trump was inaugurated as President of the United States.

24.     Five days later, President Trump tweeted on his official Twitter account: "I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and even, those registered to vote who are dead (and many for a long time).  Depending on results, we will strengthen up voting procedures!" @realDonaldTrump, Twitter (Jan. 25, 2017, 7:10 AM and 7:13 AM), *available at* https://twitter.com/realDonaldTrump/status/824227824903090176 and https://twitter.com/realdonaldtrump/status/824228768227217408?lang=en.

25.     In a televised interview on January 25, 2017, President Trump reiterated his claims that allegedly fraudulent votes were cast for his opponent:  "We're gonna launch an investigation to find out. And then the next time—and I will say this, of those votes cast, none of 'em come to me. None of 'em come to me. They would all be for the other side. None of 'em come to me. But when you look at the people that are registered: dead, illegal and two states and some cases maybe three states—we have a lot to look into."  He vowed to "make sure it doesn't happen again." *TRANSCRIPT: ABC News anchor David Muir interviews President Trump,* ABC News (Jan. 25, 2017), *available at* http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

26.     That same day, CNN reported that according to a senior administration official, "President Donald Trump could sign an executive order or presidential memorandum initiating an investigation into voter fraud as early as Thursday." Dan Merica, Eric Bradner, and Jim Acosta, *Trump considers executive order on voter fraud*, CNN (Jan. 25,

2017), *available at* http://www.cnn.com/2017/01/25/politics/trump-calls-for-major-investigation-into-voter-fraud/index.html.  The official further informed CNN that "[t]he investigation would be carried out through the Department of Justice."  *Id.*

27.     On May 11, 2017, the White House issued Executive Order No. 13,799 establishing the Commission, which President Trump has described as a "Voter Fraud Panel."  *See* Executive Order No. 13,799, 82 Fed. Reg. 22389 (May 11, 2017); @realDonaldTrump, Twitter (July 1, 2017, 9:07 AM) *available at*  https://twitter.com/realdonaldtrump/status/881137079958241280.

28.     The Commission's stated "mission" is studying, "consistent with applicable law," the "registration and voting processes used in Federal elections." *Id.*

29.     The Commission is chaired by Vice President Michael Pence and is to be composed of up to 15 additional members having knowledge and experience in "elections, election management, election fraud detection and voter integrity efforts" or having "knowledge or experience that the President determines to be of value to the Commission." *Id.*

30.     On the same day that the Commission was established, Kansas Secretary of State Kobach was appointed as a member and Vice Chair.  Kobach is the only Secretary of State in the nation with the power to prosecute voter fraud directly.  *See Interview of Kris W. Kobach on Fox News Channel* (May 11, 2017), *available at* https://www.youtube.com/watch?v=Fm0MjHmYSJU.

31.     The Commission presently has ten additional members, consisting of a current member of the United States Elections Assistance Commission, present and former state

officials, and an employee of the Heritage Foundation. It will also have a staff of approximately three full-time equivalent employees.

32. The Executive Order directs "relevant" executive departments and agencies to "endeavor to cooperate with the Commission." Executive Order No. 13799, 82 Fed. Reg. 22389 (May 11, 2017).

33. The Commission's estimated annual operating costs for Fiscal Years 2017 and 2018 are approximately $250,000.

34. Consistent with President Trump's description of the Commission as a voter fraud panel, Kobach has described the Commission's focus as "voter fraud more broadly, all forms of it," *see* Gary Moore, *Tucker Carlson: Kris Kobach - Trump Executive Order Creates Voter Fraud Commission: 5/11/2017*, YouTube (May 11, 2017), *available at* https://www.youtube.com/watch?v=Fm0MjHmYSJU, and has explained that the Commission's "goal is to, for the first time, have a nationwide fact-finding effort, to see what evidence there is of different forms of voter fraud across the country." *See Transcript of Interview of Kris W. Kobach on New Day,* CNN (May 15, 2017), *available at* http://www.cnn.com/TRANSCRIPTS/1705/15/nday.06.html.

35. Asked how the Commission would prove President Trump's unsubstantiated claims of widespread voter fraud, Kobach explained that, "The federal government has a database of every known alien who has a greencard or a temporary visa. States have in the past asked, 'can we please run our voter rolls against that database, and see if any of those aliens are on our voter rolls?' The federal government has always said no. Well, now we're going to be able to run that database against one or two states and see how many people are known aliens residing in the United States and also on the voter rolls."

Gary Moore, *Tucker Carlson: Kris Kobach - Trump Executive Order Creates Voter Fraud Commission: 5/11/2017*, YouTube (May 11, 2017), *available at* https://www. youtube.com/watch?v=Fm0MjHmYSJU.

36.     Describing in further detail which other agencies' data the Commission would be working with on its voter fraud investigation, Kobach explained that "what we'll be doing is for the first time in our country's history, we'll be gathering data from all 50 states and we'll be using the federal government's databases which can been very valuable. The Social Security Administration has data on people when they pass away. The Department of Homeland Security knows of the millions of aliens who are in the United States legally and that data that's never been bounced against the state's voter rolls to see whether these people are registered." *Kobach talks goals of new voter fraud commission*, Fox News, Sunday Morning Futures (May 14, 2017), *available at* http://www.foxnews.com/transcript/2017/05/14/kobach-talks-goals-new-voter-fraud-commission-commerce-secretary-on-nkorea-missile-test-china-trade-deal.html.

   *The Commission's Sweeping and Unprecedented Request for Personal and Voter Data*

37.     Despite the Executive Order's directive that the Commission hold public meetings, it convened as a group for the first time on June 28, 2017 without any prior public notice.  A brief "readout" of the meeting supplied by the White House later that day stated Kobach had informed the other commissioners that a letter would be sent to all 50 states and the District of Columbia requesting data from state voter rolls. *See* Press Release, The White House, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017), *available at* https://

www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election.

38.     On June 28, 2017, Kobach "directed" that a letter be sent under his signature to the Secretaries of State or other election officials in all 50 states and the District of Columbia.  Declaration of Kris W. Kobach ¶ 4 (July 5, 2017). The other commissioners neither reviewed nor vetted the actual language of the letter before it was sent.  Sam Levine, *Trump Voter Fraud Commission Was Cautioned About Seeking Sensitive Voter Information*, Huffington Post (July 5, 2017), *available at* http://www.huffingtonpost.com/entry/trump-voter-fraud-commission_us_595d511fe4b02e9bdb0a073d; Celeste Katz, *Trump election integrity commission member: "We should have predicted" the backlash*, Mic (July 5, 2017), *available at* https://mic.com/articles/181510/trump-election-integrity-commission-member-we-should-have-predicted-the-backlash#.oeqOZx3hl.

39.     Kobach's letter "invite[d]" state officials, among other things, to share "evidence or information . . . you have regarding instances of voter fraud or registration fraud in your state" and asked *how* the Commission could "support" state election officials "with regard to information technology security and vulnerabilities."  *See*, *e.g*., Letter from Kris W. Kobach, Vice Chair, PACEI to the Honorable Matt Dunlap Secretary of State of Maine, at 1 (June 28, 2017).

40.     The letter requested that the recipients provide by July 14, 2017 "the publicly available voter roll data for [your state], including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006

onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id.* at 1-2.

41.     The letter instructed recipients to "submit your responses electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ("SAFE"), which is a secure FTP site the federal government uses for transferring large data files.  You can access the SAFE site at https://safe.amrdec.army.mil/safe/ Welcome.aspx." *Id.* at 2.

42.     The letter closed by warning that "any documents that are submitted to the full Commission will also be made available to the public." *Id.*

43.     After reports indicated that certain state officials might decline to provide some or all of the personal and voter data requested by Kobach, President Trump tweeted: "Numerous states are refusing to give information to the very distinguished VOTER FRAUD PANEL. What are they trying to hide?" @realDonaldTrump, Twitter (July 1, 2017, 9:07 AM) *available at* https://twitter.com/realdonaldtrump/status/ 881137079958241280.

44.     Kobach has stated that the purpose of his request is "to have the best data possible" to support the Commission's "purpose . . . to quantify different forms of voter fraud and registration fraud and offer solutions."  Bryan Lowry, *Kris Kobach Wants Every U.S. Voter's Personal Information for Trump's Commission*, Kansas City Star (June 29, 2017), *available at* http://www.kansascity.com/news/politics-government/ article158871959.html.

45.    The Vice President's office has confirmed that the Commission intends to run the data it receives "through a number of different databases" to check for potential fraudulent registration.  Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), *available at* https://www.propublica.org/article/election-experts-see-flaws-trump-voter-commissions-plan-to-smoke-out-fraud.

46.    The same day that Kobach sent his letter, the Voting Section of the Civil Rights Division of the Department of Justice ("DOJ") sent its own letter to states requesting their procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act.  DOJ stated that under the NVRA states must make reasonable efforts to remove from voter rolls the names of voters who have become ineligible by reason of death or change of address.  DOJ requested that states provide their policies for removing ineligible voters and identify the officials responsible for doing so.  *See, e.g.*, Letter from DOJ to Hon. Kim Westbrook Strach, Executive Director, N.C. State Bd. of Elections (June 28, 2017).

            *The Commission Shifts Its Plans to House the Personal and Voting Data*

47.    In a declaration filed on July 5, 2017 in the EPIC lawsuit against the Commission for failure to comply with federal privacy laws, Kobach stated that he "intended" that only "narrative responses" provided in response to the letter be sent to the eop.gov email address in the letter and that "voter roll data" be uploaded onto the Safe Access File Exchange (SAFE), which he described as a "tested and reliable method of secure file transfer used routinely by the military for large, unclassified data sets" that "also supports encryption by individual users."  Declaration of Kris W. Kobach ¶ 4.

48.     The SAFE website is operated by the U.S. Army Aviation and Missile Research

Development and Engineering Center, a component within the U.S. Army.

49.     After the Court in the EPIC lawsuit inquired at a July 7, 2017 hearing if the

Department of Defense, by virtue of its role in collecting and maintaining the data on the

SAFE website, should be joined as a defendant the Commission changed course on its

storage plans.  In a subsequent declaration filed on July 10, 2017, Kobach stated that "[i]n

order not to impact the ability of other customers to use" SAFE, the Director of White

House Information Technology was "repurposing an existing system" to collect the

information "within the White House Information Technology enterprise."  Third

Declaration of Kris W. Kobach ¶ 1.

50.     Asked by the Court at the same July 7 hearing what other federal agencies support

the White House's computer system, the Government stated that the "mechanics" of the

White House's information technology program are "something that may not be

appropriate to say in a public setting."  Transcript, Temporary Restraining Order Hearing

in *Elect. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 1:17-

cv-1320 (CKK) (D.D.C.) (July 7, 2017).

                *Several States Intend to Provide Voter History and Party Affiliation Data*

51.     As of July 5, 2017, "20 states have agreed to provide the publicly available

information requested by the Commission and another 16 states are reviewing which

information can be released under their state laws."  Press Release, The White House,

Statement from Kris Kobach, Kansas Secretary of State and Vice Chair of the

Presidential Advisory Commission on Election Integrity (July 5, 2017) *available at*

https://www.whitehouse.gov/the-press-office/2017/07/05/statement-kris-kobach-

kansas-secretary-state-and-vice-chair-presidential.

52.     The State of Arkansas had provided the Commission voter history and party

affiliation through the SAFE website.  In light of the pending motion for a temporary

restraining order in the EPIC lawsuit, the Commission advised the Court that the

Arkansas data would not be downloaded to White House computers and would be

deleted from the SAFE website.

53.     Several states intend to provide the Commission with voter history and party

affiliation data.  This group includes Arkansas, Colorado, Florida, North Carolina, and

Ohio.  *See*, *e.g.*, "Arkansas to give partial voter information to Voter Integrity

Commission," 40/29 NEWS (July 5, 2017), *available at* http://www.4029tv.com/

article/arkansas-to-give-partial-voter-information-to-voter-integrity-commission/

10261303; "News Release: Secretary Williams' Response to request for public voter

files," COLORADO SECRETARY OF STATE (June 29, 2017), *available*

*at* https://content.govdelivery.com/accounts/COSOS/bulletins/1a66cee; Ltr from Ken

Detzner, Florida Secretary of State to Kris W. Kobach (July 6, 2017), *available*

*at* http://www.politico.com/states/f/?id=0000015d-19cb-d1a7-a95d-

5bcf970e0001; *Request Voter Registration Data*, SUPERVISOR OF ELECTIONS, BREVARD

COUNTY *available at* http://www.votebrevard.com/statistics-and-data/request-voter-

registration-data; North Carolina: *Q&A: Election Integrity Commission's Data*

*Request*, NORTH CAROLINA STATE BOARD OF ELECTIONS AND ETHICS

ENFORCEMENT (July 10, 2017), *available at* https://s3.amazonaws.com/dl.ncsbe.

gov/Requests/QA_Election_Integrity_Commission_Request.pdf; *Statement from*

*Secretary Husted*, OHIO SECRETARY OF STATE (June 30, 2017), *available*

*at* http://www.sos.state.oh.us/sos/mediaCenter/2017/2017-06-30-a.aspx; Dana Branham,

"Ohio's Jon Husted to Trump election commission: We won't turn over confidential

voter info," CINCINNATI.COM (June 30, 2017), *available at* http://www.cincinnati

.com/story/news/2017/06/30/kentucky-refuses-federal-request-voter-roll-data-while-ohio-

mulls-over/442492001/.

54.      The Commission has directed states not to provide the requested voter data

while the motion for a temporary restraining order is pending in the EPIC lawsuit.

*The Privacy Act*

55.      The Privacy Act of 1974 regulates the government's collection, maintenance, use,

and dissemination of sensitive personal information.

56.      Congress, which passed the Act following revelations during Watergate that the

White House had collected information on its political adversaries, was "concerned with

curbing the illegal surveillance and investigation of individuals by federal agencies that

had been exposed during the Watergate scandal." Department of Justice, Overview of the

Privacy Act of 1974 (2015 edition), *available at* https://www.justice.gov/opcl/policy-

objectives.

57.      Section 552a(e)(7) of the Act provides that an agency shall "maintain no record

describing how any individual exercises rights guaranteed by the First Amendment unless

expressly authorized by statute or by the individual about whom the record is maintained

or unless pertinent to and within the scope of an authorized law enforcement activity."

58.      As the D.C. Circuit has explained: "The legislative history of the Act reveals

Congress' own special concern for the protection of First Amendment rights, as borne out

by statements regarding 'the preferred status which the Committee intends managers of information technology to accord to information touching areas protected by the First Amendment of the Constitution.'"  *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980) (citing S. Rep. No. 1183, 93d Cong., 2d Sess., reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 6916, 6971.)).  That same legislative history also "reveals a concern for unwarranted collection of information as a distinct harm in and of itself."  *Id.* In particular, Congress directed Section 552a(e)(7) at "inquiries made for research or statistical purposes which, even though they may be accompanied by sincere pledges of confidentiality are, by the very fact that government make (sic) the inquiry, infringing on zones of personal privacy which should be exempted from unwarranted Federal inquiry." *Id.* (citing S. Rep. No. 1183, (1974) U.S. Code Cong. & Admin. News at 6971-72)).

59.      The initial implementation guidelines for the Act promulgated by the Office of Management and Budget (OMB) underscore the special status accorded by the Act to records concerning individuals' First Amendment-protected activities.  According to OMB's guidelines, Section 552a(e)(7) established a "rigorous standard governing the maintenance of records regarding the exercise of First Amendment rights," including "political beliefs" and "freedom of assembly," and asked agencies to "apply the broadest reasonable interpretation" in determining whether a particular activity is protected by Section 552a(e)(7).  OMB, Responsibilities for the Maintenance of Records About Individuals by Federal Agencies, 40 Fed. Reg. 28,948, 28,965 (July 9, 1975).

60.      Accordingly, the D.C. Circuit has held that an agency "may not so much as collect information about an individual's exercise of First Amendment rights except under very circumscribed conditions" and that Section 552a(e)(7) applies regardless

whether a record is maintained in an agency's system of records. *Albright*, 631 F.2d at 919.

61.     The Privacy Act incorporates the definition of "agency" found in the Freedom of Information Act, *id.* § 552a(a)(1), which in turn defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *Id.* § 552(f).

62.     The Commission is an agency. In cooperation with an as-yet-unknown number of other federal agencies, the Commission will function as a federal investigative body with a dedicated staff and budget to conduct a widescale and first-of-its-kind investigation into alleged voter fraud.  Presently, the Commission is amassing the personal and voting data of millions of American citizens and will cross-check this information against databases maintained by other federal agencies, including the Department of Homeland Security and the Social Security Administration, to identify and ultimately have removed individuals whom it believes have fraudulently registered to vote.

63.     The Commission's functions and actions therefore go well beyond solely advising and assisting the President, and its structure shows that it is self-contained, is not operationally close to the President, and exercises substantial independent authority.

## Claims for Relief

### Count One (Violation of 5 U.S.C. § 552a(e)(7))

64.     Plaintiff hereby realleges all allegations in the above paragraphs as if fully set forth herein.

65.     Section 552a(e)(7) of the Privacy Act provides that an agency shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."

66.     The Privacy Act defines "maintain" to include "maintain, collect, use, or disseminate."  5 U.S.C. § 552a(a)(3).

67.     Through the collection, maintenance, use, and/or dissemination of data on individuals' voter history and party affiliation, activity that is protected by the First Amendment, Defendants have violated, and will violate, Section 552a(e)(7).

68.     The collection, maintenance, use, and/or dissemination of these records was not within the scope of a valid law enforcement activity.

69.     Defendants' violation has caused and continues to cause ongoing harm to Plaintiff.

**Count Two (Violation of APA – Arbitrary and Capricious Action)**

70.     Plaintiff hereby realleges all allegations in the above paragraphs as if fully set forth herein.

71.     In collecting, maintaining, using, and/or disseminating data on individuals' voter history and party affiliation, activity that is protected by the First Amendment, in violation of 5 U.S.C. § 552a(e)(7), Defendants have acted arbitrarily, capriciously, in excess of statutory jurisdiction and authority, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706.

**<u>Prayer for Relief</u>**

WHEREFORE, plaintiff pray that this Court:

1.      Declare that Defendants' collection, maintenance, use, and dissemination of
voter history and party affiliation data violates the Privacy Act and the APA;

2.      Enjoin Defendants from the collection, maintenance, use, and dissemination
of voter history and party affiliation data;

3.      Order Defendants to provide an accounting of all voter history and party
affiliation data in its custody, possession, or control; all copies that have been
made of that data; all persons and agencies with whom Defendants have
shared that data; and all uses that have been made of that data;

4.      Order Defendants to return to any supplying State all voter history and party
affiliation data received from that state or otherwise securely delete such data;
and

5.      Award Plaintiff its costs and reasonable attorneys' fees incurred in this action;
and

6.      Grant such other relief as the Court may deem just and proper.

Dated: July 14, 2017                          Respectfully submitted,

                                              /s/ *Javier Guzman*

                                              Javier M. Guzman
                                              (D.C. Bar No. 462679)
                                              Karianne M. Jones (*pro hac vice motion
                                              to be filed*)*
                                              Democracy Forward Foundation
                                              P.O. Box 34553
                                              Washington, D.C. 20043
                                              (202) 448-9090
                                              jguzman@democracyforward.org
                                              kjones@democracyforward.org

                                              *Admitted in the State of Minnesota;
                                              practicing under the supervision of firm
                                              principals.