# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMON CAUSE,<br>*Plaintiff*,<br><br>v.<br><br>PRESIDENTIAL ADVISORY COMMITTEE ON ELECTION INTEGRITY,<br><br>and<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>and<br><br>U.S. SOCIAL SECURITY ADMINISTRATION<br>*Defendants*. | Case No. 1:17-cv-01398 (RCL) |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................... 1

BACKGROUND .............................................................................................................. 4

I.      Statutory Framework ............................................................................................ 4

II.     Factual Background ............................................................................................... 5

       A.     President Trump's Unsubstantiated Claims of Voter Fraud ................................ 5

       B.     Creation of the Presidential Advisory Commission on Election Integrity ............ 7

       C.     The Commission's Sweeping and Unprecedented Request for Voter Data ......... 9

       D.     The Broadening Scope of the Commission's Investigation ............................... 11

       E.     The Commission Shifts Its Plans to Maintain the Personal and Voting Data ................................................................................................................ 12

       F.     The Commission's Renewed Request for First Amendment-Protected Voter Data and "New Tool" for Data Collection ................................................ 14

       G.    The Irreparable Harm to Plaintiff and its Members from the Commission's Request for Voter Data .................................................................................. 16

STANDARD OF REVIEW .......................................................................................... 17

ARGUMENT ................................................................................................................ 18

I.      Common Cause Has a Likelihood of Success on the Merits ........................... 18

       A.     The Commission is an "Agency" under the Privacy Act ................................... 18

       B.     Defendants Seek to Maintain Records Describing How Individuals Exercise Rights Guaranteed by the First Amendment. ...................................... 28

II.     Plaintiff Will Suffer Irreparable Harm Absent a Preliminary Injunction ....................... 30

III.    A Temporary Restraining Order Will Not Substantially Injure Other Interested Parties ......................................................................................................... 32

IV.    The Public Interest Favors a Temporary Restraining Order ........................... 32

V.     Common Cause Has Standing ....................................................................... 33

# TABLE OF AUTHORITIES

CASES

*Abigail All. For Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) .............................................................33

*Albright v. U.S.*,
    631 F.2d 915 (D.C. Cir. 1980) ...................................................5, 29, 30, 31, 34

*Am. Civil Liberties Union v. Trump*,
    No. 17-1351 (D.D.C. July 13, 2017).............................................................9, 27

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
    339 U.S. 382 (1950).............................................................28

*Armstrong v. Exec. Office of the President*,
    90 F.3d 553 (D.C. Cir. 1996) .............................................................20, 22, 26, 27

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F.Supp.2d 1 (D.D.C. 2009) .............................................................17, 31

*Camreta v. Greene*,
    563 U.S. 692 (2011).............................................................23

*Citizens for Responsibility & Ethics in Washington  v. Office of Admin.*,
    566 F.3d 219 (D.C. Cir. 2009) .............................................................. passim

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015) .............................................................34

*Elect. Privacy Info. Ctr. v. Office of Homeland Security*,
    1:02-cv-00620-CKK .............................................................20

*Electr. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    No. 1:17-cv-1320 (CKK) (D.D.C. July 24, 2017), .............................................................2

*Energy Research Foundation. v. Defense Nuclear Facilities Safety Bd.*,
    917 F.2d 581 (D.C. Cir. 1990) .............................................................21

*Fish v. Kobach*,
    No. 16-2105-JAR, slip op. (D. Kan. June 23, 2017).............................................................6

*Gerlich v. U.S. Dep't of Justice*,
    711 F.3d 161 (D.C. Cir. 2013) .............................................................28

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ........................................................................33

*Hall v. Johnson*,
   599 F. Supp. 2d 1 (D.D.C 2009) ...............................................................17, 18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................................33

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ........................................................................................34

*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 554 (4th Cir. 2017) ............................................................................4

*League of Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ........................................................................................28

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................31, 32, 33, 34

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) .............................................................20, 22, 26

*Norman v. Reed*,
   502 U.S. 279 (1992) ........................................................................................28

*Pacific Legal Found. v. Council on Envtl. Quality*,
   636 F.2d 1259 (D.C. Cir. 1980) ......................................................................21

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ......................................................................33

*Rice v. United States*,
   245 F.R.D. 3 (D.D.C. 2007) ............................................................................34

*Rushforth v. Council of Econ. Advisers*,
   762 F.2d 1038 (D.C. Cir. 1985) .................................................................21, 22

*Ryan v. Dep't of Justice*,
   617 F.2d 781 (D.C. Cir. 1980) ........................................................................21

*Sierra Club v. Andrus*,
   581 F.2d 895 (D.C. Cir. 1978) ........................................................................21

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ................................................................ passim

*Stop This Insanity Inc. Emp. Leadership Fund v. Fed. Election Comm'n*,
761 F.3d 10 (D.C. Cir. 2014) ................................................................28

*Sussman v. U.S. Marshalls Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ............................................................30

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) (Kennedy, J., concurring in the judgment) ............28

*Washington Research Project, Inc. v. Dep't of Health, Educ. and Welfare*,
504 F.2d 238 (D.C. Cir. 1974) ..............................................................19

*Winter v. Natural Resources Defense Council, Inc.*,
504 F.2d 238 (D.C. Cir. 1974) ..............................................................18

## STATUTES AND OTHER AUTHORITIES

5 U.S.C. § 552a(a)(3) ...................................................................................4

5 U.S.C. § 552a(b) ....................................................................................30

5 U.S.C. § 552a(e)(7) ........................................................................... passim

5 U.S.C. § 552(f)(1) ..................................................................................19

*Law Enforcement Activity Exception to the Privacy Act*, 50 DePaul L. Rev. 675,
680 & nn.44-45 (2000) ..........................................................................5

On July 26, 2017, Kris W. Kobach, the Vice Chair of the newly-formed Presidential Advisory Commission on Election Integrity ("Commission"), directed all 50 states and the District of Columbia to begin transmitting the public voting data of each of their citizens, including quintessentially First Amendment-protected political party affiliation and voter history data, to the Commission.  States are complying:  As of this filing, Arkansas had submitted its voters' data to the Commission, and Colorado has stated that the data of its citizens will be submitted by July 31.

Passed by Congress in the wake of the Watergate scandal when it was revealed that the White House had compiled information on individuals with opposing political viewpoints, the Privacy Act of 1974 plainly prohibits federal agencies from collecting, maintaining, and/or disseminating information that "describ[es] how any individual exercises rights guaranteed by the First Amendment."  5 U.S.C. § 552a(e)(7).   Absent this Court's intervention, the Commission, in cooperation with multiple other federal agencies, will soon be maintaining data on how millions of Americans have participated in the political process.  The Commission's actions are unlawful.  They undermine public confidence in the nation's electoral system and have caused and will continue to cause irreparable injury to Plaintiff and the public.  Accordingly, Plaintiff's application for a temporary restraining order, or, in the alternative, a preliminary injunction should be granted.

## PRELIMINARY STATEMENT

Following repeated, unfounded claims of voter fraud by President Donald J. Trump, the Commission was established on May 11, 2017, with a stated "mission" of studying "registration and voting processes used in Federal elections."  The Commission's activities have gone far

beyond "studying" "registration and voting processes."  It has launched an unprecedented investigation into alleged voter fraud for which it has solicited the state voting records of every American.  Commission members, including Kansas Secretary of State and Commission Vice Chair Kris W. Kobach, have stated that the Commission plans to crosscheck this data against troves of other private information on individuals maintained by a group of federal agencies that is growing by the day.  As Vice Chair Kobach has made clear, the end game of this investigation is to identify—and ultimately have removed from voter rolls—those individuals whom the Commission believes to have fraudulently registered to vote.

The Commission's plans for handling the voter data have shifted repeatedly.  The Commission first issued its sweeping request for individuals' voter data on June 28, 2017.  Data provided pursuant to this request was initially being housed on a server within the Department of Defense.  But, following inquiry by Judge Kollar-Kotelly of this Court in a lawsuit involving a separate plaintiff and distinct legal claims from those here, the collection was moved to a "repurpose[d]" computer application within the White House.  *Electr. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-1320 (CKK) (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. 2017) ("*EPIC* lawsuit").  The Commission, moreover, has not been forthcoming with the role that other agencies will play in the storage and use of the voter data.  When asked by the court in the *EPIC* lawsuit whether other federal agencies were "cooperating" with the Commission, it informed the court that none then were. Transcript of Temporary Restraining Order at 30, *EPIC* lawsuit (July 7, 2017) ("Transcript"). But the Commission also stated that the "mechanics" of other agencies' involvement in the White House technology system "may not be appropriate to say in a public setting." *Id.* at 35.  In light of an application for temporary injunctive relief made by the plaintiff in the *EPIC* suit, the

Commission rescinded its request for voter data on July 10 while the court was considering

EPIC's request.  Briefing and argument in that matter concluded on July 17.   On July 24, the

court denied EPIC's application, leading the Commission two days ago to re-issue its request for

voter data.

This Court should enjoin the Commission's latest attempt to collect and maintain voter

data.  New facts have come to light since the conclusion of briefing in the *EPIC* lawsuit that

demonstrate that the Commission and other Defendants are violating the Privacy Act and that

through these very actions the Commission has demonstrated itself to be more than a mere

advisory body.  For example, at the July 19, 2017 Commission meeting, the breadth of the

Commission's investigation and the impending data crosscheck project were revealed.  Vice

Chair Kobach spoke at that meeting of the controversial Interstate Voter Registration Crosscheck

Program that he runs in his capacity as the chief elections official from Kansas, under which 30

states pool their voters' data to identify those who are registered in two states and then

investigate whether to remove them from voter rolls, including—as Vice Chari Kobach

specifically noted—by criminal prosecution.  Vice Chair Kobach vowed that the Commission's

work would be "equally successful" on a national scale.  He then directed Commission staff to

collect "whatever data there is" within the federal government that "might be helpful" to the

Commission's investigation, including information kept by Defendant Department of Homeland

Security, the Department of Justice, and the U.S. Census Bureau—all federal agencies to which

the Privacy Act's strictures apply.   Meanwhile, the Commission's plans regarding the storage of

the voter data appear to have changed yet again:  Vice Chair Kobach's July 26, 2017 letter

"offer[s] a *new tool*" for states to "transmit data" to the Commission.  Left unanswered once

again is the role other federal agencies have in the administration of this "new tool."

Defendants' unlawful actions have already caused and will continue to cause substantial, immediate and irreparable harm to Plaintiff Common Cause, its members, and the integrity of the country's political process.  In response to the Commission's investigation and data crosscheck project, scores of voters have already removed their names from the voter rolls.  Countering this wave of voter de-registrations and the other fallout from the Commission's investigation has caused Common Cause to divert substantial resources from its mission and ongoing activities. Moreover, individual members of Common Cause, who are voters and participants in the political process, are facing a high level of anxiety over how and why the government is collecting their party affiliation and voting history data.

To prevent any further injury from the Commission's investigation while this Court considers the merits of Plaintiff's claims, including potentially the need to conduct limited discovery into the identities and mechanics of the federal agencies involved in the Commission's investigation, this Court should immediately enjoin Defendants from collecting, maintaining, using, or disseminating individuals' voting history and party affiliation in violation of federal law.

## BACKGROUND

**I.      Statutory Framework**

The Privacy Act of 1974 ("Act") provides that an agency shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  The Act, in turn, defines "maintain" to include "maintain, collect, use, or disseminate."  5 U.S.C. § 552a(a)(3).

In enacting the Act following Watergate, Congress had a "special concern for the protection of First Amendment rights" and "for unwarranted collection of information as a distinct harm in and of itself." *Albright v. U.S.*, 631 F.2d 915, 918 (D.C. Cir. 1980); *see also* Steven W. Becker, *Maintaining Secret Government Dossiers on the First Amendment Activities of American Citizens: The Law Enforcement Activity Exception to the Privacy Act*, 50 DePaul L. Rev. 675, 680 & nn.44-45 (2000) (describing Watergate's effect on passage of Privacy Act, including "revelations connected with Watergate-related investigations, indictments, trials, and convictions," such as "the slowly emerging series of revelations of 'White House enemies' lists'" and "surreptitious taping of personal conversations within the Oval Office of the White House as well as political surveillance, spying, and 'mail covers.'" (citing H.R. Rep. No. 93-1416, at 8-9 (1974)). Thus, whereas *other* sections of the Privacy Act protect the information of individuals only once it is included by an agency within a system of records, "it is not surprising that Congress would have provided in this Act, dedicated to the protection of privacy, that an agency may not so much as collect information about an individual's exercise of First Amendment rights except under very circumscribed conditions." *Albright*, 631 F.2d at 919.

## II.  Factual Background

### A.  President Trump's Unsubstantiated Claims of Voter Fraud

Both during the campaign and following his election, President Trump made repeated, unsubstantiated assertions of voter fraud. On October 10, 2016, for example, then-candidate Trump tweeted that, "Of course there is large scale voter fraud happening on and before election day." Donald J. Trump (@realDonaldTrump), Twitter (Oct. 10, 2016, 5:33 AM), *available at* https://twitter.com/realdonaldtrump/status/787995025527410688?lang=en. On October 17, 2016, candidate Trump rallied supporters at a campaign stop in Wisconsin with claims that "voter fraud is very, very common," including voting by "people that have died 10 years ago" and "illegal immigrants." C-SPAN, *Donald Trump Campaign Event in Green Bay, Wisconsin* (Oct. 17, 2016), *available at* https://www.c-span.org/video/?417019-1/donald-trump-campaigns-green-bay-wisconsin.

On November 8, 2016, Donald J. Trump was elected to be the forty-fifth president of the United States.  Shortly thereafter, he tweeted:  "In addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally." Donald J. Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 12:30 PM), *available at* https://twitter.com/realdonaldtrump/status/802972944532209664.  Three days later, Kansas Secretary of State and Trump campaign adviser Kris W. Kobach echoed the president-elect's assertion, telling reporters that, although he had no hard evidence, "I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton."  Hunter Woodall, *Kris Kobach Agrees With Donald Trump That 'Millions' Voted Illegally But Offers No Evidence*, Kansas City Star (Nov. 30, 2016), *available at* http://www.kansascity.com/news/politics-government/article117957143.html.  Mr. Kobach was also photographed in late November 2016 carrying a document entitled, *Department of Homeland Security: Kobach Strategic Plan for the First 365 Days,* that contained a reference to voter rolls.  *See* Brian Lowry, Curtis Tate & Lindsay Wise, *Trump-Kobach Photo Shows Homeland Security Plans,* Wichita Eagle (Nov. 21, 2016), *available at* http://www.kansas.com/news/politics-government/election/article116227188.html.  In separate litigation challenging Kansas's non-compliance with the National Voter Registration Act ("NVRA"), Mr. Kobach has resisted releasing the photographed document, which outlines proposed amendments to the NVRA, and he has been fined $1,000 by the court for "deceptive conduct and lack of candor."  *Fish v. Kobach*, No. 16-2105-JAR, slip op. at 2-10 (D. Kan. June 23, 2017).

President Trump was inaugurated on January 20, 2017.  Five days later, he tweeted: "I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and even, those registered to vote who are dead (and many for a long time).  Depending on results, we will strengthen up voting procedures!" Donald J. Trump (@realDonaldTrump), Twitter (Jan. 25, 2017, 4:10 AM and 4:13 AM), *available at* https://twitter.com/realDonaldTrump/status/824227824903090176 and

https://twitter.com/realdonaldtrump/status/824228768227217408?lang=en.  President Trump

soon thereafter reiterated his claims that allegedly fraudulent votes were cast for his opponent:

"We're gonna launch an investigation to find out. And then the next time—and I will say this, of

those votes cast, none of 'em come to me. None of 'em come to me.  They would all be for the

other side. . . . But when you look at the people that are registered: dead, illegal and two states

and some cases maybe three states."  He vowed to "make sure it doesn't happen again."

*TRANSCRIPT: ABC News anchor David Muir interviews President Trump*, ABC News (Jan. 25,

2017), *available at* http:// abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-

interviews-president/story?id=45047602.  That same day, *CNN* reported that, according to a

senior administration official, "President Donald Trump could sign an executive order or

presidential memorandum initiating an investigation into voter fraud as early as Thursday."  Dan

Merika, Eric Bradner, and Jim Acosta, *Trump considers executive order on voter fraud*, CNN

(Jan. 25, 2017), *available at* http://www.cnn.com/2017/01/25/politics/trump-calls-for-major-

investigation-into-voter-fraud/index.html.  The official further informed *CNN* that "[t]he

investigation would be carried out through the Department of Justice."  *Id.*

**B.    Creation of the Presidential Advisory Commission on Election Integrity**

Against this backdrop, the White House established the Commission by Executive Order

on May 11, 2017.  *See* Executive Order No. 13,799, Establishment of Presidential Advisory

Commission on Election Integrity, 82 Fed. Reg. 22389 (May 11, 2017) ("Executive Order").

President Trump has referred to the Commission as a "Voter Fraud Panel."  Donald J. Trump

(@realDonaldTrump), Twitter (July 1, 2017, 6:07 AM) *available at*

https://twitter.com/realdonaldtrump/status/881137079958241280.  The Commission's stated

"mission" is to study, "consistent with applicable law," the "registration and voting processes

used in Federal elections." Executive Order § 3.  The Executive Order provides that the

Commission "shall strive to avoid duplicating [] the efforts of existing governmental entities"

and that "[r]elevant executive departments and agencies shall endeavor to cooperate with the

Commission."  *Id.* § 7(b).

The Commission is chaired by Vice President Michael Pence and is to be composed of up to 15 additional members.  *Id.* § 2.  President Trump appointed Mr. Kobach as a member and Vice Chair of the Commission.  The White House, *President Announces Formation of Bipartisan Presidential Commission on Election Integrity* (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.  Although the Executive Order describes the Commission as "solely advisory," Executive Order § 3, the White House announcement stated that the Commission "will also study concerns about voter suppression, as well as other voting irregularities" and, in so doing, "will utilize all available data, including state and federal databases."  The White House, *President Announces Formation of Bipartisan Presidential Commission on Election Integrity* (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission. Three days later, Vice Chair Kobach detailed his planned uses for these federal databases in a televised interview.  According to Vice Chair Kobach, "for the first time in our country's history," the Commission would be "using the federal government's databases" to crosscheck against data collected from all 50 states.  In particular, as he explained, "The Social Security Administration has data on people when they pass away. The Department of Homeland Security knows of the millions of aliens who are in the United States legally and that data that's never been bounced against the state's voter rolls to see whether these people are registered."  *Kobach talks goals of new voter fraud commission*, Fox News, Sunday Morning Futures (May 14, 2017), *available at* http://www.foxnews.com/transcript/2017/05/14/kobach-talks-goals-new-voter-fraud-commission-commerce-secretary-on-nkorea-missile-test-china-trade-deal.html.  The next day, Vice Chair Kobach again emphasized the unprecedented nature of the Commission's undertaking, explaining that the Commission's "goal is to, for the first time, have a nationwide fact-finding effort, to see what evidence there is of different forms of voter fraud across the country."  *See*

*Transcript of Interview of Kris W. Kobach on New Day,* CNN (May 15, 2017), *available at*
http://www.cnn.com/TRANSCRIPTS/1705/15/nday.06.html.

　　To build this evidentiary record, the Commission will have a dedicated, full-time staff of
approximately three employees; a budget of approximately $250,000 for Fiscal Years 2017 and
2018; and "administrative services, funds, facilities, staff, equipment, and other support services"
furnished by the General Services Administration.  Charter of the Presidential Advisory
Commission of Election Integrity at ¶ 7 ("Charter"), *available at*
https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf; Executive
Order § 7.  Apart from the Chair and Vice Chair, the Commission presently has ten additional
members, consisting of a current member of the United States Elections Assistance Commission,
present and former state election and judicial officials, and an employee of the Heritage
Foundation.  *See Presidential Advisory Commission on Election Integrity*, White House Blog
(July 13, 2017), *available at* https://www.whitehouse.gov/blog/2017/07/13/presidential-
advisory-commission-election-integrity.

### C.　　The Commission's Sweeping and Unprecedented Request for Voter Data

　　The Commission convened as a group for the first time on a June 28, 2017 call.
Following brief welcoming remarks, Vice President Pence "disconnected from the call."
Declaration of Andrew J. Kossack at ¶ 5, *Am. Civil Liberties Union v. Trump,* No. 17-1351
(D.D.C. July 13, 2017) ("Kossack Declaration").  At that point, Vice Chair Kobach "informed
the members of his intention to request information from the states," including "information
from voter rolls."  *Id.*  Vice Chair Kobach "and staff described the request" to the other
Commission members, but the members did not see a copy of the request before the meeting, did
not vet the language of the request, and "did not vote" on whether to send it out.  *Id.*; Sam
Levine*, Trump Voter Fraud Commission Was Cautioned About Seeking Sensitive Voter
Information,* Huffington Post (July 5, 2017)*, available at*
http://www.huffingtonpost.com/entry/trump-voter-
fraudcommission_us_595d511fe4b02e9bdb0a073d*;* Celeste Katz, *Trump election integrity*

*commission member: "We should have predicted" the backlash, Mic* (July 5, 2017)*, available at*
https://mic.com/articles/181510/trump-election-integrity-commission-member-we-should-have-
predicted-the-backlash#.oeqOZx3hl.

Later that day, Vice Chair Kobach "directed" that a letter be sent under his signature to
the Secretaries of State or other election officials in all 50 states and the District of Columbia.
Declaration of Kris W. Kobach at ¶ 4, *EPIC* lawsuit, (July 5, 2017) ("Kobach Declaration").
Vice Chair Kobach's letter "invite[d]" state officials, among other things, to share "evidence or
information . . . you have regarding instances of voter fraud or registration fraud in your state"
and asked how the Commission could "support" state election officials regarding "information
technology security and vulnerabilities." *See, e.g.*, Letter from Kris W. Kobach, Vice Chair,
PACEI to the Honorable Matt Dunlap Secretary of State of Maine, at 1 (June 28, 2017),
*available at* http://i2.cdn.turner.com/cnn/2017/images/06/30/peic.letter.to.maine[2].pdf.  In
addition, the letter gave recipients a deadline of July 14, 2017 to provide "the publicly available
voter roll data for [your state], including, if publicly available under the laws of your state, the
full first and last names of all registrants, middle names or initials if available, addresses, dates of
birth, political party (if recorded in your state), last four digits of social security number if
available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled
status, information regarding any felony convictions, information regarding voter registration in
another state, information regarding military status, and overseas citizen information." *Id.* at 1-2.
The letter further instructed recipients to "submit your responses electronically to
ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ("SAFE"),
which is a secure FTP site the federal government uses for transferring large data files.  You can
access the SAFE site at https://safe.amrdec.army.mil/safe/
Welcome.aspx." *Id.* at 2.  The letter closed by warning that "any documents that are submitted
to the full Commission will also be made available to the public." *Id.*

Vice Chair Kobach has stated that the purpose of the data request is "to have the best data
possible" to support the Commission's "purpose . . . to quantify different forms of voter fraud

and registration fraud and offer solutions."  Bryan Lowry, *Kris Kobach wants every U.S. voter's personal information for Trump's commission* (June 29, 2017), Kansas City Star, *available at* http://www.kansascity.com/news/politics-government/article158871959.html.  The Vice President's office confirmed that the Commission intends to run the data it receives "through a number of different databases" to check for potential fraudulent registration.  Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), *available at* https://www.propublica.org/article/election-experts-see-flaws-trump-voter-commissions-plan-to-smoke-out-fraud.

>        **D.**        **The Broadening Scope of the Commission's Investigation**

The scope of the Commission's investigation has broadened even further since the issuance of the June 28 letter.  At the Commission's second meeting on July 19, 2017, Vice Chair Kobach described his operation of the Interstate Voter Registration Crosscheck Program, under which 30 states pool their voter data to identify those who are registered in more than one state with the aim of removing duplicative names from the voter rolls, including by criminal prosecution.  The White House, *Remarks by Vice President Pence and Elected Officials at the First Meeting of the Presidential Advisory Commission on Election Integrity* (July 19, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/07/19/remarks-vice-president-pence-and-elected-officials-first-meeting.  The methodology and reliability of the Interstate Voter Registration Crosscheck Program have been questioned, and concerns have been raised as to whether it is being used as a tool for voter suppression.  *See, e.g.*, Greg Palast, *The GOP's Stealth War Against Voters*, Rolling Stone (Aug. 24, 2016), *available at* http://www.rollingstone.com/politics/features/the-gops-stealth-war-against-voters-w435890 (quoting Oregon's Secretary of State as stating, "We left [Crosscheck] because the data we received was unreliable."); Kia Makarechi, *Did Trump Just Begin Laying the Groundwork for "Mass Voter Purging"?*, Vanity Fair (June 30, 2017), *available at* http://www.vanityfair.com/news/2017/06/trump-kobach-voter-fraud.  This notwithstanding, Vice Chair Kobach then stated for the first time his hope that the Commission's work would be

"equally successful on the national level."  The White House, *Remarks by Vice President Pence and Elected Officials at the First Meeting of the Presidential Advisory Commission on Election Integrity* (July 19, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/07/19/remarks-vice-president-pence-and-elected-officials-first-meeting.  At the same meeting, Commission members proposed obtaining the following information maintained by federal agencies to aid the Commission in its data crosschecking project:

- *Department of Homeland Security:* information on all non-citizens both legally and illegally within the United States as well as answers given by applicants on naturalization forms regarding voting history; The White House, *Presidential Advisory Commission on Election Integrity* (published on July 24, 2017), *available at* *https://www.youtube.com/watch?v=oZI27wB8-po&feature=youtu.be* (1:31:20, 1:34:20);

- *U.S. Census Bureau:* surveys on individuals who did not vote or did not register to vote; *Id.* at 1:55:15;

- *Federal district courts:* information regarding individuals excused from jury duty for being non-citizens; *Id.* at 1:32:20; and

- *Department of Justice:* information regarding referrals for criminal prosecution based on non-citizens excused from jury duty or admissions on naturalization forms to having voted in an election as a non-citizen; *Id.* at 1:33:10.

Vice Chair Kobach instructed Commission staff "in the interim" between meetings to "collect whatever data there is that's already in the possession of the federal government that might be helpful to us."  *Id.* at 1:37:05.

E.     **The Commission Shifts Its Plans to Maintain the Personal and Voting Data**

In response to litigation, the Commission has repeatedly shifted its plans regarding the storage of the personal and voting data it receives as part of its investigation.  In a declaration filed on July 5, 2017 in the *EPIC* lawsuit against the Commission, Vice Chair Kobach initially stated that he "intended" that only "narrative responses" provided in response to his June 28

letter be sent to the eop.gov email address in the letter and that "voter roll data" be uploaded onto the SAFE website that is operated by the U.S. Army and that Vice Chair Kobach described as a "tested and reliable method of secure file transfer used routinely by the military for large, unclassified data sets" that "also supports encryption by individual users."  Kobach Declaration at ¶ 4.

After the court in the *EPIC* lawsuit inquired at a July 7, 2017 hearing if the Department of Defense should be joined as a defendant by virtue of its operation of the SAFE website, the Commission changed course on its data storage plans.  In a subsequent declaration filed on July 10, 2017, Vice Chair Kobach stated that "[i]n order not to impact the ability of other customers to use" SAFE, the Director of White House Information Technology was "repurposing an existing system" to collect the information "within the White House Information Technology enterprise."  Third Declaration of Kris W. Kobach at ¶ 1, (July 10, 2017), *EPIC* lawsuit.  Asked by the court at the same July 7 hearing what other federal agencies support the White House's computer system, the Commission stated that the "mechanics" of the White House's information technology program are "complicated" and "something that may not be appropriate to say in a public setting."  Transcript at 35, *EPIC* lawsuit.  And asked by the court whether other agencies were cooperating with the Commission, it stated that none then were.  *See id.* at 30.  A week later, another declarant, Charles Herndon, the White House's Director of Information Technology, stated that no other federal agency will have a role in this initial "data collection process" from the states, but left unaddressed the mechanics of the upcoming data crosscheck project and the process for collecting, storing or using the data maintained by the other federal agencies. Declaration of Charles Christopher Herndon at ¶ 6, (July 17, 2017), *EPIC* lawsuit.[1]

---

[1] Among the many unknowns regarding the voter data is whether, notwithstanding the Commission's relocation of the initial data collection away from the Defense Department's SAFE website, the Department remains involved in the Commission's efforts.  As noted above, Herndon is the Director of Information Technology at the White House. The Director of Information Technology is "responsible for the information resources and information systems provided to the President, Vice President, and EOP by the Presidential Information Technology Community (Community)."  White House, Presidential Memorandum-Establishing the Director

**F.      The Commission's Renewed Request for First Amendment-Protected Voter Data and "New Tool" for Data Collection**

Although Vice Chair Kobach's June 28 letter initially gave states a deadline of July 14 to transmit their voters' data, the Commission put the data collection on hold pending a decision on the temporary restraining order and preliminary injunction that was filed in the *EPIC* lawsuit. *See* Third Declaration of Kris W. Kobach at ¶¶ 2-3.  On July 24, 2017, the court denied the injunctive relief.  *See* Order (July 24, 2017), *EPIC* lawsuit.[2]

On July 26, 2017, Vice Chair Kobach renewed the data request in a letter to the states, explaining that the Commission is interested in "gathering facts" and, in keeping with the open-ended nature of its investigation, "going where those facts lead." *See* Letter from Kris W. Kobach, Vice Chair PACEI to Office of the Secretary of State of Alabama at 2 (July 26, 2017) *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf.  The letter described yet another system for collecting the voter data, stating that the "Commission is offering a new tool" to transmit the voter data to the "White House computer system" and that "detailed instructions" would be provided after states reached

---

of White House Information Technology and the Executive Committee for Presidential Information Technology (March 19, 2015), *available at* https://obamawhitehouse.archives.gov/the-press-office/2015/03/19/presidential-memorandum-establishing-director-white-house-information-te.  Information services for the Community are provided by the White House Communications Agency, which "is a joint service military agency under the operational control of the White House Military Office (WHMO) and administrative control of the [Defense Information Systems Agency]."  Fiscal Year 2018 President's Budget Defense Information Systems Agency (DISA)  204-05, 215 (May 2017).  DISA, in turn, is a "combat support agency of the Department of Defense" that complies with the Privacy Act. OUR WORK / DISA 101, available at http://www.disa.mil/About/Our-Work; *see also, e.g.*, Privacy Act, available at http://www.disa.mil/About/Legal-and-Regulatory/Privacy-Office (listing DISA Privacy Act System of Records Notices, among other documents).

[2] On July 24, the State of Ohio made available its voter data, including party affiliation and voter history, in a letter to the Commission.  *See* Letter from John Husted, Ohio Secretary of State, to Members of the Presidential Advisory Commission on Election Integrity (July 24, 2017), *available at*        https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/July-24-letter-from-Ohio-Secretary-of-State.pdf (providing Commission with link to download data).

out to an email address provided in the letter. *Id.* The July 26 letter once again left unaddressed any role other federal agencies may have in the operation of this "new tool." *Id.*

On July 27, 2017, Arkansas transmitted its voters' data, including party affiliation and voter history. *Arkansas Again Submits Info to Voting Commission*, Associated Press (July 27, 2017), *available at* https://www.usnews.com/news/best-states/arkansas/articles/2017-07-27/arkansas-again-submits-info-to-voting-commission. Colorado likewise has said it plans to transmit the same information for its voters by close of business on July 31. Blair Miller, *Colorado to send voter info. to Trump commission Monday; no evidence any withdrawals were ineligible*, The Denver Channel (July 27, 2017, *available at* http://www.thedenverchannel.com/news/politics/colorado-to-send-voter-info-to-trump-commission-monday-no-evidence-any-withdrawals-were-ineligible?page=2.

Although certain states have indicated that they may withhold their voters' data from the Commission, President Trump stated at a Commission meeting that 30 states "have already agreed" to share their voters' data and that data "will be forthcoming" from the rest of the states, observing that, "If any state does not want to share this information, one has to wonder what they're worried about." The White House, *Remarks by President Trump and Vice President Pence at the Presidential Advisory Commission on Election Integrity Meeting* (July 19, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/07/19/remarks-president-trump-and-vice-president-pence-presidential-advisory. Multiple additional states, including Florida and Texas, have indicated that they intend to turn over voter data, including party affiliation and voter history, to the Commission. *See* Letter from Ken Detzner, Florida Secretary of State to Kris W. Kobach, Kansas Secretary of State (July 6, 2017), *available at* https://www.brennancenter.org/sites/default/files/analysis/Florida_DOS_Letter_to_Presidential_Advisory_Commission.pdf; Anna M. Tinsley, "What Texas will (and won't) send to Trump's voter fraud commission," Star-Telegram (July 7, 2017), *available at* http://www.star-telegram.com/news/politics-government/election/article160151354.html.

### G.   The Irreparable Harm to Plaintiff and its Members from the Commission's Request for Voter Data

As a result of the Commission seeking to collect and maintain voter data, including party affiliation and voter history, voters have de-registered from the rolls, while others are gravely concerned about how their data will be used by the Commission, making them hesitant to fully participate in the political process. *See, e.g.*, *Thousands Unregister From Voter Rolls After Trump Panel's Data Requests*, NBC News (July 18, 2017), *available at* http://www.nbcwashington.com/news/politics/Thousands-Unregister-Voter-Rolls-Election-Integrity-435155813.html; Brian Eason*, More than 3,000 Colorado voters have canceled their registrations since Trump election integrity commission request*, The Denver Post (July 13, 2017), *available at* http://www.denverpost.com/2017/07/13/trump-election-integrity-commissions-colorado-voters-cancel-registration/.  Inhibiting public participation in this way undermines public confidence in the political process.  In addition to this effect, which in and of itself injures Common Cause's purpose and mission, both the organization and its members will continue to be harmed if the Commission's collection of voter data concerning voter history and party affiliation is not enjoined.

#### 1.   Common Cause

As a non-partisan membership organization dedicated to promoting the integrity of the U.S. election process, election protection, and open, honest, and accountable government, Common Cause and its members regularly engage in education and advocacy efforts in the realm of campaign finance reform, ethics, redistricting, transparency, fair access to media, and voting matters.  Declaration of Karen Hobert Flynn, attached hereto as Exhibit A at ¶¶ 3-5.  For example, Common Cause and its members conduct nonpartisan voter protection, education and outreach activities, including on-site election protection assistance.  *Id.* Common Cause also helps to facilitate voter registration and advocates for policies, practices, and legislation that aim to protect eligible voters from disenfranchisement.  *Id.*

The Commission's request for voter data has forced Common Cause to spend considerable time and effort opposing the request and attempting to counteract its harmful

effects, including preparing op-ed and other opinion pieces opposing the request, corresponding with Secretaries of State regarding the request, speaking at a rally and encouraging voters not to deregister, and organizing approximately 30,000 individuals to send a petition to the White House opposing the Commission. *Id.* at ¶ 15; *see also* Declaration of Liza McClanhan, attached hereto as Ex. B at ¶ 6. As a consequence, Common Cause has had to divert resources from its core activities and ongoing projects, frustrating its mission and purpose. Ex. A at ¶¶ 16-17; Ex. B at ¶ 6. Common Cause expects that it will have to continue to expend these resources if the Commission is permitted to continue its collection of voter history and party affiliation. *Id.*

### 2.      Common Cause's Members

Common Cause's members are gravely concerned about the Commission collecting their voting history and party affiliation data and crosschecking it against databases from other federal agencies. They are highly anxious about how their data will be used as well as whether it will be disclosed to other parties and/or the public. Ex. B at ¶ 7; Decl. of Anthony Gutierrez, attached hereto as Exhibit C at ¶ 5-8. The Commission's collection of this data undermines their confidence in the country's election systems as participants in the political process. *Id.* Moreover, some members are anxious that the collection of their voter data will lead to their vote being suppressed, particularly given remarks by certain Commission members. Ex. C at ¶ 7. Members of Common Cause will continue to be injured if the Commission is not stopped from collecting voter history and party affiliation.

### STANDARD OF REVIEW

To obtain preliminary injunctive relief, a moving party must show: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 11–12 (D.D.C. 2009) (citing *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C 2009) ("The same standard applies to both temporary restraining

orders and to preliminary injunctions.").  In applying this four-factor standard, district courts

may employ a sliding scale under which a particularly strong showing in one area can

compensate for weakness in another.  *Id.*  Accordingly, "'[i]f the showing in one area is

particularly strong, an injunction may issue even if the showings in other areas are rather weak.'"

*Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.

Cir.1995)).[3]

<h1 style="text-align:center">ARGUMENT</h1>

To stop the ongoing irreparable harm to Common Cause and its members as well as to

the political process, this Court should enjoin the Commission from collecting data concerning

individuals' voter history and party affiliation.  Each of the elements for preliminary relief

weighs in favor of preliminary injunctive relief, and taken together they decidedly compel that

result.

**I.      Common Cause Has a Likelihood of Success on the Merits**

Common Cause is likely to succeed on the merits.  The Privacy Act plainly prohibits

federal agencies from collecting, maintaining, using and disseminating data concerning an

individual's First Amendment activity.

**A.      The Commission is an "Agency" under the Privacy Act**

The Privacy Act incorporates the definition of "agency" found in the Freedom of

Information Act, 5 U.S.C. § 552(a)(1), which, in turn, defines "agency" as "any executive

department, military department, Government corporation, Government controlled corporation,

---

[3] "[I]t is not clear whether this Circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter v. Nat. Res. Def. Counsel,* 555 U.S. 7, 22 (2008).  *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F.Supp.3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit Court of Appeals have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Id.* (citing *Sherley*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  However, the Court of Appeals has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id. (citing Sherley*, 644 F.3d at 393).  In any event, the Court need not resolve that question in the instant motion, because Common Cause makes a strong and sufficient showing on each of the preliminary injunction factors.

or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *Id.* at § 552(f)(1).

The Commission satisfies this definition.  In cooperation with Defendants Department of Homeland Security ("DHS") and Social Security Administration ("SSA") and a still-emerging number of other federal agencies, the Commission is engaged in a first-of-its-kind investigation into alleged voter fraud for which it is amassing the personal and voting data of millions of Americans and comparing it to other data that the federal government keeps on individuals. These classic agency functions go beyond merely offering advice and demonstrate that the Commission is an "agency" to which the Privacy Act applies under the law of this Circuit or, at the very least, that discovery is necessary to obtain information known only to Defendants regarding the Commission's authority and operations as well as its interactions with other federal agencies.

### 1. Agency Status is a Case-by-Case Determination Guided by Core Principles and Aided by Discovery

There is no bright-line rule for determining when a particular government entity is accorded "agency" status for purposes of the Privacy Act.  Rather, the D.C. Circuit has made clear that, when confronted "with one of the myriad organizational arrangements for getting the business of the government done," each such arrangement "must be examined anew and in its own context" by a reviewing court.  *Washington Research Project, Inc. v. Dep't of Health, Educ. and Welfare,* 504 F.2d 238, 245-46 (D.C. Cir. 1974).  Consistent with the case-by-case nature of this determination, "the specific evidence bearing upon that question varies with the entity in question."  *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558–59 (D.C. Cir. 1996). As another court in this district has observed, in determining whether an entity is an "agency," courts have frequently looked "beyond public documents" to depositions, document discovery, letters, memoranda, and other statements, particularly where the "language establishing the entity's power [in the public documents] is broad and lacking in firm parameters."  *Elect. Privacy Info. Ctr. v. Office of Homeland Security*, 1:02-cv-00620-CKK ("Office of Homeland

Security"), Memorandum Opinion at 12 & n.4 (Dec. 26, 2002) (declining to grant motion to dismiss and ordering discovery in order to determine whether entity was an "agency"). Consideration of such evidence is "at the very least, helpful, *if not required*, in determining the status of an entity positioned within the Executive Office of the President." *Id.* (emphasis added).

Although the specific evidence consulted may vary by entity, the D.C. Circuit has set forth principles to guide the inquiry. In its most recent decision on "agency" status, the Circuit instructed courts to assess the so-called *Soucie* factors, "[1] whether the entity exercises substantial independent authority, [and 2] whether ... the entity's sole function is to advise and assist the President" —and, "in an effort to harmonize these tests" —"[1] how close operationally the group is to the President, [2] whether it has a self-contained structure, and [3] the nature of its delegated authority." *Citizens for Responsibility & Ethics in Washington ("CREW") v. Office of Admin.*, 566 F.3d 219, 222–23 (D.C. Cir. 2009) (citing *Armstrong*, 90 F.3d at 558 and *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993)). And, "in the absence of a direct comparator [to an entity already deemed to be an 'agency'], then, the Court is required to draw upon the principles elucidated by the D.C. Circuit's previous opinions in discerning the side of the 'agency' line on which [an entity] falls." *Citizens for Responsibility & Ethics in Washington*, 559 F.Supp.2d 9 at 24 (D.D.C. 2008) ("*CREW*").

In *Soucie v. David,* 448 F.2d 1067 (D.C. Cir. 1971), for instance, the D.C. Circuit held that the Office of Science and Technology Policy ("OSTP") within the White House was an "agency" for purposes of FOIA because, in addition to "advis[ing] and assist[ing] the President in achieving coordinated federal policies in science and technology," *id.* at 1073-74, OSTP had "the function of evaluating federal programs," *id.* at 1075. As the D.C. Circuit subsequently recognized, its analysis in *Soucie* hinged on the OSTP's actual functions; for even though "the reports under consideration in *Soucie* were requested by the President precisely for advisory purposes," the Circuit held that the OSTP was an agency precisely "because the Office had functions in addition to advising the President." *Ryan v. Dep't of Justice*, 617 F.2d 781, 788

(D.C. Cir. 1980); *see also Rushforth v. Council of Econ. Advisers,* 762 F.2d 1038, 1041 (D.C. Cir. 1985) (observing that "critically, it was the functional role of the agency on which *Soucie* turned").

The D.C. Circuit similarly found the Defense Nuclear Facilities Safety Board ("Board") to be an "agency" in *Energy Research Foundation. v. Defense Nuclear Facilities Safety Bd.*, 917 F.2d 581, 582, 584 (D.C. Cir. 1990).  There, the Circuit once again looked to *Soucie* and the actual functions performed by the Board, holding that it "does considerably more than merely offer advice," but also "formally evaluates the Energy Department's standards relating to defense nuclear facilities and it forces public decisions about health and safety" and "conducts investigations."  *Id.*  Invoking its previous holding, the Circuit went on to explain that just as in *Soucie*, "Evaluation plus advice was enough to make the [Board] an 'agency.'"  *Id.*; *see also Pacific Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259 (D.C. Cir. 1980) (finding Council on Environmental Quality to be an agency); *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) (same, for the Office of Management and Budget).

By contrast, the D.C. Circuit held in *CREW* that the Office of Administration ("OA") did not warrant "agency" status because OA neither "perform[ed] [n]or is authorized to perform tasks other than operational and administrative support for the President and his staff."  566 F.3d at 224.  Importantly, however, the Circuit reached this conclusion only *after* the district court had permitted deposition and document discovery centered on OA's "interactions with federal agencies," "the duties OA performs," and OA's "authority and operations," an understanding of which the D.C. Circuit deemed "critical" to the agency analysis.  *Id.* at 225-26; *see also id.* (noting that discovery included deposition testimony from OA's director regarding "its interactions with federal agencies[] and the duties OA performs"); *see also Armstrong,* 90 F.3d 553, 561, 565 (concluding, following deposition discovery of a senior official about his actual duties, that the National Security Council is not an agency because it "plays [no] substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President"). And in *Meyer*, 981 F.2d 1288 (D.C. Cir. 1993), the D.C. Circuit has likewise held that President

Ronald Reagan's Task Force on Regulatory Relief—which "reviewed agency rules and proposed regulatory revisions to the President, but [] could not issue guidelines or other types of directives," *CREW*, 566 F.3d at 223 (citing *Meyer*, 981 F.2d at 1289-90, 1294) —was not an agency because it "was not a body with 'substantial independent authority' to direct executive branch officials." *Meyer*, 981 F.2d at 1297.  Synthesizing the Circuit's prior teachings, the D.C. Circuit in *Meyer* further reasoned that because the Task Force "seems to have been merely a committee which convened periodically both to bring together the views of various cabinet department heads concerning significant proposed regulations, and to shape for the President's decision intra-agency disputes," it therefore "fell within the *Soucie* test as an entity whose sole function is to advise and assist the President."  *Meyer*, 981 F.2d at 1297 (finding no indication that Task Force members "were to exercise substantial independent authority, nor in fact, did they do so" (internal quotation marks omitted)).

As the above case law illustrates, a court's determination of an entity's "agency" status turns on an assessment of both the authorized and actual functions of an entity.  *See, e.g.*, *CREW*, 566 F.3d at 224 (assessing tasks that OA "performed" and was "authorized to perform"); *Meyer*, 981 F.2d at 1297 (same, for authority Task Force members "were to exercise" and what they "in fact" exercised); *Soucie*, 448 F.2d at 1075 (assessing "function" of OSTP); *Rushforth,* 762 F.2d at 1041 ("critically, it was the functional role of the agency on which *Soucie* turned").  As one district court in this Circuit has observed, an entity's "function may be discerned from its charter documents as well as the responsibilities [the entity] actually undertakes, if they in fact extend beyond the responsibilities delineated in [the] charter documents." *CREW*, 559 F.Supp.2d at 24.

Nor is this Court bound by Judge Kollar-Kotelly's denial, without prejudice, of a temporary restraining order and preliminary injunction in the *EPIC* lawsuit in an opinion that held that the "record presently" before the court was "insufficient to demonstrate that the Commission is an agency for the purposes of the APA."  Memorandum Opinion, *EPIC* lawsuit at 27 ("Opinion").  As an initial matter, the *EPIC* decision is not binding precedent here.  *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (stating black letter principle that a decision of a federal

district court judge is not binding precedent in that judicial district or even upon the same judge). But more to the point, the plaintiff in the *EPIC* matter brought different claims—premised on the Commission's failure to conduct a Privacy Impact Assessment in violation of the E-Government Act of 2002 and the Administrative Procedure Act—against a different roster of Defendants apart from the Commission—including the Department of Defense, the Unites States Digital Service, and the Executive Committee for Presidential Information Technology—and sought different forms of relief—principally, that the data collection be enjoined until the completion of a Privacy Impact Assessment—than Plaintiff does here.  Consequently, the court in the *EPIC* matter was presented with a factual record that differed in significant and material ways from the record before this Court.  The court in the *EPIC* case, moreover, underscored that the facts pertaining to the Commission were in a state of flux, noting that its holding as to the Commission's "agency" status "may need to be revisited" to the extent "that factual circumstances change . . . for example, if the *de jure* and *de facto* powers of the Commission expand beyond those of a purely advisory body."  *Id.* at 3, 27; *see also, e.g.*, *id.* at 2 (noting that the "factual circumstances. . . have changed substantially since this case was filed three weeks ago").  As set forth above and described in further detail below, the factual circumstances have indeed already changed in material ways since the closure of briefing in the *EPIC* matter.  As a result, the actual and authorized functions of the Commission contained in the present factual record demonstrate that it is an "agency" under the guiding principles identified by the D.C. Circuit.

### 2. The Commission exercises "substantial independent authority" and its sole function is not to "advise and assist the President"

The Commission's stated "mission," as set forth in its chartering documents, is "consistent with applicable law, [to] study the registration and voting processes used in Federal elections."  Executive Order at § 3.  It must "cooperate with" other federal agencies and "shall strive to avoid duplicating" existing efforts by these agencies.  *Id.* at § 5.  And, in executing its work, the Commission "will utilize all available data, including state and federal databases."

The White House, *President Announces Formation of Bipartisan Presidential Commission on Election Integrity* (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.  These documents also establish a firm and defined structure for the Commission, providing that it will have a dedicated staff and no more than 15 additional members; setting forth a budget for the next two fiscal years; and charging the General Services Administration with "provid[ing] the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis." Executive Order at §§ 5, 7; *see also* Charter ¶¶ 7, 11.

The Commission's "function may be discerned from . . . the responsibilities [it] actually undertakes, if they in fact extend beyond the responsibilities delineated in [the] charter documents." *CREW*, 559 F.Supp.2d at 24.  That is clearly the case here, where the Commission's investigation already far transcends its nominal "mission," and is continuing to broaden.  As demonstrated by the Commission's actions and the statements of its members and their surrogates, the Commission has embarked upon an unprecedented investigation into voter fraud with the aim of ultimately ejecting allegedly fraudulently registered voters from state voter rolls.  To accomplish this end, the Commission is poised to receive extensive personal and voting data from residents of all 50 states and the District of Columbia.  The goal of aggregating this national voter file, in Vice Chair Kobach's words, is to enable the Commission "for the first time in our country's history" to compare the data on citizens received from the states against "the federal government's databases," including those maintained by the Social Security Administration and the Department of Homeland Security, "to see whether these people are registered."  *See Kobach talks goals of new voter fraud commission*, Fox News, Sunday Morning Futures (May 14, 2017), available at http://www.foxnews.com/transcript/2017/05/14/kobach-talks-goals-new-voter-fraud commission-commerce-secretary-on-nkorea-missile-test-china-trade-deal.html.  *Cf. Int'l Refugee Assistance Project v. Trump,* 857 F.3d 554, 595 (4th Cir. 2017)*,* as amended (May 31, 2017), as amended (June 15, 2017), cert. granted, 137 S. Ct. 2080

(2017) (statements of President Trump and his advisors "taken together, provide direct, specific evidence of what motivated" recent executive order and "are the exact type of 'readily discoverable fact[s]' that we use in determining a government action's primary purpose" (quoting *McCreary*, 545 U.S. at 862).  The Vice President's office has confirmed that the personal and voter data received by the Commission will be run "through a number of different databases" to check for potential fraudulent registration.  Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), available at https://www.propublica.org/article/election-experts-see-flaws-trump-voter-commissionsplan-to-smoke-out-fraud.  This already sweeping investigation widened in scope at the July 19, 2017 meeting—notably, after the closure of briefing in the *EPIC* matter—when Vice Chair Kobach invoked the controversial Interstate Crosscheck program over which he presides and stated that the Commission would be "equally successful" on a national scale.  He then directed the Commission's staff to obtain data from the Department of Justice and the U.S. Census Bureau, in addition to the Department of Homeland Security, in order to crosscheck against the data being collected from the states.

As revealed by its actions and the comments of its members and their surrogates, the Commission in no way is limited to advising and assisting the President.  Rather, it is carrying out a wide-scale investigation and data crosscheck project of presently unknown scope in cooperation, and on par with, multiple other federal investigative agencies that maintain information on individuals.  At a minimum, then, the Commission plainly is playing the sort of independent "evaluating" function that was sufficient to confer "agency" status in *Soucie*.  In reality, and as demonstrated by the present record, the Commission's actions extend well beyond mere evaluation into the kind of investigative activities that define federal agencies as distinct from other types of entities within the Executive Branch.

**3.      The Commission has a "self-contained structure," is operationally distinct from the President, and exercises substantial delegated authority**

The latter three factors identified by the D.C. Circuit likewise establish that the Commission is an "agency" to which the Privacy Act applies.  *First*, the Commission's structure is well-defined and self-contained.  As the Circuit explained in *Meyer*, the Task Force at issue there was "simply a partial cabinet group" and the "President does not create an [agency]…every time he convenes a group of senior staff or departmental heads to work on a problem."  *Meyer*, 981 F.2d at 1296; *see also Armstrong*, 90 F.3d at 560 (juxtaposing self-contained National Security Council with "an amorphous assembly from which *ad hoc* [sic] task groups are convened periodically by the President," notwithstanding "several points of tangency between the White House and the NSC staff").  The Commission, by contrast, is not merely an ill-defined subset of the President's cabinet and White House staff:  It has a dozen members, including one federal agency head (who is purportedly serving in her personal capacity) and numerous state elected and appointed officials; a dedicated staff and operating budget for the next two fiscal years; and the ability to draw on "administrative services, funds, facilities, staff [and] equipment" from the General Services Administration "as may be necessary."  *See* Charter ¶ 7 (describing Commission's operating budget for FY2017 and FY2018 and staff); Call Agenda (June 28, 2017) (listing "[o]verview of Election Integrity Commission staff" as discussion topic).

*Second*, the Commission is operationally separate from the President.  Although the Commission was established by Executive Order and is Chaired by the Vice President, there is not an "intimate organizational and operating relationship between the President and the [Commission]."  *Armstrong*, 90 F.3d at 560.  Quite the contrary, and consistent with the wide-ranging authority granted to any federal agency head, Vice Chair Kobach alone "directed" the investigative action of seeking the unprecedented voter data set from the states.  Kobach Declaration at ¶ 4.  He also informed the other Commission members of the data request only after Vice President Pence had "disconnected" from the June 28 meeting, *see* Kossack Declaration at ¶ 5, and without giving the other members the chance to vote on or vet the letter,

*see* Sam Levine, *Trump Voter Fraud Commission Was Cautioned About Seeking Sensitive Voter Information,* Huffington Post (July 5, 2017), *available at* http://www.huffingtonpost.com/entry/trump-voter-fraudcommission_us_595d511fe4b02e9bdb0a073d; Celeste Katz, *Trump election integrity commission member: "We should have predicted" the backlash,* Mic (July 5, 2017), *available at* https://mic.com/articles/181510/trump-election-integrity-commission-member-we-should-have-predicted-the-backlash#.oeqOZx3hl.  Likewise, at the July 29, 2017 meeting, Vice Chair Kobach instructed Commission staff broadly to obtain "whatever data there is that's already in the possession of the federal government that might be helpful" to the Commission's investigation, including from multiple federal agencies that maintain assorted data sets on individuals.  He again did so, in real time, and without intervention of either the President or the Vice President, further supporting the Commission's operational independence.

Finally, as described above *supra* at 23-25, the Commission is exercising substantial independent authority in conducting the unprecedented and broadening investigation and data crosscheck involving individuals' personal and voter data in cooperation with multiple other federal agencies.  *See CREW*, 559 F.Supp.2d at 28 (observing that the D.C. Circuit's evaluation of the nature of an entity's delegated authority "appears to focus on the *Soucie* factors").

For the reasons described above, the Commission is an "agency" for purposes of the Privacy Act.[4]

---

[4] If the Court nevertheless finds that the current record is insufficient to establish the Commission's agency status, and given both the fast-changing factual circumstances regarding the Commission and the continued lack of clarity regarding the mechanics of the data flow between the cooperating federal agencies, Plaintiff requests that the Court order limited, expedited discovery into the Commission's operations, authority, and interactions with federal agencies participating in the data crosscheck project.  *CREW*, 566 F.3d at 225-26 (discovery that "shed light on OA's authority and operations" permitted by the district court was "critical" to determining whether OA was an "agency"); *Office of Homeland Security*, Memorandum Opinion at 12 & n.4 (Dec. 26, 2002) (declining to grant motion to dismiss and ordering discovery in order to determine whether entity was an "agency").

### B.    Defendants Seek to Maintain Records Describing How Individuals Exercise Rights Guaranteed by the First Amendment.

There can be no doubt that the information sought by the Commission, specifically, citizens' political party affiliation and voting history and registration status, are the type of records—those describing how individuals exercise rights guaranteed by the First Amendment—whose maintenance is prohibited by the Privacy Act.  *See* 5 U.S.C. § 552a(e)(7).  Indeed, in considering allegations that a prior Department of Justice had violated the Privacy Act, including Section 552a(e)(7), by not selecting attorney applicants for interviews because of their political affiliations, the D.C. Circuit accepted that such political affiliations—including party affiliation—were "First Amendment activities" for the purposes of the Privacy Act.  *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 172 (D.C. Cir. 2013) (discussing Green Party membership).  And as the Supreme Court has explained, "[p]olitical participation is integral to our democratic government; for this reason, limitations [on it] 'operate in an area of the most fundamental First Amendment activities.'"  *Stop This Insanity Inc. Emp. Leadership Fund v. Fed. Election Comm'n*, 761 F.3d 10, 13 (D.C. Cir. 2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)) (discussing campaign contributions and expenditures); *Norman v. Reed*, 502 U.S. 279, 288-90 (1992) (describing "the First Amendment right of political association" which "advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *see also Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 452 (1950) ("the postulate of the First Amendment is that our free institutions can be maintained without proscribing or penalizing political belief, speech, press, assembly, or *party affiliation*") (emphasis added); *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring in the judgment) (discussing allegations that "involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views") (citing *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion)); *League of Latin Am. Citizens v. Perry*, 548 U.S. 399, 461-62 (2006)

(Stevens, J., concurring in part and dissenting in part) (finding that the First Amendment protects "citizens from official retaliation based on their political affiliation").

The history of the Act underscores this conclusion.  As the D.C. Circuit has explained: "The legislative history of the Act reveals Congress' own special concern for the protection of First Amendment rights, as borne out by statements regarding 'the preferred status which the Committee intends managers of information technology to accord to information touching areas protected by the First Amendment of the Constitution.'"  *Albright*, 631 F.2d at 919 (citing S. Rep. No. 1183, 93d Cong., 2d Sess., *reprinted in* (1974) U.S. Code Cong. & Admin. News, pp. 6916, 6971)).  The initial implementation guidelines for the Act promulgated by the Office of Management and Budget (OMB) further highlight the special status accorded by the Act to records concerning individuals' First Amendment-protected activities.[5]  According to OMB's guidelines, § 552a(e)(7) established a "rigorous standard governing the maintenance of records regarding the exercise of First Amendment rights," including "political beliefs" and "freedom of assembly," and asked agencies to "apply the broadest reasonable interpretation" in determining whether a particular activity is protected by § 552a(e)(7).  OMB, Responsibilities for the Maintenance of Records About Individuals by Federal Agencies, 40 Fed. Reg. 28,948, 28,965 (July 9, 1975).  Accordingly, the D.C. Circuit has held that an agency "may not so much as collect information about an individual's exercise of First Amendment rights except under very circumscribed conditions" and that Section 552a(e)(7) applies regardless whether a record is maintained in an agency's system of records.  *Albright*, 631 F.2d at 919.  The Commission is thus plainly prohibited from maintaining the records it is poised to collect.

---

[5] "These guidelines are owed the deference usually accorded interpretation of a statute by the agency charged with its administration, particularly when, as here, the regulation 'involves a contemporaneous construction of a statute by the (persons) charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'"  *Albright*, 631 F.2d at 919, n.5 (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)).

Defendants DHS and SSA are likewise prohibited from maintaining individuals' First Amendment-protected information.  Conspicuously unaddressed within the Government's submissions thus far in the *EPIC* matter are the mechanics of how individuals' First Amendment-protected data will be handled by the growing list of federal agencies involved in the crosscheck project.  Understanding these mechanics is crucial to ensuring that the law is followed.  It is unclear, for example, whether these agencies will be collecting and maintaining the data themselves —directly in contravention of § 552a(e)(7) —or if they plan instead to disclose their data to the Commission—which could violate separate provisions of the Privacy Act, such as § 552a(b), which provides that "[n]o agency shall disclose any record which is contained in a system of records" except under certain limited circumstances, *see Sussman v. U.S. Marshalls Serv.*, 494 F.3d 1106, 1121 (D.C. Cir. 2007); *see also* 5 U.S.C. § 552a(b).  To ensure that *no* provision of the Act is violated, the Commission should, at a minimum, reveal the mechanics of the involvement of SSA and DHS, among other agencies, in the data crosscheck project.

## II.     Plaintiff Will Suffer Irreparable Harm Absent a Preliminary Injunction

The collection of sensitive data that reveals an individual's First Amendment activities by federal agencies constitutes irreparable injury to the individual's privacy interests as well as their interests in freedom of expression under the First Amendment.  *Albright*, 631 F.3d at 919 ("although not expressly provided for in the Constitution, courts have long recognized that the First Amendment has a penumbra where privacy is protected from governmental intrusion") (internal quotations and citations omitted).  Indeed, the D.C. Circuit has recognized in the context of Section 552a(e)(7) of the Privacy Act that "unwarranted collection of information [i]s a distinct harm in and of itself."  *Id*. ("[T]he section is directed to inquiries made for research or statistical purposes which, even though they may be accompanied by sincere pledges of confidentiality are, by the very fact that government make (sic) the inquiry, infringing on zones of personal privacy which should be exempted from unwarranted Federal inquiry." (quoting S.Rep. No. 1183, (1974) U.S. Code Cong. & Admin. News at 6971-72)).

Common Cause has submitted declarations from two of its members describing the extent of the injuries that they already have experienced and will continue to experience if the Commission is not enjoined from collection, maintenance, and dissemination data concerning their party affiliation and personal voting history.  Ex. B at ¶ 7; Ex. C at ¶ 5-8.  As these declarations document, voters should not be exposed to high levels of anxiety or have to consider whether they will suffer consequences as a result of their voting and participation in the political process for fear that the Executive Branch is collecting and crosschecking information about their activities.  Such injuries are significant and irreparable.  *See also Albright*, 631 F.3d at 919; *League of Women Voters*, 838 F.3d at 14; *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) ("Brady has submitted declarations from several of its members indicating that they are now concerned for their personal safety in parks and refuges and cannot fully enjoy their visits to certain national parks or wildlife refuges because they feel less safe…..These environmental and aesthetic injuries are irreparable.").

In addition to their members' injuries, Common Cause itself has suffered irreparable injury to its organization and its mission. As outlined in the Declaration of Karen Hobert Flynn, Common Cause has had to divert resources away from its pressing and core projects to activities and actions aimed at counteracting the effects of the Commission's unlawful actions.  Common Cause cannot recover this time or these resources, which demonstrates the irreparable nature of the injury it has and will continue to suffer.  *League of Women Voters*, 838 F.3d at 14 ("Because, as a result of the Newby Decisions, those new obstacles unquestionably make it more difficult for the Leagues to accomplish their primary mission…they provide injury for purposes both of standing and irreparable harm.").  This is not a case where Plaintiff stands to suffer financial harm that can be recouped back through a damages award at a later stage in the litigation.  To the contrary, the injuries that Plaintiff and its members have experienced and will continue to experience as a result of the Commission's actions are irreparable and can only be remedied with the Court's exercise of its equitable powers.

### III.    A Temporary Restraining Order Will Not Substantially Injure Other Interested Parties

No party will be harmed by this Court's issuance of a temporary restraining order.  To start, the governmental interest at stake is a spurious one:  in effect to validate President Trump's unsubstantiated claims of massive voter fraud.  Additionally, the Commission has shown itself rightfully willing to pause its data request to allow legal challenges to its actions to be adjudicated. Thus, the Government will experience no discernable harm in halting its collection, maintenance, and dissemination of party affiliation and voter history data while this Court considers the merits of the case.  Indeed, the Government should have every interest in ensuring that the actions it takes are legal and, thus, waiting until the merits of the claims are determined in this matter prior to engaging in further collection of individuals' data.

On the other side of the scale, Common Cause and its members stand to suffer grave harm, as discussed above, absent an injunction issuing.  In addition to Common Cause and its members, others – such as members of the general public whose own voter files are also subject to the Commission's request – will also experience the very harm the Privacy Act was designed to prevent should this Court not issue temporary relief.  The balance of equities, thus, clearly tilts towards issuing the requested relief.

### IV.    The Public Interest Favors a Temporary Restraining Order

The public interest overwhelmingly favors a temporary restraining order here.  Absent relief, there is a substantial risk that citizens will be disenfranchised and/or hesitant to participate fully and actively in the political process. Echoing the Supreme Court, this Circuit has recognized that the public has a "strong interest in exercising the fundamental political right to vote." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 13–14 (D.C. Cir. 2016) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted)).  Actions, such as the Commission's impermissible attempt to collect and maintain voter history and party affiliation, undermine citizens' rights to vote.  Here, voters have already deregistered as a result of the Commission's requests and additional de-registrations will result from the Commission's

renewed request. Granting temporary injunctive relief is necessary to prevent members of the public from removing themselves from the political process.

Moreover, "there is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters*, 838 F.3d at 12 (quoting *Pursuing America's Greatness v. Fed. Election Commission*, 831 F.3d 500, 511–12 (D.C. Cir. 2016)); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).  The public has a "substantial" interest in "governmental agencies abid[ing] by the federal laws that govern their existence and operations."  *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  No public interest is served in allowing the Defendants to continue their efforts to collect, maintain, and disseminate voter history and party affiliation data in violation of the Privacy Act.

## V.    **Common Cause Has Standing**

Common Cause has organizational and associational standing.  As to the former, organizational standing is established by a "concrete and demonstrable injury to [an] organization's activities – with the consequent drain on the organization's interests."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  For such an injury to exist, "there must . . . be a direct conflict between the defendant's conduct and the organization's mission."  *Abigail All. For Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).  As detailed above, *see supra* at 16-17, 30-31, and in the Declarations of its President and two members, *see* Exs. A-C, the Commission's actions directly conflict with Common Cause's mission.  Those actions have forced Common Cause to divert its resources from ongoing and core projects in order to counteract the effects and fallout of the Commission's actions.  That injury easily suffices to establish organizational standing.  *See e.g., People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*, 797 F.3d 1087 at 1094 (D.C. Cir. 2015) (organizational standing found where "the organization used its resources to counteract [a harm to its mission]"); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the 'actions taken by the defendant have perceptibly impaired the [organization's] programs.'").

With respect to associational standing, courts look to whether (a) an organization's members, or any one of them, has standing to sue in their own right, (b) whether the interests the organization seeks to protect in the litigation are germane to the organization's purpose, and (c) whether the claim or relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342 (1977); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 598 (D.C. Cir. 2015).   Common Cause meets this standard, too.   As outlined above, *see supra* 16-17, 30-31, Common Cause members are experiencing extreme anxiety over their voter history and party affiliation data being released to the Commission without their consent; their confidence in the electoral system is being eroded. Moreover, absent injunction, Common Cause members' personal voter history and party affiliation will be released to the Commission as well as potentially to other third parties or the public.   Any one of these injuries confer standing upon Common Cause members to sue.   *See, e.g., League of Women Voters*, 838 F.3d at 10-14; *Rice v. United States*, 245 F.R.D. 3, 6 (D.D.C. 2007) ("Plaintiffs' assertions of emotional injury were sufficient to survive the government's motion for judgement on the pleadings.") (citing *Albright*, 732 F.2d at 181).   These interests, which Common Cause seeks to vindicate in this action, are germane to its organizational purpose, outlined in detail *supra* at 16-17, 30-31.   And both the claims and relief sought do not require participation of individual members, since the Commission's activities are aimed at all 50 states and the District of Columbia and the remedy sought does not require individualized proof.

Dated: July 28, 2017                    Respectfully submitted,

                                        /s/ *Javier M. Guzman*
                                        Javier M. Guzman
                                        D.C. Bar No. 462679
                                        Josephine Morse* (*pro hac vice motion pending*)
                                        Skye L. Perryman
                                        D.C. Bar No. 984573
                                        Karianne M. Jones** (*pro hac vice motion pending*)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, D.C. 20043
                                        (202) 448-9090
                                        jguzman@democracyforward.org
                                        jmorse@democracyforward.org
                                        sperryman@democracyforward.org
                                        kjones@democracyforward.org

                                        *Attorneys for Plaintiff*

                                        *Admitted to practice in New York; practicing
                                        under the supervision of organization attorneys.

                                        **Admitted to practice in Minnesota;
                                        practicing under the supervision of
                                        organization attorneys.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2017, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system, which will send a notice of filing to all counsel of record.

/s/  Javier M. Guzman
JAVIER M. GUZMAN