# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE
805 15th Street, N.W.
Washington, D.C. 20005,

and

JAN CANTLER
c/o DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043,

and

ANTHONY GUTIERREZ
c/o DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043,

and

THOMAS KENNEDY
c/o DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043,

and

ELLEN NAKHNIKIAN
c/o DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043,

*Plaintiffs*,

vs.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20405,

and

Case No. 1:17-cv-01398 (RCL)

U.S. DEPARTMENT OF HOMELAND SECURITY
245 Murray Lane, S.W.
Washington, D.C. 20528,

and

KRIS W. KOBACH, in his official capacity as Vice-
Chair of the Presidential Advisory Commission on
Election Integrity

*Defendants*.

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Common Cause, Anthony Gutierrez, Thomas Kennedy, Ellen Nakhnikian, and Jan Cantler, hereby sue the Presidential Advisory Commission on Election Integrity ("Commission"), the U.S. Department of Homeland Security ("DHS"), and Kris W. Kobach, in his official capacity as Vice-Chair of the Commission.

### Preliminary Statement

Plaintiffs bring this action to enjoin the Commission and its Vice-Chair, Defendant Kris W. Kobach, from conducting an unprecedented and sweeping investigation into alleged voting misconduct by individual American citizens. Neither the Constitution nor federal law permits this investigation, for which the Commission, acting in concert with other Defendants, has already amassed the politically sensitive voting data of millions of individual American citizens. Moreover, the Commission's continued maintenance of data regarding Americans' political affiliations and voting history violates the Privacy Act of 1974, a Watergate-era law which specifically proscribes the government's collection of information that "describ[es] how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7).

2

Although Executive Order No. 13,799 established the Commission as a "solely advisory" body, the Commission and Defendant Kobach have undertaken multiple actions that not only far outstrip this limited mission but also lack any legal authority. Among these actions, the Commission's investigation began on June 28, 2017, when Defendant Kobach, acting on his own, requested the voting rolls (including individuals' party affiliation and voter history) from all 50 states and the District of Columbia without permitting his fellow Commission members to vote on the data request. Defendant Kobach likewise failed to even notify his fellow Commission members before sending a second data request to the states on July 26, 2017.

In his role as Vice-Chair, Defendant Kobach has made clear his intention to "crosscheck" the data the Commission intakes from the states against other federal databases containing information on individuals (including databases maintained by Defendant DHS and other federal agencies) in order to identify individuals whom the Commission believes to be fraudulently registered to vote. At the Commission's July 19, 2017 meeting, Defendant Kobach spoke openly of modelling the Commission's investigation on the multi-state voting crosscheck program that he runs out of Kansas— known as the Interstate Voter Registration Crosscheck Program—that compares states voting data to identify potential misconduct and target individuals for removal from state voter rolls, including by criminal prosecution. To that end, Defendant Kobach, with the consent of the Commission, directed Commission staff to obtain "whatever data" there was within the federal government (including multiple sources of data on individuals held by Defendant DHS and other federal agencies subject to the Privacy Act) to assist the Commission in its investigation. These actions have driven at least one member of the

Commission, Maine Secretary of State Matthew Dunlap, to publicly question the propriety of the Commission's pursuit of individuals' voting data and to withhold the data of Maine's voters until he better understands "the Commission's goal."   But multiple other states have complied with the Commission's request, and, as a result, the Commission is continuing to collect and maintain voting data on millions of American voters.

In one of his *Breitbart* columns, Defendant Kobach has stated that he contemplates that "*every* investigation" the Commission undertakes will require individuals' state voter roll data.  Defendant Kobach has discussed the need to call witnesses to testify before the Commission concerning specific individuals who allegedly voted fraudulently in elections and believes the state voter data is needed to, among other things, "confirm" the identity and voting history of the individuals named. Just days before the filing of this Amended Complaint, Defendant Kobach publicly targeted and accused a group of voters in New Hampshire of voter fraud in another *Breitbart* column, citing to information presented to the Commission for its September 12 meeting. Defendant Kobach continued to make these accusations in New Hampshire at the Commission's most recent September 12 meeting.  In an apparent attempt to continue their investigation unchecked and keep the public in the dark, neither Defendant Kobach nor other Commission members updated the Commission or the public at the September 12 meeting on the work that the Commission has been conducting.

Defendants may not, under the cloak of a presidential "advisory" Commission, establish a new federal agency within the White House to conduct an unauthorized investigation of the validity of millions of Americans' participation in the political

process.  Doing so directly circumvents the Privacy Act's protections on the collection of information regarding citizens' First Amendment activities as well as the Act's restrictions on disclosure of individuals' information, and lacks any basis in the Constitution or federal law.  Accordingly, Defendants' actions—which are *ultra vires* and violate the Privacy Act and the Administrative Procedure Act—should be enjoined.

### Parties

1.      Plaintiff, Common Cause, is a nonprofit corporation organized and existing under the laws of the District of Columbia.  Common Cause is one of the nation's leading democracy reform organizations and has over one million members and supporters nationwide.  Since its founding in 1970, Common Cause has been dedicated to the promotion and protection of the democratic process, such as the right of all citizens, including its eligible members, to be registered for and vote in fair, open, and honest elections.  Common Cause brings this action on behalf of itself and its members.

2.      Common Cause conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered to vote and have their ballots counted as cast.  Common Cause also advocates for policies, practices, and legislation—such as automatic and same-day registration—that facilitate voting for eligible voters and ensure against disenfranchisement.  Common Cause opposes efforts that burden registration and/or voting, including restrictive voter identification laws, partisan gerrymandering, and any other effort that could potentially chill citizens' rights to register or stay registered.  Common Cause advocates the safeguarding of personal information, in keeping with the dictates of both state and federal law.

3.      Common Cause and its members have been and will be injured by the Defendants' activities, including the efforts to obtain personal and private information regarding voter affiliation, vote history, and other related details.  Common Cause has already expended staff time and resources to engage in non-litigation related outreach and communications efforts to oppose the impermissible collection of voter information as sought by the Commission, diverting resources from its core activities.  The expenditures of resources that Common Cause has been forced to make as a result of the Commission's activities are aimed at counteracting the harm that the Commission's impermissible attempt to collect voter information will cause to Common Cause's mission of encouraging and facilitating voter participation and engagement.

4.      The Commission's attempt to collect voter information will also harm Common Cause's and its members' efforts to encourage voter registration and participation.  For voters and prospective voters facing political polarization, the threat that the federal government will monitor their electoral participation and even their party affiliations is deeply troubling and has deterred and will continue to deter the exercise of their First Amendment-protected rights to express their views through the ballot box.  Further, the Commission's effort to collect voter information is causing registrants and voters to cancel their registration status (as has already occurred in Florida and Colorado) or forgo registering and voting altogether.  Such actions would directly undo the work to which Common Cause has devoted itself over the past few decades and would limit voter engagement and participation in our democracy.  To counteract these harmful effects, Common Cause has been engaged in direct counseling of individual voters seeking to de-

register from voting as a result of the fear they have for what the Commission will do with their personal First Amendment information.

5.     Plaintiff Anthony Gutierrez is a United States citizen and resident of the State of Texas.  Mr. Gutierrez is registered to vote in Texas and his personal information, including political party affiliation and voting history, has been sought by the Commission.  Texas's Secretary of State has stated that he will be providing the Commission with voting information regarding Texas-registered voters such as Mr. Gutierrez.  Mr. Gutierrez has experienced grave concern over his voting history, party, and other personal data being collected by the Commission.  He is also concerned that the Commission's plans to crosscheck the data collected against other federal databases, including those maintained by Defendant DHS, will create obstacles to his future participation in the political process.

6.     Plaintiff Thomas Kennedy is a United States citizen and a resident of the State of Florida, where he is registered to vote.  Originally from Argentina, Mr. Kennedy became a citizen of the United States in 2016 and, upon completing his citizenship ceremony, immediately registered to vote. The Commission has obtained voter information regarding Florida-registered voters such as Mr. Kennedy.  Mr. Kennedy is highly concerned and anxious about the Commission's collection of his voter information as well as its stated plans to perform a crosscheck in concert with other federal agencies, including Defendant DHS, which has and/or imminently will disclose Mr. Kennedy and other naturalized citizens' data to the Commission without consent.  Such a crosscheck will disproportionately disenfranchise and/or hamper recently naturalized citizens, like Mr. Kennedy, from voting and/or participating fully in the political process.  Mr.

Kennedy is especially concerned about Defendants' actions given Defendant Kobach's direct public attacks and animus towards immigrants, like himself. Mr. Kennedy's participation in the political process is, accordingly, threatened by Defendants' actions.

7.     Plaintiff Ellen Nakhnikian is a United States citizen and resident of New York. She is a registered voter. The Commission has obtained voter information regarding New York-registered voters such as Ms. Nakhnikian.  Ms. Nakhnikian is highly concerned about the Commission's collection of her voter information as well as its stated plans to perform a crosscheck in concert with other federal agencies. Such actions undermine her confidence and participation in the political process and also invade her privacy.

8.     Plaintiff Jan Cantler is a United States citizen and resident of New York.  She is a registered voter.  Ms. Cantler is highly concerned about the Commission's collection of her voter information as well as its stated plans to perform a crosscheck in concert with other federal agencies.  Such actions undermine her participation in the political process and also invade her privacy.

9.     Ms. Cantler supported the Governor of New York's stance that voter data would not be disclosed to the Commission, but became anxious and concerned when the Commission took steps to override the Governor's decision in order to obtain her and other New York voters' data.  To express her opposition and in an attempt to persuade the Commission and Defendant Kobach to change its course, Ms. Cantler called Defendant Kobach's office—the Secretary of State's office in Kansas—to reach him. Ms. Cantler was not connected to Defendant Kobach but was connected to someone in the Secretary of State's office.  After making clear that she was not a Kansas constituent, Ms. Cantler expressed her concerns regarding Defendant Kobach and the Commission's

activities to this individual.  The individual rebuffed Ms. Cantler's concerns, stating only

that the data that was being collected by the Commission was "public data."  Ms. Cantler

explained that the data that the Commission was directing the states to provide was not of

the type that could be accessed by the general public without going through certain steps

and that the matching logic that would be used by the Commission to crosscheck

individual voter data could lead to inaccurate and problematic results as well as invasions

of privacy.  The individual continued to rebuff her concerns.

10.     Defendant Commission is a federal agency within the meaning of 5 U.S.C.

§ 552a(a)(1) and 5 U.S.C. § 551(1) that is headquartered in Washington, D.C.

11.     Defendant U.S. Department of Homeland Security is a federal agency within the

meaning of 5 U.S.C. § 552a(a)(1) and 5 U.S.C. § 551(1) that is headquartered in

Washington, D.C.  DHS (including its components) maintains multiple "systems of

records" containing records concerning individuals' immigration status, including, for

example, files of individuals' citizenship applications as well as the Systematic Alien

Verification for Entitlements Program ("SAVE"), a system administered by the U.S.

Citizenship and Immigration Services, a component of DHS, that tracks the legal status

of non-citizens for use in administering benefit programs.  Multiple states have

previously attempted to use the SAVE database to verify individuals' names as part of

voter list maintenance programs.

12.     Defendant Kris W. Kobach is the Vice-Chair of the Commission. He is sued in his

official capacity as Vice-Chair of the Commission. Defendant Kobach was appointed

Vice-Chair of the Commission by President Donald J. Trump.  Laws and policies

Defendant Kobach has championed have been the subject of multiple lawsuits by voters' rights and civil rights groups and have been responsible for suppressing votes.

## Jurisdiction and Venue

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Privacy Act, 5 U.S.C. §§ 552a(b), (e)(7), and the APA, 5 U.S.C. §§ 701-706.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## Legal Framework

15.     Advisory commissions are governed by the Federal Advisory Committee Act, which sets forth various statutory requirements for commissions established by the President or other federal agencies, including requirements regarding public access to committee materials and meetings. *See* 5 U.S.C. app. 2 § 2; *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445-47 (1989).

16.     Lawfully constituted federal agencies are empowered to act by statute and may exercise only the authority prescribed by Congress. *See City of Arlington v. FCC*, 569 U.S. 290, 290 (2013) ("Both [agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*.").  Multiple statutes, including the Privacy Act of 1974 and the Administrative Procedure Act, govern agencies' actions and interactions with members of the public.

17.   The Privacy Act of 1974 regulates the government's collection, maintenance, use, and dissemination of sensitive personal information.

18.   Congress, which passed the Act following Watergate, was "concerned with curbing the illegal surveillance and investigation of individuals by federal agencies that had been exposed during the Watergate scandal."  Overview of the Privacy Act of 1974, Dep't of Justice (last updated July 16, 2015), https://www.justice.gov/opcl/policy-objectives.

19.   Section 552a(b) of the Privacy Act prohibits the "disclos[ure of] any record which is contained in a system of records by any means of communication to any person, or to another agency," unless certain exceptions apply.

20.   Section 552a(e)(7) provides that an agency shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."

21.   As the D.C. Circuit has explained: "The legislative history of the Act reveals Congress' own special concern for the protection of First Amendment rights, as borne out by statements regarding 'the preferred status which the Committee intends managers of information technology to accord to information touching areas protected by the First Amendment of the Constitution.'"  *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980) (citing S. Rep. No. 1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6971). Congress directed Section 552a(e)(7) at "inquiries made for research or statistical purposes which, even though they may be accompanied by sincere pledges of confidentiality are, by the very fact that government make (sic) the inquiry, infringing on

zones of personal privacy which should be exempted from unwarranted Federal inquiry."
*Id.* (citing S. Rep. No. 1183).  This same legislative history also "reveals a concern for
unwarranted collection of information as a distinct harm in and of itself."  *Id.*; *see also
Bassiouni v. FBI*, 436 F.3d 712, 718 (7th Cir. 2006) ("[I]n enacting § 552a, Congress was
motivated by a general concern with the potential for abuse if the Government is allowed
to collect political dossiers about American citizens.").

22.     Moreover, in interpreting the Privacy Act, the D.C. Circuit has "taken particular
care not to undermine the Act's fundamental goals," *Pilon v. U.S. Department of Justice*,
73 F.3d 1111, 1118 (D.C. Cir. 1996), and has resisted "'neat legal maneuver[s]'
attempted by the government that, while literally consistent with the Act's terms, were
not in keeping with the privacy-protection responsibilities that Congress intended to
assign to agencies under the Act," *id.* (alteration in original; citation omitted) (quoting
*Benavides v. U.S. Bureau of Prisons*, 995 F.2d 269, 272 (D.C. Cir. 1993)); *see also Bartel
v. FAA*, 725 F.2d 1403, 1409 (D.C. Cir. 1984) (declining to adopt interpretation that
would have "circumvent[ed]" the Act's privacy protections); *Tijerina v. Walters*, 821
F.2d 789, 797 (D.C. Cir. 1987) (same, regarding interpretation that "would give agencies
license to defang completely the strict limitations on disclosure that Congress intended to
impose").

23.     Accordingly, the D.C. Circuit has held that an agency "may not so much as
collect information about an individual's exercise of First Amendment rights except
under very circumscribed conditions," and that Section 552a(e)(7) applies regardless
whether a record is maintained in an agency's system of records.  *Albright*, 631 F.2d at
919.

24.     The Privacy Act incorporates the definition of "agency" found in the Freedom of

Information Act, 5 U.S.C. § 552a(a)(1), which in turn defines "agency" as "any executive

department, military department, Government corporation, Government controlled

corporation, or other establishment in the executive branch of the Government (including

the Executive Office of the President), or any independent regulatory agency."  *Id.*

§ 552(f)(1).

25.     Whether a governmental entity is an "agency" under the Privacy Act is a case-by-

case determination where "the specific evidence bearing upon that question varies with

the entity in question."  *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558-59

(D.C. Cir. 1996).  Courts in this circuit look at several factors in making this

determination, including whether an entity's sole function is to advise and assist the

President and whether the entity exercises substantial independent authority.  *Citizens for*

*Responsibility & Ethics in Wash.* (*"CREW"*) *v. Office of Admin.*, 566 F.3d 219, 222-23

(D.C. Cir. 2009).  Thus, depending on its specific functions, a commission or other

governmental body can be deemed to be an agency to which the Privacy Act applies.

26.     Although it was formed as a "commission," Defendant Commission is an

"agency" for the purposes of the Privacy Act.

### Factual Allegations

### *Candidate Donald J. Trump's Repeated, Unsubstantiated Claims of Voter Fraud*

27.     Prior to his election, then-presidential candidate Donald J. Trump repeatedly

made unsubstantiated assertions of voter fraud.

28.     On October 10, 2016, candidate Trump tweeted, "Of course there is large scale voter fraud happening on and before election day."[1]

29.     On October 17, 2016, candidate Trump told supporters at a campaign rally in Wisconsin that "voter fraud is very, very common," including voting by "people that have died 10 years ago" and "illegal immigrants."[2]

30.     On November 8, 2016, Donald J. Trump was elected as the forty-fifth president of the United States.

31.     On November 27, 2016, president-elect Trump tweeted, "In addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally."[3]

32.     Three days later, Defendant Kobach echoed the president-elect's assertion, stating that, "I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton."[4]

33.     In December 2016, addressing president-elect Trump's claim that "millions of people voted illegally," Trump senior advisor Kellyanne Conway stated that she has

---

[1] @realDonaldTrump, Twitter (Oct. 17, 2016, 8:33 AM), https://twitter.com/realdonaldtrump/status/787995025527410688?lang=en.
[2] *Donald Trump Campaign Event in Green Bay, Wisconsin*, C-SPAN (Oct. 17, 2016), https://www.c-span.org/video/?417019-1/donald-trump-campaigns-green-bay-wisconsin.
[3] @realDonaldTrump, Twitter (Nov. 27, 2016, 3:30 PM), https://twitter.com/realdonaldtrump/status/802972944532209664.
[4] Hunter Woodall, *Kris Kobach Agrees with Donald Trump That 'Millions' Voted Illegally But Offers No Evidence*, Kansas City Star (Nov. 30, 2016), *available at* http://www.kansascity.com/news/politics-government/article117957143.html.

"been receiving information about the irregularities and about the illegal votes, particularly from sources, officials like Kris Kobach."[5]

34.     Indeed, president-elect Trump met with Defendant Kobach in the days after the election.  Defendant brought to the meeting a document entitled "Department of Homeland Security: Kobach Strategic Plan for the First 365 Days," which outlined various objectives for DHS in the first year of the Trump Presidency, and mentioned voter rolls.

35.     In separate litigation challenging Kansas's non-compliance with the National Voter Registration Act ("NVRA"), Defendant Kobach has resisted releasing the photographed document, which outlines proposed amendments to the NVRA, and consequently he has been fined $1,000 by the court for "deceptive conduct and lack of candor."[6]

***Creation of the Presidential Advisory Commission on Election Integrity to Investigate Voter Fraud***

36.     On January 20, 2017, Donald J. Trump was inaugurated as President of the United States.

37.     Five days later, President Trump tweeted on his official Twitter account: "I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and even, those registered to vote who are dead

---

[5] Emily Shapiro, *Kellyanne Conway Dodges Question on Trump's Claim That 'Millions' Voted Illegally*, ABC News (Dec. 2, 2016), http://abcnews.go.com/Politics/ kellyanne-conway-dodges-question-trumps-claim-millions-voted/story?id=43924056.
[6] Christopher Ingraham, *Federal Judge Upholds Fine Against Kris Kobach for 'Pattern' of 'Misleading the Court' in Voter-ID Cases*, Wash. Post, July 2016, https://www .washingtonpost.com/news/wonk/wp/2017/07/26/federal-judge-upholds-fine-against-kris-kobach-for-pattern-of-misleading-the-court-in-voter-id-cases/?utm_term=.1b1d8491cf31.

(and many for a long time).  Depending on results, we will strengthen up voting procedures!"[7]

38.     On January 25, 2017, President Trump reiterated his claims that allegedly fraudulent votes were cast for his opponent: "We're gonna launch an investigation to find out.  And then the next time—and I will say this, of those votes cast, none of 'em come to me.  None of 'em come to me.  They would all be for the other side. None of 'em come to me.  But when you look at the people that are registered: dead, illegal and two states and some cases maybe three states—we have a lot to look into."  He vowed to "make sure it doesn't happen again."[8]

39.     That same day, CNN reported that according to a senior administration official, "President Donald Trump could sign an executive order or presidential memorandum initiating an investigation into voter fraud as early as Thursday." The official further informed CNN that "[t]he investigation would be carried out through the Department of Justice."[9]

---

[7] @realDonaldTrump, Twitter (Jan. 25, 2017, 7:10 AM and 7:13 AM), https://twitter .com/realDonaldTrump/status/824227824903090176 and https://twitter.com/ realdonaldtrump/status/824228768227217408?lang=en.
[8] *TRANSCRIPT: ABC News anchor David Muir interviews President Trump,* ABC News (Jan. 25, 2017), *available at* http://abcnews.go.com/Politics/transcript-abc-news-anchor -david-muir-interviews-president/story?id=45047602.
[9] Dan Merica et al., *Trump Considers Executive Order on Voter Fraud*, CNN, Jan. 25, 2017, http://www.cnn.com/2017/01/25/politics/trump-calls-for-major-investigation-into- voter-fraud/index.html.

40.     On May 11, 2017, the White House issued Executive Order No. 13,799

establishing the Commission, which President Trump has described as a "Voter Fraud

Panel."[10]

41.     The Executive Order states that the Commission "shall be solely advisory" and

that its "[m]ission" is to study, "consistent with applicable law," the "registration and

voting processes used in Federal elections."[11]

42.     The Commission is chaired by Vice President Michael Pence and is to be

composed of up to 15 additional members having knowledge and experience in

"elections, election management, election fraud detection, and voter integrity efforts" or

having "knowledge or experience that the President determines to be of value to the

Commission."[12]

43.     The Executive Order directs "[r]elevant" executive departments and agencies to

"endeavor to cooperate with the Commission."[13]

44.     The Commission's Charter provides for a dedicated, full-time staff of

approximately three employees; an annual budget of approximately $250,000 for Fiscal

Years 2017 and 2018; and "administrative services, funds, facilities, staff, equipment, and

other support services" furnished by the General Services Administration.[14]

---

[10] *See* Exec. Order No. 13,799 ("Exec. Order"), 82 Fed. Reg. 22,389 (May 11, 2017);
@realDonaldTrump, Twitter (July 1, 2017, 9:07 AM) (capitalization omitted), https://
twitter.com/realdonaldtrump/status/881137079958241280.

[11] Exec. Order No. 13,799.

[12] *Id.*

[13] *Id.*

[14] *Charter of the Presidential Advisory Commission of Election Integrity* ¶¶ 6-7
("Charter"), White House, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/
commission-charter.pdf; Exec. Order § 7.

45.     While the Charter of the Commission provides for three full-time staff members, Defendant Kobach has publicly stated that the Commission's staff is "substantial" and includes both full-time staff as well as individuals detailed from other federal agencies.[15]

46.     Apart from the Chair and Vice-Chair, the Commission presently has ten additional members, consisting of a current member of the United States Elections Assistance Commission, present and former state election and judicial officials, the President and General Counsel of the Public Interest Legal Foundation ("PILF"), and an employee of the Heritage Foundation who also serves on the board of PILF.[16]

47.     According to its bylaws, the Commission acts by votes of its membership.[17]

48.     The Charter for the Commission indicates that the Commission was established in accordance with Executive Order 13,799 and the provisions of the Federal Advisory Committee Act ("FACA"), as amended (5 U.S.C. app. 2).  However, the bylaws state that the Commission only "has voluntarily agreed to operate in accordance with [FACA]."[18]

***Appointment of Defendant Kris Kobach as Vice-Chair of the Commission***

49.     The Charter for the Commission permits the Vice President to appoint a Vice-Chair of the Commission "who may perform the duties of the chair if so directed by the

---

[15] Sam Levine, *Watchdog Groups Sue for Documents on Trump Voter Fraud Probe*, Huffington Post, Aug. 22, 2017, http://www.huffingtonpost.com/entry/trump-voter-fraud-probe_us_599c4ae9e4b04c532f448f59.

[16] Pam Fessler, *Amid Skepticism and Scrutiny, Election Integrity Commission Holds First Meeting*, NPR, July 19, 2017, http://www.npr.org/2017/07/19/537910132/amid-skepticism-and-scrutiny-election-integrity-commission-holds-first-meeting.

[17] *Presidential Advisory Commission on Election Integrity By-Laws and Operating Procedure* § 5, White House, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF.

[18] *Id.* § 2.

Vice President."[19]  Yet, President Donald Trump appointed the Vice-Chair of the

Commission.

50.     In a press release on May 11, 2017, the White House announced that President

Trump had appointed Kris W. Kobach as Vice-Chair.[20]  Defendant Kobach is the only

Secretary of State in the nation with the power to prosecute voter fraud directly, and is

known as a drafter and proponent of many policies that disenfranchise racial and ethnic

minorities from the political process.

51.     As Secretary of State of Kansas, Defendant Kobach has supported a multi-state

crosscheck program, the Interstate Voter Registration Crosscheck Program, that

compares names of individuals among several states to identify potential voter fraud. The

program has been accused of vastly over-identifying cases of alleged voter fraud and has

had the effect of erroneously removing eligible voters from the rolls. The press release

announcing Defendant Kobach's appointment as Vice-Chair stated that the Commission

"will utilize all available data, including state and federal databases."[21]

52.     After being named Vice-Chair, Defendant Kobach described the Commission's

mission as focused on "voter fraud more broadly, all forms of it,"[22] and has explained

that the Commission's "goal is to, for the first time, have a nationwide fact-finding

---

[19] Charter ¶ 11.
[20] *President Announces Formation of Bipartisan Presidential Commission on Election Integrity*, White House (May 11, 2017), https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.
[21] *Id.*
[22] Gary Moore, *Tucker Carlson: Kris Kobach - Trump Executive Order Creates Voter Fraud Commission: 5/11/2017*, YouTube (May 11, 2017), https://www.youtube.com/watch?v=Fm0MjHmYSJU.

effort" focused on assessing "evidence" of "different forms of voter fraud across the country."[23]

53.    Defendant Kobach has stated that the Commission intends to utilize databases from federal agencies in order to "crosscheck" against the names of individual voters to determine if there are alleged fraudulently registered voters on the rolls.  Defendant Kobach has explained that the federal government has always prohibited states from doing such a crosscheck, but that with the creation of the Commission, the government is "going to be able to run [federal] database[s] against one or two states and see how many people are known aliens residing in the United States and also on the voter rolls."[24]

54.    Yet, Defendant Kobach's efforts go far beyond matching a federal database with data from "one or two states."  Defendant Kobach has expanded the scope of the Commission's data collection and crosscheck efforts—stating that the Commission "for the first time in our country's history . . . [will] be gathering data from all 50 states" and using the "federal government's databases" to "bounce[]" the data on individual voters against the federal databases.  He specifically referenced data on individuals in the hands of Defendants DHS, indicating that such data could be checked against state voter rolls to identify fraud.[25]   A spokesman for the Commission has confirmed that the Commission

---

[23] *Transcript: Trump Forms Voter Fraud Commission*, CNN (May 15, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1705/15/nday.06.html.
[24] Moore, *supra* note 24.
[25] *Transcript: Kobach Talks Goals of New Voter Fraud Commission*, Fox News (May 14, 2017), http://www.foxnews.com/transcript/2017/05/14/kobach-talks-goals-new-voter-fraud-commission-commerce-secretary-on-nkorea-missile-test-china-trade-deal.html.

intends to run the voting data it receives on individuals through a number of different databases to check for alleged fraudulent voter registrations.[26]

55.    Defendant Kobach's written public statements as a paid columnist for *Breitbart* have discussed the Commission's need to hear witness testimony concerning voter fraud committed by specific individuals and that it will use data it collects from the states to "confirm" the identity of individual American voters alleged to have committed fraud.[27]

56.    In a *Breitbart* column posted on the Commission's website, Defendant Kobach has targeted and publicly accused a group of individual voters in New Hampshire of fraud, indicating that he has found "proof" within materials provided to the Commission for its most recent meeting that these individuals committed voter fraud.[28]

57.    Defendant Kobach has continually emphasized that the data comparison tactics used by the Commission have never before been used by the federal government.  He bragged that as Secretary of State in Kansas, he implemented a similar program that was challenged in court by the ACLU.

---

[26] Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), *available at* https://www.propublica.org/article/election-experts-see-flaws-trump-voter-commissions-plan-to-smoke-out-fraud.

[27] Kris W. Kobach, *Why States Need to Assist the Presidential Commission on Election Integrity*, *Breitbart* (July 3, 2017), *available at* http://www.breitbart.com/big-government/2017/07/03/kobach-why-states-need-to-assist-the-presidential-commission-on-election-integrity/.

[28] Kris W. Kobach, *It Appears That Out-of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race*, *Breitbart* (Sept. 7, 2017), *available at*  http://www.breitbart.com/big-government/2017/09/07/exclusive-kobach-out-of-state-voters-changed-outcome-new-hampshire-senate-race/; Letter from Sec'y of State William Gardner and Commissioner John Barthelmes to Hon. Shawn N. Jasper (Sept. 6, 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-response-to-nh-speaker-jasper-from-depts-state-safety.pdf; *Speaker Receives Voter Registration Statistics Requested of Departments of State and Safety*, State of New Hampshire House of Representatives, (Sept. 7, 2017) *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-nh-speaker-jasper-report.pdf.

**The Commission's First Meeting and Its Unprecedented and Unauthorized Request for Personal and Voter Data**

58.     Despite the Executive Order's directive and the requirements under FACA that the Commission hold public meetings with prior notice, the Commission first convened as a group on a June 28, 2017, call without any prior public notice.  Following brief welcoming remarks, Vice President Pence disconnected from the call.

59.     Neither the Commission nor the White House provided the public with a transcript of the teleconference.  A brief "readout" of the meeting supplied by the White House stated that Defendant Kobach had informed the other Commission members that a letter would be sent to all 50 states and the District of Columbia requesting data from state voter rolls.

60.     That same day, Defendant Kobach "directed" that a letter be sent under his signature to the Secretaries of State or other election officials in all 50 states and the District of Columbia.  Declaration of Kris W. Kobach ¶ 4, *Elec. Privacy Info. Ctr.* (*"EPIC"*) v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320 (D.D.C. July 5, 2017). The other Commission members neither reviewed nor vetted the actual language of the letter before it was sent.  Nor did the members vote on sending out the letter.

61.     Defendant Kobach's June 28 letter "invite[d]" state officials, among other things, to share "evidence or information . . . you have regarding instances of voter fraud or registration fraud in your state" and asked *how* the Commission could "support" state election officials "with regard to information technology security and vulnerabilities."[29]

---

[29] *See, e.g.*, Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity, to Hon. Elaine Marshall, Sec'y of State, N.C. 1 (June 28, 2017),

62.     The letter requested that the recipients provide by July 14, 2017, "the publicly-available voter roll data for [your state], including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information."[30]

63.     The letter instructed recipients to "submit your responses electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ('SAFE'), which is a secure FTP site the federal government uses for transferring large data files.  You can access the SAFE site at https://safe.amrdec.army.mil/safe/Welcome.aspx."[31]

64.     Shortly after Defendant Kobach sent the letter, one Commissioner, Luis Borunda, Maryland's Secretary of State, resigned from the Commission.

65.     After reports indicated that certain state officials might decline to provide some or all of the data requested by Defendant Kobach, President Trump tweeted: "Numerous states are refusing to give information to the very distinguished VOTER FRAUD PANEL. What are they trying to hide?"[32]

---

*available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-to-states-06282017.pdf.

[30] *Id.* at 1-2.

[31] *Id.* at 2.

[32] @realDonaldTrump, Twitter (July 1, 2017, 9:07 AM), https://twitter.com/realdonaldtrump/status/881137079958241280.

66.     The same day that Defendant Kobach sent his letter, the Voting Section of the

Civil Rights Division of the Department of Justice ("DOJ") sent its own letter to states

requesting their procedures for complying with the statewide voter registration list

maintenance provisions of the NVRA. DOJ requested that states provide their policies for

removing ineligible voters and identify the officials responsible for doing so.[33]

***The Commission's Second Meeting***

67.     At the Commission's second meeting on July 19, 2017, the Commission's

intentions to conduct an unauthorized investigation of alleged individual voter fraud

became even more clear.

68.     Defendant Kobach described his operation of the Interstate Voter Registration

Crosscheck Program in Kansas, under which 30 states pool their voter data to identify

those who are registered in more than one state with the aim of removing duplicative

names from the voter rolls, including by criminal prosecution.[34]

69.     The methodology and reliability of the Interstate Voter Registration Crosscheck

Program have been questioned, and concerns have been raised as to whether it is being

used as a tool for voter suppression.  This notwithstanding, Defendant Kobach then stated

his hope that the Commission's work would be "equally successful on the national

level."[35]

---

[33] *See, e.g.*, Letter from T. Christian Herren, Jr., Chief, Voting Section, Civil Rights Div., U.S. Dep't of Justice, to Hon. Kim Westbrook Strach, Exec. Dir., N.C. State Bd. of Elections (June 28, 2017).
[34] White House, *Presidential Advisory Commission on Election Integrity*, YouTube (July 24, 2017), https://www.youtube.com/watch?v=oZI27wB8-po.
[35] *Id.*

70.     One Commission member described the objective of the Commission's investigation as "deciding . . . how accurate . . . the voter rolls" are.[36]

71.     Referring to the "red tape" and other obstacles that have previously prevented state efforts to obtain information on individuals held by the federal government as part of voter list maintenance programs, Commission members discussed the following information maintained by federal agencies on individuals that could aid the Commission in its investigation:

- ***Department of Homeland Security:*** information on all non-citizens both legally and illegally within the United States as well as answers given by applicants on naturalization forms regarding voting history;

- ***U.S. Census Bureau:*** surveys on individuals who did not vote or did not register to vote;

- ***Federal district courts:*** information regarding individuals excused from jury duty for being non-citizens;

- ***Department of Justice:*** information regarding referrals for criminal prosecution based on non-citizens excused from jury duty or admissions on naturalization forms to having voted in an election as a non-citizen; and

- ***Social Security Administration:*** index of death records.[37]

72.     Repeated references were made at the meeting to referrals of individuals suspected of voter fraud to the DOJ for possible criminal prosecution. For example, one

---

[36] *Id.*
[37] *Id.*

Commission member questioned whether agencies of the federal government and the federal judiciary were forwarding data they collect to DOJ for criminal prosecution.[38]

73.     In response to these comments, Defendant Kobach instructed Commission staff between upcoming Commission meetings to "start trying to collect whatever data there is that's already in the possession of the federal government" that "might be helpful" to the Commission's unauthorized voter fraud investigation.[39]

***The Broadening Scope of the Commission's Unauthorized Investigation***

74.     The scope of the Commission's investigation has broadened even further since the issuance of the initial June 28, 2017 letter and since the two prior Commission meetings.

75.     Although Defendant Kobach's June 28 letter initially gave states a deadline of July 14 to transmit their voters' data, the Commission put the data collection on hold pending a decision on the temporary restraining order and preliminary injunction that was filed in a separate lawsuit.

76.     After preliminary motions in that suit were resolved, Defendant Kobach renewed the data request by a letter dated July 26 to the states, citing to the NVRA's requirement that states maintain voter registration information and explaining that the Commission is interested in "gathering facts" and "going where those facts lead."[40]

77.     Defendant Kobach did not discuss his plans to issue the July 26 letter request with the Commission at the July 19 meeting, nor were the plans to issue the request discussed with Commission members thereafter.  The lack of transparency has concerned

---

[38] *Id.*
[39] *Id.*
[40] *See, e.g.*, Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity, to N.Y. State Bd. of Elections 2 (July 26, 2017).

Commission members, causing at least one of them to question the validity of the Commission's work.

78.     For example, after noting that the data request was not considered or discussed with the full Commission, Commission member Matthew Dunlap stated in a public statement after the July 19 meeting:  "If we're going to act as a Commission, we should really be considering the entire request for data as a body, and determining what it is we're researching and how to look for it."[41]  Mr. Dunlap has refused to provide data from citizens of his state (Maine) until there is clarity as to "the Commission's goal."[42] Commission member and Indiana Secretary of State Connie Lawson has stated that she does not know what the Commission intends to do with the state voter roll data.[43]  West Virginia county clerk, Mark Rhodes, who is also a Commission member, stated after the July 19 meeting that he did not receive any information regarding the Commission's post-meeting activities.  Rhodes was also not informed of Kobach's July 26 request letter prior to its being sent.[44]  Former Arkansas state legislator, David Dunn, who is also a

---

[41] *See Secretary Dunlap Reviewing Elections Commission's Second Request for Voter Data*, Dep't of the Sec'y of State of Me., http://www.maine.gov/sos/news/2017/ electioncommission2.html.
[42] Scott Thistle, *Maine's Sec'y of State says he will Reject Second Request for Voter Registration data*, Portland Press Herald, http://www.pressherald.com/2017/07/31/ maines-secretary-of-state-says-he-will-reject-second-request-for-voter-registration-data/ (last modified Aug. 1, 2017).
[43] Tony Cook and Kaitlin L Lange, *Indiana's secretary of state could be check on Trump voter fraud commission*, IndyStar (July 9, 2017), http://www.indystar.com/story/news/ politics/2017/07/09/indianas-connie- lawson-could-check-trump- voter-fraud-commission/442250001/.
[44] Kira Lerner, *Democrats on Trump's voting commission iced out since first meeting*, ThinkProgress (Aug. 22, 2017), https://thinkprogress.org/democrats-voting-commission-ceec3ea98a33/.

Commission member, similarly stated that he has not received information on the Commission's work after the July 19 meeting.[45]

79.     This notwithstanding, a spokesman for the Commission confirmed that the work of the Commission was continuing and that Commission members would be informed of that work at the next meeting.[46]  As discussed below, such a discussion did not occur at the September 12 meeting, keeping the public and certain Commission members in the dark as to the work that is ongoing.

80.     Numerous states have complied and/or have plans to comply with the Commission's latest request for data—including the request for party affiliation and voter history protected by the First Amendment.  As of the filing of this Amended Complaint, at least 17 states indicated they would provide data and 11 more have said they would do so if the Commission fulfilled certain request requirements.

81.     Although certain states have indicated that they may withhold their voters' data from the Commission, President Trump stated at the July 19 meeting that data from the rest of the states "will be forthcoming," observing that "[i]f any state does not want to share this information, one has to wonder what they're worried about."[47]

82.     The Commission has already shown that it will use other methods to obtain data even in cases where state officials have declined to provide the information in response to the request letter.  For example, in New York, the Commission sought voter data through a Freedom of Information Law request after state officials refused to provide their voter

_____

[45] *See id.*
[46] *See id.*
[47] White House, *supra* note 36.

rolls to the Commission.  To obtain New York's data, the Commission had to certify that it would not use the data, or information derived from it, for any "non-election" purpose.

***The Continual Shifting of the Commission's Plans to Store Voter Information***

83.     The Commission has not been transparent about where it intends to store the personal voter data that it is collecting for its investigation of individual Americans but its efforts have involved other federal agencies.

84.     The initial June 28, 2017 voter data request issued by Defendant Kobach directed states to submit their data to a ".eop.gov" email address.  Yet, Defendant Kobach stated in a sworn declaration in a separate lawsuit over the Commission's activities that he "intended" that only "narrative responses" provided in response to the letter be sent to the eop.gov email address in the letter and that "voter roll data" be uploaded onto the Safe Access File Exchange (SAFE), which he described as a "tested and reliable method of secure file transfer used routinely by the military for large, unclassified data sets" that "also supports encryption by individual users."[48]  The SAFE website is operated by the U.S. Army Aviation and Missile Research Development and Engineering Center, a component within the U.S. Army and the Department of Defense.

85.     After the court in a separate lawsuit inquired if the Department of Defense, by virtue of its role in collecting and maintaining the data on the SAFE website, should be joined as a defendant to that action, the Commission changed course on its storage plans. In a subsequent sworn declaration, Kobach stated that "[i]n order not to impact the ability of other customers to use" SAFE, the Director of White House Information Technology was "repurposing an existing system" to collect the information "within the White House

---

[48] Declaration of Kris W. Kobach ¶ 5, No. 17-1320.

Information Technology enterprise."[49]  When asked by the same Court what other federal agencies support the White House's computer system, the Government stated that the "mechanics" of the White House's information technology program are "something that may not be appropriate to say in a public setting."[50]  When asked by the court whether other agencies were cooperating with the Commission, it stated that none then were.[51]

86.     A week later, another declarant, Charles Herndon, the White House's Director of Information Technology, stated that no other federal agency will have a role in this initial "data collection process" from the states, but left unaddressed the mechanics of the upcoming data crosscheck project and the process for collecting, storing or using the data maintained by the other federal agencies.[52]

87.     The Commission's second data request issued on July 26 by Defendant Kobach described yet another system for collecting the voter data, stating that the "Commission is offering a new tool" to transmit the voter data to the "White House computer system" and that "detailed instructions" would be provided after states reached out to an email address provided in the letter.[53]  The July 26 letter once again left unaddressed any role other federal agencies may have in the operation of this "new tool."

88.     In the weeks since the Commission's second request, at least two Commission members have confirmed that they have been using their personal email to communicate

---

[49] Third Declaration of Kris W. Kobach ¶ 1, *EPIC*, No. 17-1320 (D.D.C. July 10, 2017).
[50] Transcript of Temporary Restraining Order Hearing, *EPIC*, No. 17-1320 (D.D.C. July 7, 2017).
[51] *Id.* at 30:5-13.
[52] Declaration of Charles Christopher Herndon ¶ 6, *EPIC*, No. 17-1320 (D.D.C. July 17, 2017).
[53] *See* Letter from Kobach to N.Y. State Bd. of Elections, *supra* note 42, at 2.

about the Commission's business.[54]   The Commission has not given any indication of

what security precautions accompanied the use of personal email for Commission

business and whether voter data has been transmitted in this manner.

### The Commission's Third Meeting

89.     The Commission convened for a third time on September 12, 2017.

90.     The September 12 meeting was chaired by Defendant Kobach, not Vice President

Pence.

91.     At the September 12 meeting, Defendant Kobach defended his *Breitbart* column,

in which he declared that he had "proof" that individual voters in New Hampshire

committed fraud based on materials that were provided to the Commission by New

Hampshire state officials.

92.     Defendant Kobach's *Breitbart* column now appears on the Commission's website.

93.     During the meeting, Defendant Kobach also touted his authority as Kansas

Secretary of State to prosecute voter fraud, noting that he has prosecuted only 8 cases of

illegal voting due to his limited resources, but that he has more cases "in the hopper."

94.     Commission member and Heritage Foundation Fellow Hans von Spakovsky

testified regarding a database hosted by the Heritage Foundation that purportedly

"documents 1,071 proven incidents of election fraud."[55]

---

[54] Zoe Tillman, *Members Of Trump's Election Integrity Commission Used Personal Email Accounts*, BuzzFeed (Sept. 6, 2017), *available at* https://www.buzzfeed.com/ zoetillman/at-least-one-member-of-trumps-election-integrity-commission?utm_ term=.tygxzmGG1#.krRoWnNNl].

[55] Hans Von Spakovsky, *Presidential Advisory Commission on Election Integrity*, The Heritage Foundation, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei- hans-von-spakovsky-election-presentation.pdf (last visited Sept. 11, 2017).

95.     The Commission also heard testimony from Dr. John Lott Jr., President of the

Crime Prevention Research Center, that every American voter should be subject to a

criminal background check through the federal National Instant Criminal Background

Check System and that the system should be updated to include certain immigration

information.[56]

96.     The Commission received a written presentation by Commission member J.

Christian Adams, highlighting "real life examples" of improper voter registration and

voting by named non-citizens, in part based on materials used in the citizenship process,

and recommending increased reliance on the SAVE database by state election officials as

well as opening "new information-sharing channels" between Defendant DHS and state

officials in order to identify voter fraud more easily.[57]

97.     Other presentations to the Commission recommended, among other things, that

"8,471 cases of likely duplicate voting be investigated for possible wrongdoing" by the

Commission[58] and that increased reliance be placed on data crosscheck methodology to

identify alleged voter fraud.[59]

---

[56] John R. Lott Jr., *Presentation to Presidential Advisory Commission on Election Integrity: A Suggestion and Some Evidence*, Crime Prevention Research Center, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-dr-john-lott-presentation.pdf (last visited Sept. 13, 2017).
[57] Submission from J. Christian Adams, *Garden State Gotcha*, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-submission-J-Christian-Adams_Garden-State-Gotcha_PILF.pdf (last visited Sept. 13, 2017).
[58] Gov't Accountability Inst., America The Vulnerable:  The Problem of Duplicate Voting, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-govt-accountability-institute-problem-duplicate-voting.pdf (last visited Sept. 13, 2017).
[59] *Data Mining for Potential Voter Fraud Findings and Recommendations*, Simpatico Software Systems, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-ken-block-presentation.pdf (last visited Sept. 13, 2017).

98.    At the September 12 meeting, the Commission was not transparent about the work it had conducted since its previous meeting on July 19.

***The Harmful Consequences of the Commission's Unauthorized Voter Fraud Investigation***

99.    As a result of the Commission's unauthorized investigation, thousands of voters have de-registered from the rolls, while others are gravely concerned about how their data will be used by the Commission, making them hesitant to fully participate in the political process.[60]  Inhibiting public participation in this way undermines public confidence in the political process, creating direct harm to Plaintiffs.

100.    As detailed above, Plaintiffs Kennedy, Gutierrez, Cantler, and Nakhnikian are all registered voters whose data is at risk, given Defendants' unauthorized actions and imminent plans.  Plaintiffs are highly concerned and have experienced anxiety over the Commission and Defendant Kobach's investigation and collection of voting data as well as how the Commission and Defendant Kobach will use their voter data.  Plaintiffs are also harmed by Defendants' efforts to crosscheck their individual data and face the imminent prospect that these crosscheck efforts will hamper, impede, and/or suppress their participation in the political process.

101.    As detailed above, Plaintiff Common Cause and its members are and will be harmed by the unauthorized investigation and data collection by Defendants Commission

---

[60] *See, e.g.*, *Thousands Unregister from Voter Rolls After Trump Panel's Data Requests*, NBC News, July 18, 2017, http://www.nbcwashington.com/news/politics/Thousands-Unregister-Voter-Rolls-Election-Integrity-435155813.html; Brian Eason*, More Than 3,000 Colorado Voters Have Canceled Their Registrations Since Trump Election Integrity Commission Request*, Denver Post, July 13, 2017, http://www.denverpost.com/2017/07/13/trump-election-integrity-commissions-colorado-voters-cancel-registration.

and Kobach and have already expended staff time and resources to counteract the Commission's unlawful activities.

102.    As detailed above, Plaintiff Kennedy is and will be harmed by the unlawful disclosure by DHS of his individually identifiable data without his consent.

### Claims for Relief

### Count One
**(*Ultra Vires* Action Against Defendants Commission and Kobach)**

103.    Plaintiffs hereby reallege all allegations in the above paragraphs as if fully set forth herein.

104.    Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

105.    Executive Order No. 13,799 established the Commission as a "solely advisory" body charged to "study" the registration and voting processes used in federal elections "consistent with applicable law."

106.    Defendant Kobach and the Commission have taken multiple actions that lack any authorization in the Constitution, federal law, or the Executive Order and related documents establishing the Commission.  Among them:

  a.  Notwithstanding the Commission's authorization to be purely advisory, the Commission, at Defendant Kobach's direction, has undertaken a sweeping, first-of-its-kind investigation into alleged voting misconduct by individual American citizens that will affect their most fundamental rights.

  b.  Defendant Kobach alone "directed" the unprecedented investigative action of seeking from all 50 states and the District of Columbia on June 28, 2017, the

        voting data of all American citizens without giving other members of the

        Commission the opportunity to approve or vet the request.

   c.   Defendant Kobach did not consult with the other members of the

        Commission—or propose for a vote at the Commission's July 19 meeting—

        before renewing the data request to the states on July 26, 2017.

   d.   Defendant Kobach and the Commission intend to crosscheck the voting data

        obtained from the states against other private information on individuals

        maintained by agencies throughout the federal government (including

        databases maintained by Defendants DHS) in order to identify individuals the

        Commission believes are fraudulently registered to vote.

   e.   When states have previously requested that such a crosscheck be performed

        with DHS databases in order to determine which of their residents may be

        fraudulently registered to vote, Defendant Kobach has acknowledged that the

        federal government has always prohibited such a check.

   f.   Defendant Kobach has discussed the Commission's need to hear testimony

        from witnesses concerning voter fraud committed by specific individuals.

   g.   The Commission has been presented with materials claiming that multiple

        specific individuals have fraudulently registered or voted.

   h.   Defendant Kobach has accused individual voters in New Hampshire of voter

        fraud based on materials presented to the Commission.

107.   Commission member Luis Borunda, Maryland's Deputy Secretary of State,

resigned following Defendant Kobach's June 28, 2017, data request to the states.

108.    Commission members Matthew Dunlap, Mark Rhodes, and David Dunn were kept in the dark about the substance of the Commission's activities following the July 19 meeting.

109.    As a result, Commission member Dunlap has stated he will not comply by sending the data of Maine's voters to the Commission until he better understands "the Commission's goal."

110.    Notwithstanding statements of non-compliance by state officials, President Trump has declared that voting data on individuals will nevertheless be "forthcoming" from every state.

111.    After New York officials declined to comply with the Commission's data request, the Commission obtained the data through other means, after certifying in a public information request that the Commission would be not be using the data for a "non-election" purpose.

112.    The allegations set forth above demonstrate that under Defendant Kobach's leadership, and at his direction, the Commission is engaged in a lawless and unbounded investigation of individual voters for which there is no authorization in the Executive Order, the Constitution, or any act of Congress.

113.    The investigative actions taken by Defendant Kobach and the Commission are completely unauthorized actions by a federal official and a governmental body that are therefore *ultra vires*.

114.    Accordingly, the investigation is *ultra vires* and Plaintiffs are entitled to a declaration that the Commission is without authority to investigate and maintain the voting data of millions of American citizens, an order requiring that any and all such data

in the Commission's possession or that comes into its possession be returned to the states that furnished it, and an injunction preventing Defendant Kobach and the Commission from undertaking this unauthorized investigation.

## Count Two
### (Violation of 5 U.S.C. § 552a(e)(7) By Defendant Commission)

115.    Plaintiffs hereby reallege all allegations in the above paragraphs as if fully set forth herein.

116.    Section 552a(e)(7) of the Privacy Act provides that an agency shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."

117.    The Privacy Act defines "maintain" to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3).

118.    Through the collection, maintenance, use, and/or dissemination of data on individuals' voter history and party affiliation—activity that is protected by the First Amendment—Defendants have violated, and will continue to violate, Section 552a(e)(7).

119.    The collection, maintenance, use, and/or dissemination of these records was unauthorized and does not fall within the scope of a valid law enforcement activity.

120.    As described above, Plaintiffs have been adversely affected by Defendant's maintenance, use, and/or dissemination of their First Amendment-protected data.

## Count Three
### (Violation of 5 U.S.C. § 552a(b) by Defendant Department of Homeland Security)

121.    Plaintiff Kennedy hereby realleges all allegations in the above paragraphs as if fully set forth herein.

122.    Information regarding Plaintiff Kennedy is maintained by Defendant DHS in one or more Privacy Act "systems of records."

123.    Pursuant to 5 U.S.C. § 552a(b), DHS may not "disclose any record which is contained in a system of records by any means of communication to any person, or to another agency," unless certain exceptions apply.

124.    At the July 19, 2017, Commission meeting, Defendant Kobach instructed Commission staff to obtain information that Defendant DHS maintains on individuals including Plaintiff Kennedy, such as DHS's files on the immigration status and citizenship applications of individuals including Plaintiff Kennedy.

125.    On information and belief, DHS has—or imminently will—disclose to the Commission and/or Commission staff information about individuals including Plaintiff Kennedy contained in DHS's "systems of records."

126.    At no time did Plaintiff Kennedy provide DHS either verbal or written consent to disclose information concerning himself to the Commission and its staff.

127.    Upon information and belief, this disclosure was or will be intentional and willful, and no exception in 5 U.S.C. § 552a(b) applies.

128.    Plaintiff Kennedy has been adversely affected as a direct and proximate cause of Defendant DHS's disclosure as described in the paragraphs above.

<u>Count Four</u>
**(Violation of 5 U.S.C. § 706 by Defendants Commission and DHS)**

129.    Plaintiffs hereby reallege all allegations in the above paragraphs as if fully set forth herein.

130.    In collecting, maintaining, using, and/or disseminating data on Plaintiffs' voter history and party affiliation, activity that is protected by the First Amendment, in

violation of 5 U.S.C. § 552a(e)(7), Defendants Commission and DHS have acted arbitrarily, capriciously, in excess of statutory jurisdiction and authority, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706.

131.    In disclosing Plaintiff Kennedy's data in violation of 5 U.S.C. § 552a(b), Defendant DHS has acted arbitrarily, capriciously, in excess of statutory jurisdiction and authority, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706.

132.    The collection, maintenance, use, dissemination, and disclosure of Plaintiffs' data in violation of Sections 552a(e)(7) and 552a(b) of the Privacy Act by Defendants is a final agency action that is not in accordance with law.

133.    If relief is unavailable under the Privacy Act, Plaintiffs are entitled to declaratory and injunctive relief under 5 U.S.C. § 706 enjoining the Defendants from collecting, maintaining, using and/or disseminating the voter history and party affiliation data in violation of Section 552a(e)(7); directing Defendants to expunge any such voter history and party affiliation data that is in their possession or comes into their possession; enjoining Defendant DHS from disclosing individuals' Privacy Act-protected records in violation of Section 552a(b); and directing Defendant Commission to expunge any such data received on Plaintiff Kennedy and other individuals from Defendant DHS.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that Defendant Kobach and the Commission are operating *ultra vires* because they are collecting and maintaining the voting data of millions of Americans as part an investigation they have no legal authority to conduct;

2.      Enjoin Defendant Kobach and the Commission from undertaking the
unauthorized investigation of individual American voters;

3.      Declare that the collection, maintenance, use, and dissemination of voter
history and party affiliation data by Defendant Commission violates Section
552a(e)(7) of the Privacy Act and, in the alternative, the APA;

4.      Enjoin Defendant Commission from the collection, maintenance, use, and
dissemination of voter history and party affiliation data;

5.      Order Defendant Commission to provide an accounting of all voter history
and party affiliation data in their custody, possession, or control; all copies
that have been made of that data; all persons and agencies with whom the
Commission has shared that data; and all uses that have been made of that
data;

6.      Order Defendant Commission to return to any supplying state all voter history
and party affiliation data received from that state or otherwise securely and
permanently delete such data;

7.      Declare that the disclosure of Plaintiff Kennedy's data by Defendant DHS to
the Commission and/or Commission staff violates Section 552a(b) of the
Privacy Act and, in the alternative, the APA.

8.      Enjoin Defendant DHS from the disclosure of individuals' Privacy Act-
protected data to the Commission in violation of Section 552a(b).

9.      Order Defendant Commission to return to DHS the data of Plaintiff Kennedy
and any other data received on individuals in violation of Section 552a(b).

10.     Award Plaintiffs costs and reasonable attorneys' fees incurred in this action;
        and

11.     Grant such other relief as the Court may deem just and proper.


Dated: September 13, 2017                      Respectfully submitted,

                                        /s/ *Skye L. Perryman*
                                        Javier M. Guzman
                                        (D.C. Bar No. 462679)
                                        Josephine Morse *pro hac vice*
                                        Skye L. Perryman
                                        (D.C. Bar No. 984573)
                                        Karianne M. Jones *pro hac vice*
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, D.C. 20043
                                        (202) 448-9090
                                        jguzman@democracyforward.org
                                        jmorse@democracyforward.org
                                        sperryman@democracyforward.org
                                        kjones@democracyforward.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September, 2017, the foregoing Amended Complaint was served electronically on all parties of record via the Court's CM/ECF system.

Dated: September 13, 2017                    /s/ *Skye L. Perryman*