IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMON CAUSE, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>PRESIDENTIAL ADVISORY<br>    COMMISSION ON ELECTION<br>    INTEGRITY, *et al.*,<br><br>    *Defendants.* | Case No. 1:17-cv-1398 (RCL)<br><br>Oral Argument Requested |

**PLAINTIFFS' MOTION, IN THE ALTERNATIVE,
FOR JURISDICTIONAL DISCOVERY**

In their motion to dismiss, Defendants labor to portray the Presidential Advisory Commission on Election Integrity as a run-of-the-mill advisory committee, and to trivialize Plaintiffs' allegations regarding its activities—and the injuries they have caused Plaintiffs—as speculative. In attempting these feats, Defendants are forced to ignore and recast the factual allegations in Plaintiffs' complaint. Because this is improper at the pleadings stage, Defendants' efforts fail, as Plaintiffs' opposition to Defendants' motion to dismiss explains. Plaintiffs' injuries are real and concrete, and this Court has jurisdiction to remedy them. But should this Court have any doubt, Plaintiffs move, in the alternative, for limited jurisdictional discovery to confirm their allegations regarding the Commission's and other Defendants' injurious activities. Given the specificity of Plaintiffs' factual allegations, the liberal standard for seeking jurisdictional discovery, and recent revelations about Defendants' activities, jurisdictional discovery is required before the case may be dismissed for lack of subject-matter jurisdiction.[1]

---

[1] Pursuant to LCvR 7(m), counsel for Plaintiffs conferred with counsel for Defendants prior to filing this motion, and counsel indicated that Defendants would oppose it.

## PLAINTIFFS' ALLEGATIONS ABOUT DEFENDANTS' ONGOING ACTIVITIES

The factual allegations in Plaintiffs' complaint—which must be presumed to be true at this stage—speak for themselves:

The Commission, in concert with other Defendants, has "amassed the politically sensitive voting data of millions of individual American citizens" so that it may "conduct[] an unprecedented and sweeping investigation into alleged voting misconduct by individual American citizens." Am. Compl. at 2; *see, e.g.*, *id.* ¶ 106(a). The President announced the Commission's mission five days after his inauguration, stating that he would "be asking for a major investigation into voter fraud." *Id.* ¶ 37 (capitalization altered); *see id.* ¶ 38 (similar). Defendant Kris Kobach, Vice Chair of the Commission, has confirmed the Commission's aim, explaining that its "'goal is to, for the first time, have a nationwide fact-finding effort' focused on assessing 'evidence' of 'different forms of voter fraud across the country.'" *Id.* ¶ 52; *see also id.* ¶ 70 (another "Commission member described the objective of the Commission's investigation as 'deciding . . . how accurate . . . the voter rolls' are"). It is unsurprising, then, that Kobach has written that "'*every* investigation' the Commission undertakes will require individuals' state voter roll data." *Id.* at 4.

Specifically, Kobach has stated that the Commission needs state voter data "to, among other things, 'confirm' the identity and voting history of the individuals named." *Id.* He has announced that the Commission will "'crosscheck'" this data "against other federal databases containing information on individuals (including databases maintained by Defendant [the Department of Homeland Security or DHS] and other federal agencies) in order to identify individuals whom the Commission believes to be fraudulently registered to vote." *Id.* at 3; *see id.* ¶ 53 ("Kobach has explained . . . that with the creation of the Commission, the government is

'going to be able to run [federal] database[s] against one or two states and see how many people are known aliens residing in the United States and also on the voter rolls.'" (alterations in the original)); *id.* ¶ 54 ("Kobach has . . . stat[ed] that the Commission 'for the first time in our country's history . . . [will] be gathering data from all 50 states' and using the 'federal government's databases' to 'bounce[]' the data on individual voters against the federal databases. . . . [And a] spokesman for the Commission has confirmed that the Commission intends to run the voting data it receives on individuals through a number of different databases to check for alleged fraudulent voter registrations." (certain alterations in the original)); *id.* ¶ 106(d) ("Kobach and the Commission intend to crosscheck the voting data obtained from the states against other private information on individuals maintained by agencies throughout the federal government (including databases maintained by . . . DHS) in order to identify individuals the Commission believes are fraudulently registered to vote.").[2]

The Commission's work is well underway. First, the Commission began gathering individual voter data when Kobach, on June 28, 2017, "requested the voting rolls (including individuals' party affiliation and voter history) from all 50 states and the District of Columbia." *Id.* at 3; *see id.* ¶¶ 60-63, 106(b). Then, on July 26, 2017, Kobach "sen[t] a second data request to the states." *Id.* at 3; *see id.* ¶¶ 76, 106(c). "Numerous states have complied and/or have plans to comply with the Commission's . . . request for data—including the request for party affiliation and voter history protected by the First Amendment." *Id.* ¶ 80; *see id.* ¶ 81 (President Trump has

---

[2] Precedent for the Commission's crosscheck can be found in Defendant Kobach's service as Kansas Secretary of State. "At the Commission's July 19, 2017 meeting, Defendant Kobach spoke openly of modelling the Commission's investigation on the multi-state voting crosscheck program that he runs out of Kansas . . . that compares states['] voting data to identify potential misconduct and target individuals for removal from state voter rolls, including by criminal prosecution." Am. Compl. at 3; *see id.* ¶¶ 51, 68-69.

stated that data from all "states 'will be forthcoming'"); Defendants' Document Index ("Defs.' Doc. Index") at 8-9 (Sept. 29, 2017), *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity* ("*LCCR*"), No. 17-cv-1354 (CKK) (D.D.C. filed Sept. 29, 2017), ECF No. 33-3 (listing state data received).[3] For example, "[t]he Commission has obtained voter information regarding Florida-registered voters such as [Plaintiff Thomas] Kennedy," Am. Compl. ¶ 6; *see* Defs.' Doc. Index at 8 (entry 100, listing data received from Florida); and "regarding New York-registered voters such as [Plaintiff Ellen] Nakhnikian," Am. Compl. ¶ 7, and Plaintiff Jan Cantler, *id.* ¶¶ 8-9; *see* Defs.' Doc. Index at 8 (entry 105, listing data received from New York); *see also* Am. Compl. ¶ 5 ("Texas's Secretary of State has stated that he will be providing the Commission with voting information regarding Texas-registered voters such as [Plaintiff Anthony Gutierrez]").

Second, the Commission has commenced its crosscheck of state voter data with federal data. At the Commission's July 19, 2017 meeting, "Kobach instructed Commission staff . . . to 'start trying to collect whatever data there is that's already in the possession of the federal government' that 'might be helpful' to the Commission's . . . investigation." Am. Compl. ¶ 73. In his Executive Order establishing the Commission, the President directed "'[r]elevant' executive departments and agencies" across his administration "to 'endeavor to cooperate with the Commission.'" *Id.* ¶ 43 (alteration in the original) (quoting Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)). Kobach and the Commission have identified data from DHS as key to the Commission's endeavor. *See id.* ¶¶ 54, 71. Accordingly, plaintiffs have alleged that DHS "has [disclosed] and/or imminently will disclose . . . data" concerning Plaintiff Thomas

---

[3] *See also* Ex. G to Pls.' Opp'n to Defs.' Mot. to Dismiss (Nov. 28, 2017), ECF Nos. 30, 31 (requesting judicial notice and attaching Defs.' Doc. Index as an exhibit).

Kennedy and "other naturalized citizens[] . . . to the Commission." *Id.* ¶ 6; *see id.* ¶ 11 (describing DHS's "Systematic Alien Verification for Entitlements Program"); *id.* ¶ 102 (alleging "the unlawful disclosure by DHS of [Plaintiff Kennedy's] individually identifiable data"); *id.* ¶¶ 124-25 ("Kobach instructed Commission staff to obtain information that Defendant DHS maintains on individuals including Plaintiff Kennedy, such as DHS's files on the immigration status and citizenship applications of individuals including Plaintiff Kennedy," and in response, "DHS has [disclosed]—or imminently will . . . disclose[—]to the Commission and/or Commission staff information about individuals including Plaintiff Kennedy contained in DHS's systems of records."); *id.* ¶ 131 (alleging that DHS has "disclos[ed] Plaintiff Kennedy's data" to the Commission).

In light of the Commission's documented activities, Defendants cannot credibly maintain that it is confining its efforts to "*study[ing]* the registration and voting *processes* used in Federal elections," which is all that the Executive Order creating the Commission authorizes. Exec. Order No. 13,799 § 3, 82 Fed. Reg. 22,389, 22,389 (May 11, 2017) (emphasis added). Rather, the Commission is seeking evidence of voter fraud, individual voter by individual voter, and is planning to refer any specific alleged incidents of fraud to enforcement authorities. Kobach "has discussed the need to call witnesses to testify before the Commission *concerning specific individuals* who allegedly voted fraudulently in elections." *Id.* at 4 (emphasis added); *see id.* ¶ 55. At the Commission's July 19, 2017 meeting, there were "[r]epeated references . . . to referrals of individuals suspected of voter fraud to the [Department of Justice] for possible criminal prosecution." *Id.* ¶ 72. Indeed, Kobach has publicized certain results of the Commission's investigation so far. For example, on the basis of "information presented to the

5

Commission for its September 12 meeting," "Kobach publicly targeted and accused a group of voters in New Hampshire of voter fraud." *Id.* at 4; *see id.* ¶¶ 56, 91, 106(h).

## ARGUMENT

As Plaintiffs have explained in their opposition to Defendants' motion to dismiss, and as is apparent from the above recitation, Plaintiffs' factual allegations about Defendants' activities are detailed, concrete, well-supported, and well-pleaded. As such, at this stage of this litigation, these allegations must be taken as true, including for purposes of establishing Plaintiffs' standing to sue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Defendants nonetheless claim that the Court lacks subject matter jurisdiction, arguing that certain of Plaintiffs' alleged injuries—those purportedly concerning "potential *future* uses of data by the Commission and federal agencies"—are speculative. *See* Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mot.") at 15 (Oct. 18, 2017), ECF No. 27-1. Defendants go so far as to argue that "concern[] over potential *future* uses of data . . . is the only basis for [Plaintiff Kennedy's] claim against DHS." *Id.*; *see id.* at 35-37 (arguing that Plaintiff Kennedy has not sufficiently alleged that he has standing to sue DHS). In so arguing, Defendants mischaracterize Plaintiffs' allegations. But regardless, dismissal for lack of subject matter jurisdiction would not be appropriate until Plaintiffs are permitted limited jurisdictional discovery to confirm their allegations.

**1.** Contrary to Defendants' characterization, Plaintiffs have experienced and alleged injuries stemming from Defendants' past, present, and ongoing efforts. Specifically, as detailed above, Plaintiffs have alleged that the Commission is presently undertaking a voter fraud investigation, *see, e.g.*, Am. Compl. at 4; *id.* ¶¶ 55, 60-63, 72, 76, 106(a)-(c); that in order to do so, the Commission is in receipt of First Amendment-protected data from numerous states, *see, e.g., id.* at 4; *id.* ¶ 80, including (already) from two of the individual Plaintiffs' states, *see id.*

¶¶ 5-9; and that the Commission has begun the process of crosschecking this state data against data from DHS, *see, e.g.*, *id.* at 3; *id.* ¶¶ 6, 53, 54, 71, 102, 106(d), 124-25, 131.  In attempting to argue that all of "the individual [P]laintiffs lack standing," Defendants ignore these allegations, and they fail to specify which of Plaintiffs' alleged injuries, in their view, "concern[] . . . potential future uses of data by the Commission."  *See* Defs.' Mot. at 15.  That does not suffice.

      Defendants' efforts to downplay Plaintiff Kennedy's allegations against DHS are particularly puzzling.  *See id.* at 35-37.  Defendants say that Plaintiff Kennedy only "speculates that [DHS] will share information with the Commission," *id.* at 35; that he merely "posits— based on remarks from individual members—that the Commission will collect information from DHS," *id.*; that he "offers *no allegation* that DHS will agree to share such data," *id.* at 36 (emphasis added); and that he "has offered *no allegations* or evidence that [DHS] will violate the Privacy Act," *id.* at 37 (emphasis added).  To the contrary, Plaintiffs have plainly alleged that DHS "has [disclosed] and/or imminently will disclose . . . data" concerning Plaintiff Kennedy and "other naturalized citizens[] . . . to the Commission."  Am. Compl. ¶ 6; *see id.* ¶¶ 125, 131.  In support of this allegation, Plaintiffs have described how Kobach and the Commission have singled out data that DHS maintains for use in the Commission's crosscheck, *see id.* ¶¶ 54, 71, and how Kobach has "instructed Commission staff to obtain information that Defendant DHS maintains on individuals including Plaintiff Kennedy," *id.* ¶ 124.  Defendants imply that DHS has not complied or will not comply with the Commission's request, Defs.' Mot. at 36, even as they cite the "'presum[ption] that [public officers] have properly discharged their official duties,'" *id.* (second alteration in the original) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)), and even though the President has directed his administration—including

DHS—to investigate alleged voter fraud, *see* Am. Compl. ¶¶ 37-38, and "'to cooperate with the Commission'" in such efforts, *id.* ¶ 43 (quoting Exec. Order No. 13,799 § 7(b)).

More to the point: at this stage of the litigation, given Plaintiffs' well-pleaded allegation that DHS "has [disclosed] and/or imminently will disclose . . . data" concerning Plaintiff Kennedy and "other naturalized citizens[] . . . to the Commission," *id.* ¶ 6, it is not enough—and indeed it is improper—for Defendants to ignore these allegations or to merely *assert* contrary facts in arguing that Plaintiffs lack standing and that this Court lacks jurisdiction.  *See Arpaio*, 797 F.3d at 19.  In challenging Plaintiff Kennedy's standing, Defendants could, of course, have submitted *evidence* demonstrating that DHS has not complied and will not comply with any data requests by the Commission—an agency declaration, for example. *See, e.g.*, *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (a court "may consider materials outside the pleadings" in determining whether it has jurisdiction).  That Defendants chose not to do so is telling.

**2.**  For all of the above reasons, and those stated in Plaintiffs' opposition to Defendants' motion to dismiss, Defendants' attempts to cast doubt on the well-pleaded factual allegations underpinning Plaintiffs' standing are unavailing.  Yet if the Court has any doubt, dismissal is not the proper course.  Rather, the Court should order limited jurisdictional discovery to permit Plaintiffs the opportunity to gather evidence, uniquely in Defendants' possession, concerning Plaintiffs' allegations about Defendants' activities.

"There is no doubt that jurisdictional discovery is permissible in cases," like this one, "where the defendant[s] challenge[] the factual basis of the court's subject-matter jurisdiction." *Wyatt v. Syrian Arab Republic*, 225 F.R.D. 1, 2 (D.D.C. 2004) (citing *Phx. Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In fact, "[t]he D.C. Circuit has stated that

plaintiffs *must* 'be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion.'" *Briscoe v. United States*, No. 16-cv-809, 2017 WL 3188954, at *8 (D.D.C. July 25, 2017) (emphasis added) (quoting *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001)).

"In this circuit, 'if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified.'" *Judicial Watch, Inc. v. Tillerson*, -- F. Supp. 3d --, 2017 WL 5198161, at *11 (D.D.C. Nov. 9, 2017) (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000)). This standard is "'quite liberal.'" *NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55, 60 (D.D.C. 2010) (quoting *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003)); *see Duarte v. Nolan*, 190 F. Supp. 3d 8, 15 (D.D.C. 2016) (jurisdictional "discovery 'is generally to be freely permitted'" (quoting *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 48 (D.D.C. 2010))). Courts therefore allow jurisdictional discovery "'to verify allegations of specific facts,'" *Crist v. Republic of Turkey*, 995 F. Supp. 5, 13 (D.D.C. 1998) (Lamberth, J.) (quoting *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (D.C. Cir. 1992)), when a plaintiff has "'a good faith belief that . . . discovery will enable it to show that the court' enjoys jurisdiction over the suit," *Judicial Watch*, 2017 WL 5198161, at *12 (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)), and "make[s] a 'detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce,'" *id.* (quoting *NBC-USA Hous.*, 774 F. Supp. 2d at 295).

The specific facts that Plaintiffs have alleged, and about which Plaintiffs would seek limited discovery if necessary to assure the Court of its jurisdiction, are:

- The Commission is presently undertaking an investigation of alleged voter fraud. *See, e.g.*, Am. Compl. at 4; *id.* ¶¶ 55, 60-63, 72, 76, 106(a), 106(b), 106(c).

9

- In furtherance of its investigation, the Commission has requested data from DHS. *See, e.g., id.* ¶¶ 6, 54, 71, 73, 124.

- In furtherance of the Commission's investigation, DHS "has [disclosed] and/or imminently will disclose . . . data" concerning Plaintiff Kennedy and "other naturalized citizens[] . . . to the Commission." *Id.* ¶ 6; *see, e.g., id.* ¶¶ 125, 131.

- In furtherance of its investigation, the Commission has begun the process of crosschecking data it has received from states against data it has received from DHS. *See, e.g., id.* at 3; *id.* ¶¶ 6, 53, 54, 71, 102, 106(d), 124-25, 131.

Discovery of these facts would answer any question the Court might have about whether Plaintiffs' factual allegations consist of mere "speculat[ion] about what DHS and the Commission might do in the future," Defs.' Mot. at 15, and, in particular, mere speculation "that the Commission will collect information from DHS," *id.* at 35, and that "DHS will agree to share such data," *id.* at 36.[4] Plaintiffs would propose to discover these facts through a minimal number of interrogatories and document requests to Defendant Commission and Defendant DHS, and short Fed. R. Civ. P. 30(b)(6) depositions of the Commission and of DHS.

In response, Defendants may try to double-down on their assertion that Plaintiffs' claims are speculative. *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008) (requests "for jurisdictional discovery cannot be based on mere conjecture or speculation"). Any such argument would necessarily invite the Court to ignore the factual allegations in Plaintiffs' complaint, which, of course, the Court cannot do. If past is prologue, however, Defendants may protest in particular about Plaintiffs' allegation that the Commission has commenced the process of crosschecking state data against DHS data. At the August 1, 2017 hearing on Plaintiffs'

---

[4] Plaintiffs' discovery requests are "targeted to resolve the jurisdictional issue" that Defendants have attempted to raise. *Sibley v. U.S. Supreme Court*, 786 F. Supp. 2d 338, 347 (D.D.C. 2011). However, to the extent that any "disputed jurisdictional facts . . . are inextricably intertwined with the merits," the D.C. Circuit has instructed the Court to "defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992) (citing *Land v. Dollar*, 330 U.S. 731, 731 (1947)).

motion for a temporary restraining order, for example, in arguing that Plaintiffs' allegations were "purely speculative," Defendants represented that at that time, "the Commission [was] not receiving data from [DHS] and [DHS had] not committed to any kind of data exchange."  8/1 Oral Arg. Tr. at 29.  Crucially, Defendants further represented that, "while the Commission may, in the future, explore the feasibility of exchanging data with [DHS], they haven't done so [yet]." *Id.*

However, in response to Judge Kollar-Kotelly's August 30, 2017 Order in *LCCR*, ECF No. 28, on September 29, 2017, Defendants supplied that court with an "index detailing what specific documents have been collected with respect to the Commission" for potential disclosure under section 10(b) of the Federal Advisory Committee Act, *id.* at 1, where Defendants list at least 23 communications between the Commission and DHS, or among Commission and other staff concerning DHS, from May 12, 2017, to August 24, 2017, *see* Defs.' Doc. Index at 21-22, 25-26, 36-39 (entries 365, 383, 384, 445, 472, 475, 681, 682, 689, 693, 701, 703, 705, 706, 711, 735, 738, 739, 741, 742, 744, 749, 750).  Some of these are email chains comprising an undisclosed number of messages, and Defendants have characterized two of these communications as "[s]ubstantive."  Third Decl. of Andrew J. Kossack ¶ 12(x), *LCCR* (D.D.C. filed Sept. 29, 2017), ECF No. 33-1; *see* Defs.' Doc. Index at 36-37 (entries 681 and 705, marked "(x)" to correspond to Third Decl. of Andrew J. Kossack ¶ 12(x) ("[s]ubstantive")).

Indeed, the very first communication that Defendants list between "Commission/[Office of the Vice President] Staff and Other Government Entities" is an "[e]mail chain from DHS requesting information about the scope of the Commission's work," which Defendants characterize as "[s]ubstantive."  *See* Defs.' Doc. Index at 36 (entry 681).  Defendants have also acknowledged an "email chain" among Commission staff and staff in the Office of the Vice

11

President "about potential partnership opportunities with DHS," *id.* at 22 (entry 383), and an email chain among Commission staff and the Department of Justice concerning "collecting data from non-state entities," *id.* at 39 (entry 748), such as DHS.  Defendants list emails to arrange multiple phone calls between the Commission and DHS, *see id.* at 36-39 (entries 682, 689, 693, 706, 735, 738, 741, 742, 744, 749); emails to arrange meetings between the Commission and DHS, *see id.* at 36-37, 39 (entries 701, 711, 750); and, perhaps most tellingly, an "[e]mail about potential future coordination/overlap between" the Commission and DHS, *see id.* at 37 (entry 705).  That email, which Defendants characterize as "[s]ubstantive," was sent on July 6, 2017, *see id.*, about three weeks before the August 1, 2017 hearing where Defendants argued that Plaintiffs' claims regarding DHS were "purely speculative" and represented that the Commission and DHS had not even "explore[d] the feasibility of exchanging data," 8/1 Oral Arg. Tr. at 29.[5] In their motion to dismiss, Defendants make no mention of the communications between the Commission and DHS that they have now disclosed, nor do they attempt to square those communications with Defendants' representations at the August 1, 2017 hearing.  Those communications are fatal to any further argument by Defendants that Plaintiffs can only "speculate" about collaboration and data sharing between the Commission and DHS.

Because Plaintiffs have demonstrated their "good faith belief" that discovery will enable them to confirm that their jurisdictional allegations are sound, *Caribbean Broad. Sys.*, 148 F.3d at 1090, Plaintiffs' request fits comfortably within this Circuit's caselaw approving jurisdictional discovery.  In *GTE New Media Services*, for example, although the D.C. Circuit rejected the

---

[5] At the August 1, 2017 hearing, Defendants also characterized any claim that the Social Security Administration would share data with the Commission as "purely speculative."  8/1 Oral Arg. Tr. at 29.  Yet just over two weeks later, the Commission in fact had "[e]mail contact with SSA re: SSA data."  Defs.' Doc. Index at 39 (entry 747).

district court's finding of personal jurisdiction, *see* 199 F.3d at 1345, and even went so far as to characterize the jurisdictional record "as plainly inadequate," *id.* at 1352, the Court did not order dismissal but rather remanded for jurisdictional discovery, *see id.* at 1351-52. The Court did so even though it "[could not] tell whether jurisdictional discovery [would] assist [the plaintiff]." *Id.* at 1352. Here, by contrast, Plaintiffs have amply demonstrated how limited jurisdictional discovery would resolve any questions concerning whether Plaintiffs' allegations of defendants' activities are speculative.

Similarly, in *Ignatiev*, even after observing that the "statement of . . . facts" in the plaintiff's complaint was "no doubt at the shorter and plainer end of the descriptive continuum," the D.C. Circuit nonetheless reversed the district court's dismissal for lack of subject matter jurisdiction and remanded for jurisdictional discovery, reaffirming that its caselaw "require[s] that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion." 238 F.3d at 467 (citing *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996), *abrogated on other grounds*, *Samantar v. Yousef*, 560 U.S. 305 (2010)). And in *El-Fadl*, even though the D.C. Circuit agreed that the plaintiff's "jurisdictional allegations [were] insufficient," it reversed the district court's dismissal for lack of personal jurisdiction and remanded for jurisdictional discovery because the plaintiff had "sufficiently demonstrated that it [was] possible that he could supplement [his jurisdictional allegations] through discovery," in that his allegations were "not conclusory" and "not implausible." 75 F.3d at 676.[6] If the D.C. Circuit concluded that jurisdictional discovery was

---

[6] *See, e.g.*, *Briscoe*, 2017 WL 3188954, at *8 (upon finding that the plaintiffs had not sufficiently alleged subject matter jurisdiction, and even after observing that the "plaintiffs [did] not appear to have any specific grounds to claim" that the court had subject matter jurisdiction, nonetheless denying the defendants' motion to dismiss and ordering jurisdictional discovery); *Diamond Chem. Co.*, 268 F. Supp. 2d at 15 (following *GTE New Media Services* and ordering

13

warranted in *GTE New Media Services*, *Ignatiev*, and *El-Fadl*, then to the extent this Court requires any assurance it is plainly warranted here, where Plaintiffs have demonstrated its utility with specificity and alleged facts sufficient to plausibly establish subject-matter jurisdiction.

## CONCLUSION

Plaintiffs respectfully request that, if the Court has any doubt as to its subject-matter jurisdiction, the Court grant Plaintiffs' request for limited jurisdictional discovery.

Dated: November 28, 2017

Respectfully submitted,

/s/ *Skye L. Perryman*
Javier M. Guzman (D.C. Bar No. 462679)
Skye L. Perryman (D.C. Bar No. 984573)
Josephine Morse, *pro hac vice*\*
Democracy Forward Foundation
1333 H. Street NW
Washington, D.C. 20005
(202) 448-9090
jguzman@democracyforward.org
sperryman@democracyforward.org
jmorse@democracyforward.org

\* Admitted in New York; practicing under the supervision of members of the D.C. Bar while D.C. Bar application is pending.

*Counsel for Plaintiffs*

---

jurisdictional discovery "even though [the plaintiff had] not made out a *prima facie* case of jurisdiction").

## CERTIFICATE OF SERVICE

      I hereby certify that on November 28, 2017, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM-ECF system.

                                                /s/ *Skye L. Perryman*
                                                Skye L. Perryman