**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

       Plaintiffs,

v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY, *et al.*,

       Defendants.

Civil Action No. 1:17-cv-1398 (RCL)

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

   I.   PLAINTIFFS LACK STANDING ................................................................................ 2

      A.  The Individual Plaintiffs Lack Standing ...................................................... 2

      B.  Common Cause Lacks Representational Standing ....................................... 5

      C.  Common Cause Lacks Organizational Standing .......................................... 6

   II.   PLAINTIFFS CANNOT STATE A CLAIM UNDER THE PRIVACY ACT OR THE APA ........................................................................................................................... 8

      A.  The Commission Does Not Exercise Substantial Independent Authority ................... 8

          1.   Plaintiffs have not pled facts showing that the Commission has undertaken a purported investigation into individual American citizens ................................... 8

          2.   Plaintiffs' claim that the Commission is conducting "evaluation plus advice" is not enough to surmount the agency bar ............................................................. 13

      B.  The Privacy Act Precludes the Injunctive Relief Plaintiffs Seek .............................. 14

      C.  Plaintiffs Cannot Obtain Injunctive Relief Through the APA .................................... 17

      D.  Common Cause, an Organization, Cannot Sue Under the Privacy Act ...................... 20

  III.   PLAINTIFF KENNEDY HAS NOT STATED A CLAIM AGAINST THE DEPARTMENT OF HOMELAND SECURITY ............................................................ 21

  IV.   PLAINTIFFS HAVE NOT STATED AN *ULTRA VIRES* CLAIM ............................... 22

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009). ................................................................. 21

*Albright v. United States,*
    631 F.2d 915 (D.C. Cir. 1980) ............................................... 3, 16

*Albright v. United States,*
    732 F.2d 181 (D.C. Cir. 1984) ................................................... 3

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ................................................................ 16

*Ass'n of Flight Attendants-CWA v. Dep't of Transp.,*
    564 F.3d 462 (D.C. Cir. 2009) ................................................... 5

*Attias v. Carefirst, Inc.,*
    865 F.3d 620 (D.C. Cir. 2017) ................................................... 4

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................... 10, 12

*Cell Assocs., Inc. v. Nat'l Insts. of Health,*
    579 F.2d 1155 (9th Cir. 1978) ........................................ 14, 16, 18

*Chung v. Dep't of Justice,*
    333 F.3d 273 (D.C. Cir. 2003) ......................................... 14, 17

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.,*
    566 F.3d 219 (D.C. Cir. 2009) ................................................... 8

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .................................................................. 21

*Clapper v. Amnesty Intern. USA,*
    568 U.S. 398 (2013) .......................................................... 4, 6, 7

*Comm. in Solidarity with People of El Salvador v. Sessions,*
    738 F. Supp. 544 (D.D.C. 1990) ............................................... 20

*Diaz-Bernal v. Myers,*
    758 F. Supp. 2d 106 (D. Conn. 2010) ...................................... 18

*Doe v. Chao*,
  540 U.S. 614 (2004) .................................................................................. 3, 18, 19

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ...................................................................... 14, 20

*Edison v. Dep't of the Army*,
  672 F.2d 840 (11th Cir. 1982).............................................................................. 14

*Elec. Privacy Info. Ctr. v. Dep't of Educ.*,
  48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................. 7

*Energy Research Foundation v. Defense Nuclear Facilities Safety Board*,
  917 F.2d 581 (D.C. Cir. 1990) ......................................................................... 13, 14

*FAA v. Cooper*,
  566 U.S. 284 (2012) .............................................................................................. 19

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 7

*Haase v. Sessions*,
  893 F.2d 370 (D.C. Cir. 1990) ............................................................................. 15

*Hinck v. United States*,
  550 U.S. 501 (2007)........................................................................................ 16, 18

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) (en banc) ............................................................... 8

*In re Dep't of Veterans Affairs (VA) Data Theft Litig.*,
  No. 06-0506 (JR), 2007 WL 7621261 (D.D.C. Nov. 16, 2007)............................... 20

*In re United States v. Philip Morris USA, Inc.*,
  396 F.3d 1190 (D.C. Cir. 2005) ........................................................................... 15

*In re U.S. Office of Personnel Mgm't Data Sec. Breach Litig*,
  No. 15-1394 (ABJ), 2017 WL 4129193 (D.D.C. Sept. 19, 2017) ..................... 4, 6, 8

*Judicial Watch v. Nat'l Policy Dev. Group*,
  219 F. Supp. 2d 20 (D.D.C. 2002) ....................................................................... 24

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994).............................................................................................. 15

*Laird v. Tatum*,
  408 U.S. 1 (1972) ................................................................................................... 4

*Lake v. Rubin*,
    162 F.3d 113 (D.C. Cir. 1998) ................................................................. 18

*\*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................... 17

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996) ............................................................................... 16

*\*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993) ................................................. 8, 13, 14

*Mittleman v. U.S. Treasury*,
    773 F. Supp. 442 (D.D.C. 1991) ............................................................ 18

*Monell v. Dep't of Social Servs. of City of N.Y.*,
    436 U.S. 658 (1978) ............................................................................... 25

*N.L.R.B. v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ............................................................................. 15

*Nagel v. U.S. Dep't of Health, Educ., & Welfare*,
    725 F.2d 1438 (D.C. Cir. 1984) ............................................................. 16

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ..................................................................... 7

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Service*,
    604 F. Supp. 2d 665 (S.D.N.Y. 2009) .................................................... 20

*Nat'l Fed. of Federal Emps. v. Greenberg*,
    789 F. Supp. 430 (D.D.C. 1992) ............................................................ 20

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ............................................................... 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ................................................................................. 25

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................... 7

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ............................................................................... 15

*Professional Dog Breeders Advisory Council v. Wolff*,
    No. 09-cv-258, 2009 WL 2948527 (M.D. Pa. Sept. 11, 2009) .............. 20

*Radack v. U.S. Dep't of Justice*,
    402 F. Supp. 2d 99 (D.D.C. 2005) ........................................................ 18

*Rushforth v. Council on Econ. Advisers*,
    762 F.2d 1038 (D.C. Cir. 1985) ............................................................ 14

*Scott v. Conley*,
    937 F. Supp. 2d 60 (D.D.C. 2013) ........................................................ 15

*Slate v. Public Def. Serv. for D.C.*,
    31 F. Supp. 3d 277 (D.D.C 2014) ......................................................... 24

*Smith v. Nixon*,
    807 F.2d 197 (D.C. Cir. 1986) .............................................................. 16

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ............................................................ 14

*Sussman v. United States Marshals Service*,
    494 F.3d 1106 (D.C. Cir. 2007) ............................................................ 17

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
    444 U.S 11 (1979) ................................................................................. 16

*United States v. Armstrong*,
    517 U.S. 456 (1996) .............................................................................. 22

*United States v. Chemical Found., Inc.*,
    272 U.S. 1 (1926) .................................................................................. 22

*Wilson v. Libby*,
    535 F.3d 697 (D.C. Cir. 2008) .............................................................. 14

*Woodened v. Lenape Regional High School Dist.*,
    535 F. App'x 164 (3d Cir. 2013) ............................................................. 5

## **Constitutions**

U.S. Const. art II ........................................................................................ 24

## **Statutes**

5 U.S.C. § 552a ................................................................................... passim

5 U.S.C. § 702 ...................................................................................... 17, 19

## **Other Authorities**

Privacy Act Guidelines, 40 Fed. Reg. 28,948, 28,968 (July 9, 1975) ........................................... 19

Executive Order 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)..................................................... 9

Gary Moore, *Tucker Carlson: Kris Kobach – Trump Executive Order Creates Voter Fraud Comm'n* (May 11, 2017),
    https://www.youtube.com/watch?v=Fm0MjHmYSJU) ........................................................... 9

Gov't Accountability Inst., America the Vulnerable: The Problem of Duplicate Voting (2017),
    https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-govt-accountability-
    institute-problem-duplicate-voting.pd. .............................................................................. 12

H.R. Rep. No 94-1656 (1976)...................................................................................................... 19

Kris W. Kobach, *Why States Need to Assist the Presidential Comm'n on Election Integrity*, Breitbart (July 3, 2017),
    http://www.breitbart.com/big-government/2017/07/03/kobach-why-states-need-to-assist-the-
    presidential-commission-on-election-integrity/...................................................................... 10

Presidential Advisory Commission on Election Integrity By-Laws § V(A),
    https://www.whitehouse.gov /sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF....... 25

## **INTRODUCTION**

In their Amended Complaint, plaintiffs allege that the Presidential Advisory Commission on Election Integrity (the "Commission") and the Department of Homeland Security ("DHS") have violated the Privacy Act, such that broad injunctive relief is warranted.  Plaintiffs also allege that the Commission has taken *ultra vires* action by purportedly conducting an investigation into individual voters.  Plaintiffs, however, fail in their opposition to show that they have established their Article III standing, or that they state a claim for which relief may be granted.  The Amended Complaint should be dismissed.

To begin, plaintiffs have not established their standing.  The individual plaintiffs attach new affidavits attempting to establish their injury, but they point to speculative harm that is not sufficient to establish injury-in-fact.  Common Cause has also failed to show it has representational or organizational standing.  While it has for the first time in its opposition identified members, it has not established that those members have been injured.  Nor does its voluntary decision to reallocate its resources from one advocacy activity to another establish standing.  In any event, plaintiffs fail to state a claim.  The Commission is not an agency subject to the Privacy Act or Administrative Procedure Act ("APA").  Plaintiffs concede in their opposition that the Commission has not been tasked by its foundational Executive Order with exercising substantial independent authority, which is the most important consideration in determining agency status, but nonetheless claim that it has undertaken an investigation into individual Americans in a manner that constitutes the functional exercise of such power.  Their opposition points to no facts, however, establishing such an investigation; rather, it twists facts in the Amended Complaint to speculate that one *might* exist in a way that is not enough to surmount a motion to dismiss.  Nor have plaintiffs shown a right to relief.  Plaintiffs have not rebutted defendants' arguments that broad

1

injunctive relief of the type they seek is not available under the Privacy Act or APA. Instead, they rely on dicta to resist these conclusions, but such dicta are not binding legal authority, and in any event have been superseded by more recent Supreme Court jurisprudence. Plaintiffs' claim against DHS also fails because it is entirely speculative that the agency will take any action involving plaintiffs' information; a conclusion plaintiffs do not seriously challenge in their opposition. Finally, there is no basis for the extraordinary remedy of *ultra vires* relief, again because plaintiffs have not pled facts showing that the Commission is at present conducting (or intending immensely to conduct) an investigation into individual Americans.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING

### A.    The Individual Plaintiffs Lack Standing

Despite plaintiffs' attempt to supplement their averments, the individual plaintiffs in this case still fail to allege a cognizable injury-in-fact sufficient to establish standing. Plaintiffs Cantler and Nakhnikian allege only generally that there has been an "invasion of . . . personal privacy," Cantler Decl. ¶ 14, ECF No. 30-1; Nakhnikian Decl. ¶ 11, ECF No. 30-6, a claim that collapses back on the allegation that there has been a violation of the Privacy Act. *See also* Pls.' Opp'n to Defs.' Mot. to Dismiss Am. Compl. ("Opp'n") at 8, 13, ECF No. 30. But the alleged violation alone is not sufficient to establish standing. Plaintiffs must allege some actual concrete or imminent harm to themselves, apart from the violation standing alone. These plaintiffs have failed to do so. The speculative and inflated list of *defendants'* possible activities plaintiffs posit on page 15 of their Opposition does not substitute for a description of actual or imminent harm to be suffered by *plaintiffs.*

Plaintiffs point to *Albright v. United States*, 631 F.2d 915 (D.C. Cir. 1980), to support their position that the "mere inquiry of the government into an individual's First Amendment rights" is sufficient to establish standing.  *See* Opp'n at 14 (quoting *Albright*, 631 F.2d at 919).  But that is not the holding of *Albright I*.  The quoted phrase was addressing the congressional concerns behind enactment of the Privacy Act, not standing.  Ultimately, *Albright I* decided the question of whether a record not incorporated within a "system of records" was covered by the Privacy Act; it did not address standing.  Indeed, the court noted that plaintiffs "concede[d] that the district court did not rule on th[e] question" of whether the plaintiffs had adequately pled facts demonstrating "adverse effect," the statutory equivalent to standing.  631 F.2d at 921; *see also Doe v. Chao*, 540 U.S. 614, 624 (2004) (Privacy Act plaintiff must have suffered an "adverse effect," which is a "term of art identifying a potential plaintiff who suffers the injury-in-fact and causation requirements of Article III standing"); 5 U.S.C. § 552a(g)(1)(D).  That latter question was addressed in *Albright v. United States*, 732 F.2d 181 (D.C. Cir. 1984) ("*Albright II*").  There, the court concluded that "emotional trauma alone is sufficient to qualify" as an injury for the purposes of "adverse effect," *id.* at 186, but then held that the plaintiffs had not established that their alleged emotional trauma was tied to the defendants' conduct, *id.* at 186-88.  Accordingly, the court ruled that plaintiffs had not established that they had suffered an adverse effect, *id.*, and therefore also did not have standing.  Had a statutory violation alone been enough for an "adverse effect," the case would have come out differently.

Nor do Cantler's and Nakhnikian's alleged "fears" of future consequences (such as being wrongly identified as ineligible to vote) or loss of "confidence" in the election process sufficient to establish the necessary injury.  Opp'n at 13.  Plaintiffs' speculations about future events are insufficient to create the necessary "certainly impending" injury to establish Article III standing.

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013).  Indeed, plaintiffs' fears and loss of confidence are to some extent self-inflicted injuries of the type rejected in *Clapper*.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.* at 416; *see also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

One plaintiff, Kennedy, states that the Commission's maintenance of his data and DHS's alleged disclosure of other data has caused him "emotional anguish" and to be "highly concerned and suffer anxiety."  Kennedy Decl. ¶¶ 12, 13, ECF No. 30-4.  His anguish stems primarily from his belief that the Commission intends to crosscheck his voter registration data against data about him possessed by DHS.  *Id.* ¶ 10; Opp'n at 15.  But this claim is also too speculative to support standing.  The Amended Complaint alleges only facts showing an "intention" to conduct such a crosscheck activity, but does not assert there are concrete plans to do so in the immediate future.  Am. Compl. p. 3, ¶ 54, ECF No. 21.  Nor is there any evidence that such an endeavor will produce mistakes or harm to voters.  In the absence of concrete, immediate plans and of any evidence of future misuse of the data, plaintiff Kennedy lacks standing as well.  The case relied upon by plaintiffs, *Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), for the proposition that standing claims in a data-breach context can lie based on "allegations of a substantial risk of future injury," Opp'n at 17, is inapplicable here.  Unlike in *Attias*, neither Kennedy nor the other plaintiffs plead facts from which a substantial risk of things going wrong could be inferred.  *Cf. Attias*, 865 F.3d at 628 (finding a sufficient substantial risk of harm where "an unauthorized party has already accessed personally identifying data on CareFirst's servers"); *In re U.S. Office of Personnel Mgm't Data Sec. Breach Litig.* ("*In re OPM*"), No. 15-1394 (ABJ), 2017 WL 4129193, at *25 (D.D.C.

4

Sept. 19, 2017) ("Even an objectively reasonably likelihood of harm sufficient to engender some anxiety does not create standing."), *appeals docketed*, Nos. 17-5217 & 17-5232 (D.C. Cir. Sept. 27 & Oct. 12, 2017), No. 18-1182 (Fed. Cir. Nov. 15, 2017).

### B.   Common Cause Lacks Representational Standing

Common Cause lacks representational standing, *i.e.*, it lacks standing to sue on behalf of its members. *See Ass'n of Flight Attendants-CWA v. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009). While plaintiffs do confirm in their opposition that several of the individual plaintiffs are themselves members of Common Cause, *see* Opp'n at 19 (referring to Gutierrez, Cantler, and McClenaghan Declarations), they have not established that these members themselves have been injured by the defendants, such that they have standing. Ms. Cantler, for example, stated that she was injured by the Commission's activities because those activities invaded her personal privacy, put her personal data at risk for theft, hindered her ability to fully participate in the political process without fear, and presented a "substantial risk" that the collection of data would lead to the suppression of her vote. Cantler Decl. ¶¶ 14-15, ECF No. 30-1. Mr. Gutierrez stated that he is anxious "over how the federal government is going to use [his] personal data," that the collection of data "undermines [his] confidence in the electoral system," and that he is fearful that the collection of data will lead to suppression of his vote. Gutierrez Decl. ¶¶ 7-9, ECF No. 30-3. Ms. McClenaghan raised similar concerns. McClenaghan Decl. ¶¶ 7-8, 12-13, ECF No. 30-5.

The first allegation – that the Commission has invaded the privacy of Common Cause's members – is merely an allegation that the Commission has violated the Privacy Act, without describing the *injury* alleged to have been caused by that harm. Second, the members allege that their ability to "fully participate in the political process" has been hindered. These members do not show how their ability to participate in the political process has been frustrated, however, and

so such complaints are "conjectural." *See, e.g.*, *Woodened v. Lenape Regional High School Dist.*, 535 F. App'x 164, 167 (3d Cir. 2013) (hypothetical fear of frustration of political participation rights are not sufficient for standing).   Third, the members state that there is a risk that the collection of data would lead to the suppression of their vote.   Such claims, however, stack speculation on top of speculation:  that the Commission will compare the public data it receives to other data sources; that it will then find a "false positive"; and that it will then take action against the member.   Such claims of speculative future injury are too attenuated to constitute injury-in-fact.  *See Clapper*, 568 U.S. at 410.   Finally, the members claim that they are fearful of a future breach of their information.   This is merely a speculative fear of a future injury absent any showing of a data breach; indeed, even had there been a breach, that would not be enough, as "plaintiffs cannot predicate standing on the basis of [a] [data] breach alone."  *In re OPM*, 2017 WL 4129193, at *11.

### C.      Common Cause Lacks Organizational Standing

Common Cause also lacks standing to sue on its own behalf, because it has not itself been injured.   Rather, as it makes clear in its opposition, the organization has engaged in an advocacy campaign against the Commission, which is in keeping with its mission of encouraging voting. *See* Opp'n at 20-23.   As Common Cause pleads, it is an organization that is focused on elections and promoting the right to vote (though not, notably, privacy).  *See* Opp'n at 21; Am. Compl. ¶ 1. The activities it claims it has undertaken in response to the Commission are in keeping with its goals of promoting the right to vote, for example, conducting outreach, supporting voter registration efforts, and engaging in direct counseling of individual voters.  Opp'n at 22.   Common Cause also alleges that its other voter-related activities have "suffered because Common Cause

has had to divert resources from those efforts in order to try to counteract the effects of the Commission's investigation." *Id.* at 22.

This diversion of resources, however, represents Common Cause's voluntary decision to reallocate its resources from one advocacy activity to another, neither of which involve the protection of personal privacy – the purpose of the Privacy Act.  Such a voluntary reallocation decision is not enough to establish organizational standing.  In *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015), the plaintiffs made a similar argument:  that they had to spend additional time and money in response to a new federal policy, in order to educate and advocate to the public.  The D.C. Circuit concluded that this was "no more than an abstract injury to [plaintiff's] interests."  *Id.*; *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (an organization's decision to "redirect[]" resources "is insufficient to impart standing upon the organization"); *Elec. Privacy Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014) (holding that the "expenditures . . . EPIC . . . made in response to the [new regulation] have not kept it from pursuing its true purpose as an organization but have contributed to its pursuit of its purpose").  Nor is this a situation where defendants have taken a specific action that has hindered plaintiff's organizational interest.  In *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015), for example, the defendant denied the plaintiff "access to an avenue for redress and denial of information," *Food & Water Watch*, 808 F.3d at 920; here, by contrast, plaintiffs make no comparable claim.  Indeed, were it otherwise, an organization could create standing simply by re-allocating resources from one advocacy activity to another, a conclusion that flies in the face of the Supreme Court's admonition that plaintiffs cannot "manufacture standing merely by inflicting harm on themselves."  *Clapper*, 568 U.S. at 402.

7

## II.   PLAINTIFFS CANNOT STATE A CLAIM UNDER THE PRIVACY ACT OR THE APA

### A.   The Commission Does Not Exercise Substantial Independent Authority

As plaintiffs acknowledge, the test of whether the Commission is an "agency" for purposes of the Privacy Act and the APA is whether it has "wielded substantial authority independently of the President." *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") v. *Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009); *see also* Mot. to Dismiss ("MTD") at 16-24, ECF No. 27-1; Opp'n at 24-32.  Plaintiffs apparently concede that the Commission lacks *de jure* substantial independent authority based on its foundational documents, *see* Opp'n at 28, which "is the most important indication of the [Commission's] role," *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993); *cf. In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (en banc) (construing whether an entity is subject to FACA based on authority set out in the foundational document).  But then they go on to claim that the Commission has acquired and used such authority *de facto* in a manner sufficient for it to constitute an agency.  But the facts in the Amended Complaint, taken as true, do not establish such a showing.[1]  Accordingly, plaintiffs' Privacy Act and APA claims should be dismissed on this threshold ground alone.

###   1.   Plaintiffs have not pled facts showing that the Commission has undertaken a purported investigation into individual American citizens

Plaintiffs claim that the facts in their Amended Complaint "demonstrate[] that . . . the Commission has 'undertaken a sweeping, first-of-its-kind investigation into alleged voting

---

[1] The proposed *Amicus Curiae* brief filed by former National Security and Technology Officials, ECF No. 38-1, does not address the threshold issue of whether the Commission is an agency, *see id.* at 17-20, and its speculation about potential future harms caused by a potential future  data breach would not, in any event, be sufficient to establish Article III standing.  *See, e.g.*, *In re OPM*, 2017 WL 4129193, at *12.

misconduct by individual American citizens.'"  Opp'n at 28 (quoting Am. Compl. ¶¶ 105, 106(a)). But the actual facts plaintiffs cite in their Amended Complaint do not support the existence of any such investigation.

First, plaintiffs cite isolated statements by individual Commission or staff members about their purported intentions.  But these statements do not show that the Commission actually *is* investigating individuals.  Plaintiffs first allege that Vice Chair Kobach – on the day the Executive Order was issued and before the Commission had begun any work – said that the Commission's goal was to have a "nationwide fact-finding effort focusing on assessing 'evidence' of different forms of voter fraud across the country."  Opp'n at 29 (quoting Am. Compl. ¶ 52).  Far from declaring an intent to investigate individual allegations of voter fraud (which the statement says nothing about), this statement shows a "fact-finding effort" followed by a recommendation, which is what the Executive Order contemplates.  *See* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("The Commission shall, consistent with applicable law, study the registration and voting processes used in Federal elections . . . and shall submit a report to the President.").

Plaintiffs next say that Vice Chair Kobach "has stated that the Commission intends to utilize databases from federal agencies in order to 'crosscheck' against the names of individual voters to determine if there are alleged fraudulently registered voters on the rolls."  Opp'n at 29 (quoting Am. Compl. ¶ 53).  But Vice Chair Kobach's interview, referred to in the Amended Complaint, said nothing about investigating individual voters.  Gary Moore, *Tucker Carlson: Kris Kobach – Trump Executive Order Creates Voter Fraud Comm'n* (May 11, 2017), https://www.youtube.com/watch?v=Fm0MjHmYSJU (last visited Dec. 15, 2017) (cited in Am. Compl. ¶ 53 n.24).  Moreover, the plaintiffs do not allege that the Commission is actually utilizing federal government databases, much less that it is investigating or taking action against individual

voters.  Plaintiffs' effort to convert speculation about what the Commission could do into facts showing what it is doing cannot surmount the plausibility standard required to defeat a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Plaintiffs' other allegations fail for similar reasons.  They say that the Commission "intends to run the voting data it receives on individuals through a number of different databases to check for alleged fraudulent voter registrations."  Opp'n at 29 (quoting Am. Compl. ¶ 54).  But intent does not mean that the Commission will actually do so, nor does the Amended Complaint say anything in this section about whether the Commission even intends to look at individual registrants, as opposed to drawing population-level conclusions.  Plaintiffs also allege that "Kobach has written that 'every investigation' the Commission undertakes will require individuals' state voter roll data' so the Commission can 'use data it collects from the states to 'confirm' the identity of individual American voters alleged to have committed fraud.'"  Opp'n at 29 (quoted Am. Compl. ¶ 55).  This claim relies on – and misquotes – an article written by Vice Chair Kobach.  In that article, he said that, "[f]or example, if a witness testifies before the Commission that a certain person voted fraudulently in a given state, the Commission needs to confirm that such a person even exists on the voter rolls and actually cast a ballot in the relevant election."  Kris W. Kobach, *Why States Need to Assist the Presidential Comm'n on Election Integrity*, Breitbart (July 3, 2017), http://www.breitbart.com/big-government/2017/07/03/kobach-why-states-need-to-assist-the-presidential-commission-on-election-integrity/ (last visited Dec. 13, 2017) (quoted in Am. Compl. ¶ 55 n.27).  The article describes a future hypothetical, and indeed, there are no allegations that any witnesses have testified that a specific person voted fraudulently, much less that the Commission is taking steps to determine whether that person voted fraudulently.

Plaintiffs also state that Commission members have described the Commission's mandate as determining the "accura[cy] of voter rolls," Opp'n at 29 (citing Am. Compl. ¶ 70), but that has nothing to do with purported investigations of individual voters.   They also say in their opposition that Commission members have "discussed 'referrals of individuals suspected of voter fraud to the DOJ for possible criminal prosecution.'"   Opp'n at 29 (quoting Am. Compl. ¶ 72).   What the Amended Complaint actually says is that, "one Commission member questioned whether agencies of the federal government and the federal judiciary were forwarding data they collect to DOJ for criminal prosecution."   Am. Compl. ¶ 72.   In other words, plaintiffs allege that Commission members discussed whether *other* entities made criminal prosecution referrals; not whether the Commission itself could (or would) make referrals.

Plaintiffs next discuss the evidence that the Commission has purportedly collected or evidence that has been presented to it.   They state that Vice Chair Kobach has "instructed Commission staff to 'start trying to collect'" federal government data.   Opp'n at 29 (quoting Am. Compl. ¶ 73).   But the fact that the Commission staff has been instructed to "try" to collect federal government data says nothing about whether they have collected such information or whether the Commission has used such information to investigate individuals.    Nor does the fact that the Commission "has received multiple forms of evidence," including evidence of individual cases of voter fraud, Opp'n at 29-30, mean that the Commission itself has actually investigated those cases, much less taken action.

Three final allegations in the opposition are worthy of special treatment.   First, plaintiffs assert that there are "'8,471 cases of likely duplicate voting [to] be investigated for possible wrongdoing' by the Commission."   Opp'n at 30 (quoting Am. Compl. ¶ 97).   ).   But as the Amended Complaint makes clear, the reference to 8,471 cases of alleged duplicate voting refers

to report presented to the Commission at its September 12, 2017, meeting; the report did not recommend that the *Commission* investigate those cases. *See* Gov't Accountability Inst., America the Vulnerable: The Problem of Duplicate Voting (2017), https://www.whitehouse.gov/ sites/whitehouse.gov/files/docs/pacei-govt-accountability-institute-problem-duplicate-voting.pdf. Plaintiffs also contend that the Commission has received "information about individuals . . . contained in DHS's system of records." Opp'n at 29 (quoting Am. Compl. ¶ 125). But paragraph 125 of the Amended Complaint provides no facts to support the claim that DHS has transferred such information to the Commission; rather, the paragraph merely speculates that DHS "will" transfer such information to the Commission. Am. Compl. ¶ 125. This conclusory allegation does not state a claim. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to rise a right to relieve above the speculative level."). Plaintiffs conclude by asserting that they "allege facts about the initial results of the Commission's investigation." Opp'n at 30 (quoting Am. Compl. ¶ 56). But paragraph 56 of the Amended Complaint refers to a *Breitbart* article written by Vice Chair Kobach, which refers to a study conducted by the New Hampshire Departments of State and Safety. *See* Am. Compl. ¶ 56; MTD at 39-40. Neither that study, nor Vice Chair Kobach's article, identified any specific individual voters, much less any action taken by the Commission against individual voters.

In short, plaintiffs have alleged facts showing that the Commission is conducting a study of voter fraud, and that it has been presented with evidence at its September 12, 2017, meeting about the existence of voter fraud. But plaintiffs have not alleged facts showing that the Commission itself is investigating individual voters, much less that it has (or could) take action against them. Research activities undertaken in conjunction with the Commission's direction to study election integrity do not constitute the exercise of substantial independent authority

sufficient to render a presidential entity an agency for purposes of the Privacy Act.  *See Meyer*, 981 F.2d at 1294 (Presidential Task Force, which researched federal regulations, was not an agency because there was no evidence that it "directed anyone . . . to do anything.").

          **2.**      **Plaintiffs' claim that the Commission is conducting "evaluation plus advice" is not enough to surmount the agency bar**

As discussed above, plaintiffs have not pled facts showing that the Commission is conducting an investigation into individual voters.  In an effort to surmount this weakness, plaintiffs rely on *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, 917 F.2d 581 (D.C. Cir. 1990), for the proposition that an entity that conducts "investigation[s]" or offers "evaluation plus advice" is an agency.  Opp'n at 30-32.  But this argument misconstrues *Energy Research Foundation* to create a test that cannot be reconciled with this Circuit's precedent.  In *Energy Research Foundation*, the D.C. Circuit evaluated whether the Defense Nuclear Facilities Safety Board was an "agency."  It concluded that it was an agency, in part because the Board "has at its disposal the full panoply of investigative powers commonly held by other agencies of government," 917 F.2d at 584, including the power to "conduct hearings, compel testimony, require the production of documents . . . and to require the Secretary [of Energy] to report to it classified information and other information protected from disclosure," *id.* at 582. While the Commission has the power to research topics related to voter registration and voting processes, there is no indication that it has, or has attempted to assert, any of these type of formal investigative powers, and therefore *Energy Research Foundation* is inapposite.

Further, this Circuit's precedent makes clear that "evaluation plus advice" is not the test to be applied for determining whether an entity within the Executive Office of the President, such as the Commission, is an agency. Opp'n at 30.  In *Meyer v. Bush*, for example, the D.C. Circuit concluded that President Reagan's Task Force on Regulatory Relief," which was instructed to

"review pending regulations, study past regulations with an eye towards revising them and recommend appropriate legislative remedies," 981 F.2d at 1289-90, was not an agency because it lacked the power to direct others "to do anything," *id.* at 1294.   But were the dispositive test "evaluation plus advice" – both of which the Task Force unquestionably did – *Meyer* would have come out differently.   The Commission, which shares a similar role in researching and recommending, but not compelling action, is similarly situated.[2]

### B.       The Privacy Act Precludes the Injunctive Relief Plaintiffs Seek

As set forth in defendants' opening brief, *see* MTD at 24-28, the Privacy Act is a "comprehensive remedial scheme" to regulate, *inter alia*, the management and dissemination of private information about individuals.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).   It authorizes injunctive relief only in two circumstances: to compel an agency to amend or alter an individual's record or to require an agency to allow an individual access to her records.   5 U.S.C. §§ 552a(g)(1), (g)(2)(A), and (g)(3)(A).   "The [Privacy] Act's subsection on civil remedies authorizes entry of injunctive relief in only [those] two specific situations.   In so doing, as we have held, the Act precludes other forms of declaratory and injunctive relief."  *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); *see also, e.g.*, *Cell Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1161-62 (9th Cir. 1978); *Edison v. Dep't of the Army*, 672 F.2d 840, 846-47 (11th Cir. 1982).

---

[2] *Energy Research Foundation* referred to the D.C. Circuit's holding in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), that the Office of Science and Technology is an agency for its "evaluation plus advice" premise.  *Energy Research Found.*, 917 F.2d at 584-85.  But the Office of Science and Technology had an explicit, congressionally conferred "independent function of evaluating federal programs," which the Commission lacks.  *See Rushforth v. Council on Econ. Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985).

Contrary to plaintiffs' claims, this Circuit's dicta in *Haase v. Sessions*, 893 F.2d 370 (D.C. Cir. 1990), does not compel a different result. There, the court stated that "[i]t is not at all clear to us that Congress intended to preclude broad equitable relief (injunctions) to prevent (e)(7) violations . . . . And in the absence of such an explicit intention, by creating a general cause of action (under (g)(1)(D)) for violations of the Privacy Act, Congress presumably intended the district court to use its inherent equitable powers – at least to remedy violations of (e)(7)." *Id.* at 374 n.6 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)) ("Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper exercise of that jurisdiction."))[3] These dicta does not control.

*Haase* relied on language from the Supreme Court's decision in *Porter v. Warner Holding Co.* that the Supreme Court and D.C. Circuit have since cabined. In *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005), the Court recognized the broad language in *Porter* that *Haase* cited, but held that this language was not to be broadly applied:

> As the Supreme Court has repeatedly observed: "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Reading *Porter* in light of this limited jurisdiction we must not take it as a license to arrogate to ourselves unlimited equitable power. We will not expand upon our equitable jurisdiction if, as here, we are restricted by the statutory language, but may only assume broad equitable powers when the statutory or Constitutional grant of power is equally broad.

*Id.* at 1197. Here, Congress has not granted broad equitable powers to the courts to enforce the Privacy Act. Rather, it expressly limited injunctive remedies to the amendment and access claims discussed above. Under the interpretative canon of *expressio unius*, "expressing one item of an associate group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, 137 S.

---

[3] *Scott v. Conley*, 937 F. Supp. 2d 60, 81-82 (D.D.C. 2013) quoted *Haase*'s language, but did not otherwise analyze the D.C. Circuit's dicta.

Ct. 929, 940 (2017) (brackets and citation omitted).   Applying that principle here, Congress's decision to list two forms of injunctive relief as specifically available to individuals would exclude other forms of injunctive relief.  *See Cell Assocs.*, 579 F.2d at 1159 ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.").

Second, since *Haase* was decided in 1990, the Supreme Court has further emphasized that the *expressio unius* principle applies when determining the availability of relief.  "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S 11, 19-20 (1979)); *see also Hinck v. United States*, 550 U.S. 501, 506 (2007) (holding that it is a "well-established principle" that "a precisely drawn, detailed statute preempts more general remedies."); *Transamerica*, 444 U.S. at 19 ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 488 (1996).  *Haase*, which did not consider this rule, should not be taken to control.

Plaintiffs' arguments to the contrary are unavailing.  They cite to several cases for the proposition that "the D.C. Circuit has recognized that damages are not the sole remedy for a Privacy Act (e)(7) claim."  Opp'n at 34.  But the cases they cite all discussed, often in cursory form, the availability of *amendment and access*-type injunctive reliefs, not general injunctive relief.  *See Smith v. Nixon*, 807 F.2d 197, 204 (D.C. Cir. 1986) (expungement); *Nagel v. U.S. Dep't of Health, Educ., & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984) (amendment and/or expungement claim); *Albright*, 631 F.2d at 921 (destruction of record claim).  Nor, in any event, do these cases engage with the clear authority from this Circuit that injunctive relief is not available

outside the limited circumstances set forth in the Privacy Act.  Moreover, while *Sussman v. United States Marshals Service*, 494 F.3d 1106 (D.C. Cir. 2007), did recognize the *Haase*'s court's "subsequent suggestion that the district court retains 'inherent equitable powers' to issue injunctions in § 552a(g)(1)(D) cases predicated on violations of § 552a(e)(7)," *id.* at 1122 n.10, the court declined to adopt that holding.  And *Sussman* reaffirmed the holding that "only monetary damages, not declaratory or injunctive relief," are available for violations, like that of section 552a(e)(7), that are "not described in § 552a(g)(1)(A)-(C).  *Id.* at 1122.

Finally, while plaintiffs make a general argument with reference to the purposes of the Privacy Act, Opp'n at 35-36, they do not explain why those purposes cannot be satisfied through the Act's monetary relief provisions – if the plaintiffs could show actual injury, a showing they have not attempted to make.  *See* MTD at 32-35.

## C.       Plaintiffs Cannot Obtain Injunctive Relief Through the APA

Plaintiffs cannot seek injunctive relief for alleged violations of the Privacy Act through the APA.  The APA does not waive the federal government's sovereign immunity – and thus does not provide a cause of action – when another statute "expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  "That provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  Rather, "[w]hen Congress has dealt in particularity with a claim and has intended a specified remedy – including its exceptions – to be exclusive, that is the end of the matter; the APA does not undo the judgment."  *Id.* at 216.

The Privacy Act is a "comprehensive remedial scheme," *Chung*, 333 F.3d at 275, which only provides for injunctive relief, and thus waives the federal government's sovereign immunity, in two specific circumstances.  "Courts are more likely to hold that a statute has expressly or

impliedly foreclosed injunctive or declaratory relief, even under the APA, when that statute waives immunity only over a specific class of cases." *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 119 (D. Conn. 2010). And as further discussed above, under the principle of *expressio unius*, among others, "a precisely drawn, detailed statute preempts more general remedies." *Hinck*, 550 U.S. at 506 (citation omitted); *see also Lake v. Rubin*, 162 F.3d 113, 116 (D.C. Cir. 1998) (Internal Revenue Code's more specific disclosure provisions preempts Privacy Act); *Cell Assocs.*, 579 F.2d at 1159 ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.").

Plaintiffs' APA claim is "simply a restatement of [their] Privacy Act claims," *Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 449 (D.D.C. 1991): they state that defendants have violated section (e)(7) of the Privacy Act, and therefore have violated the APA. The Privacy Act precludes injunctive relief under the APA, and as stated in defendants' motion to dismiss, a plaintiff cannot bring an APA claim to obtain injunctive relief for a Privacy Act violation. *See* MTD at 29-30 (collecting cases).[4] Their APA claim should thus be dismissed, in keeping with decades of case law from this Circuit.

Plaintiffs' opposition brief does not call this conclusion into question. First, they point to guidance from the Office of Management and Budget ("OMB") which states that subsection (g) of the Privacy Act "prescribes the circumstances under which an individual may seek court relief in the event that a Federal agency violates any requirement of the Privacy Act or any rule or regulation promulgated thereunder, the basis for judicial intervention, and the remedies which the

---

[4] For the reasons stated in defendants' opening brief, *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 103-04 (D.D.C. 2005), which held that it had authority under the APA to award injunctive relief to redress a violation of the Privacy Act, is an outlier and should be rejected. MTD at 30 n.4; Opp'n at 39.

18

courts may prescribe." Privacy Act Guidelines, 40 Fed. Reg. 28,948, 28,968 (July 9, 1975); Opp'n at 36-37.  This guidance also states that "[a]n individual may have grounds for action under other provisions of the law in addition to those provided in this section," including that "[a]n individual may seek judicial review under other provisions of the [APA]."  40 Fed. Reg. at 28,968.  That guidance says nothing about whether the APA provides injunctive remedies *beyond* the Privacy Act.  Moreover, the provision in section 702 of the APA that states that courts lack "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702, was added to the APA in 1976, after the OMB guidance was issued.  H.R. Rep. No 94-1656, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6121, 6122 (Sept. 22, 1976).  Such OMB guidance, in this context, is of little help

Second, plaintiffs argue that the "Supreme Court has likewise recognized . . . that the APA provides an avenue to equitable relief."  Opp'n at 37.  But this mischaracterizes what the Supreme Court has held.  The Court said that "[t]he Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA]."  *Chao*, 540 U.S. at 619 n.1.  But *Chao* was a case about *monetary* damage; the Court did not need to reach, and thus did not reach, the issue of whether equitable relief was otherwise available.  This was made clear eight years later in *FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012), where the Court noted that the Act "*possibly* . . . allow[s] for injunctive relief under the [APA],"(emphasis added), but, again, the Court did not reach the issue.  Moreover, as discussed earlier, the Court's more recent jurisprudence indicates that a detailed remedial scheme preempts alternative remedies.

Third, the D.C. Circuit's decision in *Stephens* is not to the contrary.  *See* Opp'n at 38. There, the court "concluded that Doe is entitled to declaratory relief against future [Department of Veteran's Affairs ("VA")] disclosure unauthorized by the *Veterans' Records Statute*, and having invalidated the VA's 'routine use' regulation insofar as it is inconsistent with the interpretation of *that statute* . . . we believe it is unnecessary to award Doe additional injunctive relief."  *Stephens*, 851 F.2d at 1467 (emphasis added).  The D.C. Circuit did not reach the issue of whether the Privacy Act precluded APA relief.

### D.     Common Cause, an Organization, Cannot Sue Under the Privacy Act

The Privacy Act does not provide organizations with a right of action.  *See* MTD at 31-32. Only "individuals" may bring a civil action against an agency to enforce the Privacy Act, 5 U.S.C. § 552a(g)(1), and an individual is defined narrowly as "a citizen of the United States or an alien lawfully admitted for permanent residence," *id.* § 552a(a)(2).  Organizations, therefore, cannot sue under the Privacy Act, either on their own behalf or on behalf of their members.  *See, e.g.*, *In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, No. 06-0506 (JR), 2007 WL 7621261, at *3 (D.D.C. Nov. 16, 2007) (organizations cannot sue under the Privacy Act on their own behalf or on behalf of their members); *Comm. in Solidarity with People of El Salvador (CISPES) v. Sessions*, 738 F. Supp. 544, 547 (D.D.C. 1990) ("[T]he Privacy Act does not confer standing upon organizations on their own or purporting to sue on behalf of their members.").

The cases plaintiffs cite are not to the contrary.  See Opp'n at 19 n.5.  The courts in *National Association of Letter Carriers, AFL-CIO v. U.S. Postal Service*, 604 F. Supp. 2d 665, 672 (S.D.N.Y. 2009), *Professional Dog Breeders Advisory Council v. Wolff*, No. 09-cv-258, 2009 WL 2948527, at *5 (M.D. Pa. Sept. 11, 2009), and *National Federation of Federal Employees v. Greenberg*, 789 F. Supp. 430, 433 (D.D.C. 1992), *rev'd on other grounds*, 983 F.2d 286 (D.C. Cir.

1993), did not consider whether an association had statutory standing to sue under 5 U.S.C. § 552a(g)(1).  And while plaintiffs suggest that courts certify class actions under the Privacy Act, *see* Opp'n at 19 n.5, plaintiffs have, of course, not brought a class complaint here.  Accordingly, Common Cause's Privacy Act claims must be dismissed.

## III.    PLAINTIFF KENNEDY HAS NOT STATED A CLAIM AGAINST THE DEPARTMENT OF HOMELAND SECURITY

The sole basis for a claim against the Department of Homeland Security is plaintiff Kennedy's theory that DHS might share information with the Commission in violation of section 552a(b) of the Privacy Act.  But, as stated in defendants' opening brief, *see* MTD at 35-37, while the Amended Complaint conclusorily asserts that "DHS has – or imminently will – disclose to the Commission and/or Commission staff information about individuals including Plaintiff Kennedy contained in DHS's 'system of records,'" Am. Compl. ¶ 125, the Amended Complaint alleges no facts that support such a claim.  Instead, it alleges that the Commission *sought* or is *seeking* such information, without any allegations about whether DHS will actually disclose such information.  MTD at 35-37.  Such theory that an entity will violate the law in the future is not sufficient for standing under *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983) and *Clapper*.  Moreover, the speculative allegation that a defendant has violated the law, without more, is simply a "legal conclusion" or "formulaic recitation of the elements" that is insufficient to state a claim under *Ashcroft v. Iqbal*.  556 U.S. 662, 680 (2009).

Plaintiffs do not rebut this argument.  Instead, they double-down on their claim that Vice Chair Kobach has directed Commission staff to seek out information from other government agencies, and note that the Executive Order directs executive agencies to "endeavor to cooperate with the Commission."  Opp'n at 15.  But plaintiffs' argument amounts to a claim that DHS will intentionally violate the Privacy Act, without any facts to support such a theory.  The Executive

Order does not *compel* agencies to cooperate with the Commission in violation of the law.   Rather, the Executive Order specifically states that its directives "shall be implemented consistent with applicable law."   Exec. Order 13,799.   Further, the fact that the Commission might seek information does not mean that the DHS will provide it.   That is particularly true here, as "in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties."   *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926)).   Plaintiffs put forward no facts that call that presumption into question.[5]

## IV.   PLAINTIFFS HAVE NOT STATED AN *ULTRA VIRES* CLAIM

Plaintiffs have not stated a claim that the Commission has acted *ultra vires* by requesting data from the states that, plaintiffs speculate, will be used to "engage[] in a lawless and unbounded investigation of individual voters for which there is no authorization in the Executive Order, the Constitution, or any act of Congress."   Am. Compl. ¶ 112; MTD at 37-41.

To begin, the facts pled in the Amended Complaint, taken as true, do not establish that the Commission is investigating alleged voting misconduct by individual American citizens.   *See* MTD at 38-40.   Plaintiffs do not show otherwise in their opposition; rather, they contort their own Amended Complaint to draw conclusions not supported by their actual averments.   For example, they state that the Commission has "'undertaken an . . . investigation into alleged voting

---

[5] Plaintiffs rely, for the first time, on allegations that the Commission and DHS have communicated with each other. *See* Opp'n at 4. But these communications, which were disclosed in another case, only show that the Commission and DHS have communicated; they do not show (nor is there a basis to conclude) that DHS has agreed to share information. Moreover, while plaintiffs state that defendants could submit evidence to rebut their claim, Opp'n at 15-16, this flips the burden: it is plaintiffs' obligation to state facts plausibly showing a legal violation, not defendants' responsibility to factually rebut a conclusory claim. Indeed, were it otherwise, *Lyons* and *Clapper* would have come out differently.

misconduct' . . . 'in order to crosscheck the voting data obtained from the states against other private information on individuals maintained by agencies throughout the federal government . . . in order to identify individuals the Commission believes are fraudulently registered to vote.'" Opp'n at 41-42 (quoting, first, Am. Compl. ¶ 106, and second, *id.* ¶ 106(d)).  But paragraph 106(d) of the Amended Complaint says that the Commission "intend[s] . . . to crosscheck" voting data against other data from the federal government.  Am. Compl. ¶ 106(d).  The word "intend" – which plaintiffs omit in their opposition – is critical, because it indicates that plaintiffs have not pled that defendants have *actually* carried out a purported *ultra vires* action; rather, they speculate that the Commission may do so in the future.  And that allegation is not sufficient to state a present claim of *ultra vires* injury.

Second, plaintiffs note that Commission staff has been instructed to collect data that is in the possession of the federal government that "might be helpful."  Opp'n at 42 (quoting Am. Compl. ¶ 42).  These allegations, of course, say nothing about what that data will be used for, much less whether it will, if collected, be used to investigate *individuals* (as opposed to making broader statistical conclusions).

Third, plaintiffs state that "[t]he Commission has already compiled 'materials claiming that multiple specific individuals have fraudulently registered or voted.'"  Opp'n at 42 (quoting Am. Compl. ¶ 106(g)).  But as stated earlier, these averments apparently refer to a study conducted by the New Hampshire Departments of State and Safety in September 2017, *see* MTD at 39-40; Am. Compl. ¶ 56 & n.28, or a third-party study that was presented to the Commission at its September 12, 2017, meeting which referenced "8,471 cases of likely duplicate voting," Am. Compl. ¶ 97 & n.58.  But neither of these studies identified individual voters.  Instead, they referred to aggregate cases or cases that are already in the public record – as this Court can assure itself upon review of

the materials referenced in the Amended Complaint.  *See Slate v. Public Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 287 (D.D.C 2014) (court can consider documents that were referenced in a complaint when resolving a motion to dismiss).  Moreover, this is not a case of defendants challenging the facts alleged in the complaints, as plaintiffs' claim.  Opp'n at 43.  This is a case where plaintiffs have mischaracterized the facts they rely on in their own Amended Complaint. *Iqbal*'s plausability standard does not allow plaintiffs to draw legal conclusions not supported by their own factual allegations.

In other words, plaintiffs have pled facts showing that the Commission has an interest in voter fraud, including looking at cases of alleged voter fraud.  But they have not shown that the Commission is investigating an individual, much less that it is taking any action against any individual voter.  It cannot be that researching public information constitutes an error that is "so extreme that one may view it as jurisdictional or nearly so."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  And contrary to plaintiffs' claim, *see* Opp'n at 42, this research power fits within the President's broad power to collect information and make recommendations.  *See, e.g.*, U.S. Const. art II, § 3, cl. 2 ("[The President] shall recommend to [Congress's] Considerations such Measures as he shall judge necessary and expedient."); *Judicial Watch*, 219 F. Supp. 2d 20, 50 & n.15 (D.D.C. 2002) ("Article II reflect[s] an understanding that the President will have access to information and the power to acquire it.").

Plaintiffs' other objections similarly fail.  They first argue that the Commission is "engaged in a voter fraud investigation without 'any authorization.'"  Opp'n at 42.  But as discussed above, the President has broad power to collect information and make recommendations.  Nor have plaintiffs pled facts showing the existence of such an investigation.  Next, plaintiffs state that "[d]efendants apparently conceded that [p]laintiffs have stated a plausible claim for *ultra vires*

conduct against Kobach," referring to the fact that the motion to dismiss' header referenced *ultra vires* action only by the Commission and the fact that the brief supposedly "makes only stray mention of allegations pertaining to Kobach." Opp'n at 43. Not so. Plaintiffs have brought suit against Mr. Kobach in his *official capacity* as Vice Chair of the Commission. Am. Compl. ¶ 12. As "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978), plaintiffs' claims are against the *Commission* (and so too must be their *ultra vires* claim). Moreover, defendants' opening brief extensively discussed allegations against Mr. Kobach in his capacity as Vice Chair of the Commission. *See* MTD at 38-40. Finally, plaintiffs claim that the Commission has taken actions without a vote by the Commission's members. *See* Opp'n at 43-44 (citing Am. Compl. ¶ 47). By the Commission's by-laws do not specify *when* a vote is required, *see* Presidential Advisory Commission on Election Integrity By-Laws § V(A), https://www.whitehouse.gov /sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF, nor do plaintiffs show how, even if a vote was required, the error would be so extreme as to amount to the Commission "act[ing] without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984).

## CONCLUSION

For the aforementioned reasons, and those stated in defendants' opening brief, this Court should grant defendants' motion to dismiss the Amended Complaint.

Dated:  December 15, 2017

Respectfully submitted,


CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Joseph E. Borson*
CAROL FEDERIGHI
Senior Trial Counsel
KRISTINA A. WOLFE
JOSEPH E. BORSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1944
Email: joseph.borson@usdoj.gov

*Counsel for Defendants*